UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

WILLIAM W. GILMAN and
EDWARD J. MCNENNEY, JR.,

                        Plaintiffs,

           -against-

MARSH & MCLENNAN COMPANIES, INC.;
MARSH INC.; MARSH USA INC.; MARSH
GLOBAL BROKING INC., and MICHAEL
CHERKASKY

                      Defendants.

------------------------------------------------------------x

RECEIVED

11 JUN 24 PN 6:49

U.S. DISTRICT COURT
S.D.N.Y.

Case No. 10 Civ. 8158 (PAC)
(ECF Case)

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiffs William Gilman and Edward J. McNenney, Jr., by their attorneys, Liddle & Robinson, L.L.P., allege as follows:

## THE NATURE OF THE ACTION

1.    This is a civil action for damages and remedies brought for: (1) malicious prosecution; (2) abuse of process; (3) misconduct by an attorney pursuant to Judiciary Law § 487; (4) violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq*.; (5) violations of the New York Labor Law § 193; (5) breaches of contract; (6) unjust enrichment; and (7) *quantum meruit*.

## JURISDICTION AND VENUE

2.    This Court has subject matter over this action pursuant to 28 U.S.C. § 1331; 29 U.S.C. § 1132(a); ERISA §§ 502(a)(1)(B) and 502(e); and principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.    This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k).

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## THE PARTIES

5. Plaintiff William W. Gilman ("Mr. Gilman") is an individual and a resident of New Jersey. Mr. Gilman was an employee of Defendants from 1976 until approximately November 2, 2004.

6. Plaintiff Edward J. McNenney, Jr. ("Mr. McNenney") is an individual and a resident of New York. Mr. McNenney was an employee of Defendants from 1990 until approximately October 28, 2004.

7. Defendant Marsh & McLennan Companies, Inc. is a Delaware corporation with its principal place of business in New York, New York.

8. Defendant Marsh Inc. is a Delaware corporation with its principal place of business in New York, New York.

9. Defendant Marsh (USA), Inc. is a Delaware corporation with its principal place of business in New York, New York.

10. Defendant Marsh Global Broking Inc. is an Illinois corporation with its principal place of business in New York, New York. Marsh & McLennan Companies, Marsh, Inc., Marsh (USA), Inc., and Marsh Global Broking Inc. are collectively referred to herein as "Marsh" or the "Marsh Defendants."

11. Defendant Michael Cherkasky ("Mr. Cherkasky") is an individual and is a resident of New York. Mr. Cherkasky served as President and Chief Executive Officer of Marsh & McLennan Companies, Inc., from October 25, 2004 to January 2008. Mr. Cherkasky is an attorney licensed in the State of New York.

12. Messrs. Gilman and McNenney were "participants" in a severance plan of Marsh (the "Severance Plan"), within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

13. Messrs. Gilman and McNenney were also participants in Marsh's Employee Incentive and Stock Award Plan (the "Stock Award Plan").

14. The Severance Plan is, and at all times relevant hereto was, an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), an "employee welfare benefit plan" within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), and an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, the Severance Plan is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified case or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

## THE FACTS

## I. CONTINGENT COMMISSIONS

### A. Contingent Commissions Have Been Used In The Insurance Industry For Decades

15. Contingent commissions are fees paid by insurers to insurance brokers who place insurance business with the insurer. They are typically paid in addition to the regular commissions that insurance brokers charge the insurer when the broker matches the insurer with a corporation that needs insurance coverage.

16. The practice of charging contingent commissions has been around since the 1960s. Around that time, insurers began offering agents (brokers) contingent commissions of about 5 to 10 percent of insurance premiums if the agents could meet certain volume and profitability goals with the particular insurer.

17.     Over time, the practice of contingent commissions became widespread.  As the practice evolved, insurers paid insurance brokers contingent commissions for the entire book of business placed by the broker with the insurer.  The book of business would typically encompass numerous customers.  In that way, the payment of contingent commissions was not tied to any particular customer's business.

18.     As of the beginning of 2005, contingent commissions among the 100 biggest insurance brokers operating in the United States averaged approximately 7 percent of annual gross revenues earned by these brokers, and in some cases comprised as much as 12 percent of annual gross revenues.   According to the New York Times, by one analyst's estimate, "contingent commissions . . . can total more than 30 percent of a broker's net income." Gretchen Morgenson, *Hat Trick: A 3rd Unit Of Marsh Under Fire*, N.Y. TIMES, May 2, 2004.

19.     Not only were contingent commissions widely used, they were considered entirely appropriate within the industry.   In fact, in April 2004, the Risk and Insurance Management Society, the trade association representing the interests of commercial customers, examined contingent commission arrangements and concluded that they "are endemic to the manufacturer/distributor relationship, and there is nothing inherently wrong with them."  Roger Wade, *A Brief History of Contingent Commission Agreements*, INSURANCE JOURNAL, Feb. 7, 2005.

**B.     Marsh Has Always Approved The Use Of Contingent Commissions**

20.     Consistent with industry practice, Marsh has earned contingent commissions from insurers for several decades.   Around the time the New York Attorney General began its investigation, Marsh was "among the largest recipients of these fees in the country, if not the largest."  Gretchen Morgenson, *Hat Trick: A 3rd Unit Of Marsh Under Fire*, N.Y. TIMES, May 2,

2004. According to the New York Times, "Dowling & Partners, a research firm in Farmington, Conn., specializing in insurance companies, has estimated the amount of revenue Marsh generated from contingency fees. The firm said that last year, Marsh's contingency fee revenues could have totaled $700 million; after taxes, the fees could have generated $450 million, or *30 percent of the insurance unit's earnings*." *Id.* (emphasis added).

21.     Not surprisingly, at no time during Messrs. Gilman and McNenney's employment with Marsh did anyone question the propriety of obtaining contingent commissions from customers.  In fact, in late April 2004, when the New York Attorney General began investigating contingent commissions, Jeffrey W. Greenberg, then the chairman and chief executive officer ("CEO") of Marsh, sent a memorandum to his staff defending contingent commission agreements, calling them a "long-standing, common industry practice."  Gretchen Morgenson, *Hat Trick: A 3rd Unit Of Marsh Under Fire*, N.Y. TIMES, May 2, 2004.  This statement merely echoed the defense of the practice presented by other insurance brokers.  As the New York Times further reported, "A spokesman for Aon provided a statement saying that the agreements are an age-old and common practice. 'Aon discloses such arrangements in fee agreements with clients, invoices to clients, and its Web site,' the company said." *Id.*

22.     Importantly, Marsh's clients were aware of the practice of contingent commissions and continued to utilize Marsh.

23.     Contingent commissions continue to be used today.  In February 2010, the attorneys general of New York, Illinois and Connecticut and the insurance departments of New York and Illinois agreed to terms that specifically allowed Marsh, as well as insurance brokers Aon Corp. and Willis Group Holdings, to collect contingent commissions, in return for greater transparency on agent and broker compensation.

## II. UNTIL THEIR TERMINATIONS BY MARSH, MESSRS GILMAN AND MCNENNEY WERE LONG-TIME AND EXEMPLARY EMPLOYEES

24.     Mr. Gilman has worked in the insurance industry for over 35 years. He started working for Defendants in August 1976.

25.     Mr. McNenney has worked in the insurance industry for over 15 years. He started working for Defendants in 1990.

26.     Messrs. Gilman and McNenney were productive and effective employees for Defendants. At all relevant times, they worked out of Defendants' New York, New York offices.

27.     Both Messrs. Gilman and McNenney were repeatedly promoted. Defendants promoted Mr. Gilman to Assistant Vice President in 1979, Vice President in 1981, Senior Vice President in approximately 1984, and Managing Director in 1988. Defendants promoted Mr. McNenney to Vice President in 1992, Senior Vice President in 1994, and Managing Director in 1997.

28.     In 2001, Mr. Gilman was recognized for his 25 years of service by his supervisor. The letter from his supervisor stated, in part, "there's no doubt you have been and will be one of the best brokers in Marsh."

## III. THE NEW YORK ATTORNEY GENERAL COMMENCES AN INVESTIGATION INTO MARSH'S CONTINGENT COMMISSIONS PRACTICES

29.     In approximately May 2004, then-New York Attorney General Eliot Spitzer ("Mr. Spitzer") announced an investigation into Marsh's use of contingent commissions. The New York Attorney General alleged that these activities were illegal.

30. During the time of the New York Attorney General's investigation, Marsh began an internal investigation of their own practice of contingent commissions.

31. In approximately June 2004, Marsh requested an interview with Mr. Gilman as part of their internal investigation. Mr. Gilman voluntarily submitted to an interview when requested.

32. In approximately September 2004, Marsh requested an interview with Mr. McNenney as part of their internal investigation. Mr. McNenney voluntarily submitted to an interview when requested.

33. Messrs. Gilman and McNenney fully cooperated with the investigation. They had not engaged in any improper conduct – much less anything that was unlawful. In addition, all of their activities had been for the benefit of, and expressly approved by, Marsh.

## IV. TO AVOID CRIMINAL PROSECUTION, MARSH AND ITS CEO, MICHAEL CHERKASKY, COLLUDE WITH THE NEW YORK ATTORNEY GENERAL TO MAKE SCAPEGOATS OF, AND TO CRIMINALLY PROSECUTE, MESSRS. GILMAN AND MCNENNEY

34. As set forth above, Messrs. Gilman and McNenney did not engage in any improper or unlawful conduct while employed by Marsh. Furthermore, Marsh knew Messrs. Gilman and McNenney had not done anything wrong because they were following the practices expressly approved and implemented by Marsh. Despite their knowledge that Messrs. Gilman and McNenney had done nothing wrong, Marsh assisted and colluded with the New York Attorney General in investigating and prosecuting Messrs. Gilman and McNenney and, in fact, encouraged the New York Attorney General to do the same.

35. Pursuant to the collusion, Marsh offered up Messrs. Gilman and McNenney as targets for criminal prosecution in return for a lenient settlement between Marsh and the New

York Attorney General. Specifically, in return for offering up Messrs. Gilman and McNenney, the New York Attorney General agreed not to criminally prosecute Marsh itself, but instead would target Messrs. Gilman and McNenney for prosecution. The collusion included Marsh designating other individuals as safe from prosecution by the New York Attorney General. In this manner, Marsh was able to deflect publicity from itself, protect certain senior Marsh executives, and proclaim that the misconduct alleged by the New York Attorney General was limited to, and the work of, a few "bad actors."

36.     As the trial court presiding over the criminal trials of Messrs. Gilman and McNenney stated, "[c]orporations which settled their civil cases entered into cooperation agreements with [the New York Attorney General], facilitating [the New York Attorney General's] access to materials." *People of the State of New York v. Gilman*, Case No. 4800-2009, 28 Misc.3d 1217(A), 2010 N.Y. Slip Op. 51379(U), at *7 (N.Y. Cty. Sup. Ct. July 2, 2010). "Thus, [the New York Attorney General] made certain that it had free access to information from Marsh and the carriers, but controlled defense access to the same information." *Id.* at 8.

37.     The New York Attorney General participated in the collusion because Mr. Spitzer, who at the time was seeking the Democratic nomination for Governor in 2006, desired to achieve a large public civil settlement with Marsh, which he could then trumpet in the press. To further bolster his crime fighting credentials, the New York Attorney General sought to obtain some successful criminal prosecutions of individuals, even if the evidence did not justify such prosecutions. Marsh agreed to provide the New York Attorney General with assistance in achieving this objective and targeted Messrs. Gilman and McNenney as high-ranking employees for prosecution.

38.     In a conversation with the New York Attorney General's office in February 2005, in response to an offer from Mr. Gilman's counsel that Mr. Gilman would submit to an interview about contingent commissions since there was nothing improper about them, the assistant attorney general responded, in sum and substance, "if we can't prosecute him under a theory based on contingent commissions, then we'll just prosecute him under something else."

39.     Furthermore, as set forth below, the New York Attorney General used the negotiation of the settlement as an opportunity to install his close friend, Mr. Cherkasky, as the CEO of Marsh.  Not only did this allow the New York Attorney General to financially reward his close friend, Mr. Cherkasky, it also guaranteed the Marsh's cooperation with the New York Attorney General in prosecuting Marsh's employees.

**C.      Marsh Moves To Appoint The New York Attorney General's Close Friend, Mr. Cherkasky, As CEO**

40.     On October 14, 2004, as New York Attorney General, Mr. Spitzer publicly announced he was filing a civil complaint against Marsh & McLennan Companies, Inc. and Marsh, Inc. in connection with the use of contingent commissions (the "Marsh Complaint").  The Marsh Complaint alleged civil causes of action against Marsh for purportedly fraudulent business practices, antitrust violations, securities fraud, unjust enrichment, and common law fraud.

41.     Upon information and belief, Marsh and Mr. Spitzer meet soon after the Marsh Complaint was filed.  At the meeting, Mr. Spitzer indicated that he would not discuss settling the matter with the then-CEO, Jeff Greenberg.  Instead, he indicated that he would discuss the matter with Mr. Cherkasky who, at the time, was transitioning from CEO of Kroll, Inc. to Marsh, Inc., both subsidiaries of Marsh.

42.     Mr. Cherkasky and Mr. Spitzer are close friends.  As the New York Times reported on February 1, 2005, "Mr. Spitzer and Mr. Cherkasky have been friends since they worked together years ago [in the 1990s] in the Manhattan district attorney's office, when Mr. Cherkasky was Mr. Spitzer's boss."  Joseph B. Treaster, *Insurance Broker Settles Spizter Suit for $850 million*, N.Y. TIMES February 1, 2005.  In addition, Mr. Cherkasky was a political supporter of Mr. Spitzer and had contributed to Mr. Spitzer's campaigns.

43.     As expected, Marsh followed Mr. Spitzer's directive.  On October 25, 2004, at an emergency meeting of Marsh's Board of Directors, the Board accepted the resignation of Mr. Greenberg and appointed Mr. Cherkasky as his replacement.  Subsequently, Mr. Cherkasky and Marsh entered into an employment contract that guaranteed Mr. Cherkasky significant compensation for a number of years.  As CEO, Mr. Cherkasky's compensation, pursuant to a three-year contract, was as much as $9,000,000 per year and he received $7,000,000 in stock as "retention" compensation. [1]  In contrast, as disclosed in Marsh's From 8-K, dated October 28, 2004, Mr. Cherkasky's prior annual compensation at Marsh was between $1,500,000 and $1,950,000.

44.     As the New York Attorney General himself indicated in a press release, the appointment of Mr. Cherkasky as CEO was an important step towards a comprehensive deal between Marsh and the New York Attorney General under which Marsh would not be prosecuted in return for its cooperation in targeting high-level individuals.  The press release by

---

[1]     Under Mr. Cherkasky's employment agreement with Marsh (the "Cherkasky Agreement"), for his work as CEO, "Mr. Cherkasky [wa]s entitled to an annual base salary of at least $1,000,000 (retroactive to October 14, 2004), and [wa]s eligible for an annual bonus opportunity with a range of 150% to 300% of annual base salary (minimum $2.5 million for 2005). Mr. Cherkasky . . . participate[d] in M[arsh]'s long-term incentive compensation plans, receiving a mix of long-term equity incentive compensation awards with a combined annual target value of $5 million.  The [Cherkasky] Agreement provide[d] for a retention award comprised of 3-year restricted stock with a grant-date value of $3.75 million and performance-based stock options with a grant-date value of $3.75 million." Marsh Form 8-K dated July 25, 2005.

Mr. Spitzer, issued on the same day as the news that Marsh had replaced Mr. Greenberg with Mr. Cherkasy as CEO of Marsh, stated:

> The actions announced today by the Board of Directors of Marsh & McLennan Companies permits Marsh and [the New York Attorney General's] office to move forward toward a civil resolution of our lawsuit.
>
> ***We are persuaded that the goals that would have been advanced by a criminal prosecution of the corporation – punishment, restitution, general deterrence, and industry reform – will be better accomplished by criminal prosecution of individuals.*** . . .
>
> Realizing these goals, while also allowing Marsh & McLennan to retain a viable role in the marketplace, makes corporate criminal prosecution unnecessary.

Press Release, New York Attorney General, Statement by Attorney General Eliot Spitzer Regarding the Marsh & McLennan Companies (Oct. 25, 2005) (emphasis added).

### D.     Under Mr. Cherkasky, Marsh Targets Messrs. Gilman and McNenney

45.     Once in charge of Marsh, Mr. Cherkasky acted quickly to give effect to the collusion with the New York Attorney General and create public targets for the New York Attorney General's "criminal prosecution of individuals," including Messrs. Gilman and McNenney, even though Marsh knew that these individuals had not committed any wrongdoing.

46.     In fact, Marsh had already begun targeting Messrs. Gilman and McNenney soon after the Marsh Complaint was filed on October 14, 2004.

47.     Within one week of the filing of the Marsh Complaint, Mr. McNenney's supervisor informed Mr. McNenney that he was going to be forced to take a leave of absence from the firm. The firm did, in fact, impose a leave of absence on Mr. McNenney.

48.     As discussed above, Mr. McNenney did consent to an interview with Marsh's internal investigation in approximately September 2004. Mr. McNenney attended without counsel and fully cooperated at the interview.

49.     In approximately late October 2004, Marsh requested another interview with Mr. McNenney as part of their internal investigation. Marsh specifically asked that Mr. McNenney appear for the interview without an attorney. Mr. McNenney declined to do so.

50.     On or about October 28, 2004, Marsh informed Mr. McNenney that his employment was terminated. The reason provided by Marsh to the New York State Unemployment Board for the termination of Mr. McNenney's employment was that Mr. McNenney was not willing to give up his civil rights.

51.     Mr. Gilman was similarly targeted. Mr. Gilman took a previously-scheduled vacation two days after the Marsh Complaint was announced.

52.     On the second work day of his vacation, October 19, 2004, Mr. Gilman read in the Wall Street Journal that he had been suspended from Marsh. This was the first time Mr. Gilman learned that he was suspended – no one from Marsh informed Mr. Gilman or his counsel.

53.     In addition, Marsh suspended and ultimately fired Mr. Gilman's daughter. Mr. Gilman's daughter did not work for Mr. Gilman and had no involvement with Marsh's contingent commission practices.

54.     On or about November 1, 2004, Mr. Gilman, who was eligible to retire, informed Marsh that he was retiring and completed the necessary paperwork to do so.

55.     On or about November 2, 2004, a representative of Defendants called Mr. Gilman's counsel and informed him that Marsh was not going to accept Mr. Gilman's retirement and, instead, Marsh terminated his employment.

56.     Upon information and belief, soon thereafter, investigators for Mr. Spitzer then began "tailing" Mr. Gilman and his family 24 hours a day.  It was only after Mr. Gilman's counsel called the New York Attorney General's office to complain about the investigators that the "tail" was stopped.

57.     Messrs. Gilman and McNenney were not terminated for cause.  Defendants did not have cause to terminate Messrs. Gilman and McNenney.  They had done nothing wrong.

58.     At the same time that Marsh was taking steps to target Messrs. Gilman and McNenney internally, Marsh began a public campaign in the media to portray these individuals as "bad actors" who were not representative of the rest of the Company.  In an interview with Bloomberg the day after becoming CEO, Mr. Cherkasky stated that "bid-rigging appears to have been confined to William Gilman, a managing director at Marsh Global Broking, and his group. Gilman and three of his subordinates have been suspended along with one other employee, he said, declining to identify them."  David Plumb & Helen Stock, *Marsh's New Chief Forms Compliance Unit; Shares Rise (Update12)*, BLOOMBERG, Oct. 26, 2004.

59.     Similarly, on November 5, 2004, the New York Times published an article reporting that "Darren Dopp, a spokesman for Mr. Spitzer, said that Michael G. Cherkasky, the new chief executive at Marsh, . . . told the attorney general that they were planning to dismiss some employees as a part of their efforts to correct abuses outlined in Mr. Spitzer's Complaint against Marsh."  Joseph B. Treaster, *Ace Dismisses 2 executives in Response to Inquiry*, N.Y. TIMES, Nov. 5, 2004.

60.     These statements by Marsh and Mr. Cherkasky underscore the willingness of Marsh to issue misstatements of facts in order to curry favor with the New York Attorney General and to discredit Messrs. Gilman and McNenney even though Marsh knew these individuals had not done anything wrong.  For example, Mr. Cherkasky's comments in his interview with Bloomberg were false in several respects.  First, Mr. Gilman did not have a "group" – no one reported to Mr. Gilman at all while he was an employee of Marsh since the 1990s.  Second, as Marsh was well aware, the "contingent commission" process did not, and does not, constitute bid-rigging.  Third, one of Mr. Gilman's alleged "subordinates" to whom Mr. Cherkasky referred was Mr. Gilman's daughter who was 26 years old at the time and, despite not reporting to Mr. Gilman and having no role with respect to contingent commissions, was also suspended by Marsh without any justification.

**E.     Marsh Enters Into A Civil Settlement With The New York Attorney General And Avoids Criminal Prosecution**

61.     On January 30, 2005, Marsh, Mr. Cherkasky and Mr. Spitzer entered into an agreement to resolve the Marsh Complaint (the "Settlement Agreement").  The Settlement Agreement required Marsh to pay $850 million into a fund over a period of four years in four annual payments, which would then be disbursed to Marsh's policyholder clients.  Under the Settlement Agreement, Marsh also agreed to implement certain changes to its business practices and to "fully and promptly cooperate with the Attorney General with regard to his Investigation, and related proceedings and actions, of any other person, corporation or entity, including but not limited to Marsh's current and former employees, concerning the insurance industry."  Upon information and belief, this "cooperation," in fact, consisted of Marsh, Mr. Spitzer and Mr. Cherkasky identifying and prosecuting Messrs. Gilman and McNenney falsely and without a legitimate basis.

62.     Furthermore, as part of the Settlement Agreement, Marsh was required to publicly distance itself from the very business practices, such as contingent commissions, that it had

endorsed for so long, and to publicly denounce its employees for having engaged in those business practices. In an exhibit to the Settlement Agreement, Marsh issued the following written statement of apology:

> Marsh Inc. would like to take this opportunity to apologize for the conduct that led to the actions filed by the New York state attorney general and superintendent of insurance. The recent admissions by former employees of Marsh and other companies have made clear that certain Marsh employees unlawfully deceived their customers. Such conduct was shameful, at odds with Marsh's stated policies and contrary to the values of Marsh's tens of thousands of other employees.
>
> In response, we have taken prompt, corrective action and implemented a series of business and corporate governance reforms. The employees of Marsh Inc. ask our clients and others to allow us the opportunity to regain their trust.

63.     As the New York Times reported at the time of the announcement of the settlement, "Mr. Spitzer said that a written apology was included in the [Settlement] [A]greement, *noting that 'certain Marsh employees unlawfully deceived their customers' had been a 'precondition for a settlement.'*" Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 million*, February 1, 2005 (emphasis added).

64.     In a press release issued concurrently with the announcement of the settlement with the New York Attorney General, Mr. Cherkasky further stated: "We deeply regret that certain of our people failed to live up to our history of dedicated client service. The acts of these employees were inconsistent with the integrity and ethics on which this company was founded . . . ." Press Release, Marsh & McLennan Companies, MMC Reaches Settlement Agreement with New York State Attorney General and Superintendent of New York State Insurance Department (Jan. 31, 2005).

65.     As Marsh was well aware, Messrs. Gilman and McNenney had not engaged in any wrongdoing, much less any crimes. However, Mr. Cherkasky was intent on having someone prosecuted, despite Marsh having accepted and approved all of the activities at issue.

66.     A number of commentators called into question how Marsh could possibly distance itself from some of the conduct that was alleged in the Marsh Complaint.  For example, the New York Times quoted Mark Geistfeld, a New York University professor who taught insurance law, as follows: "The issue is going to be whether they are vicariously liable for the misconduct of their employees . . . .  The company's argument would be weakened by the fact that *the misconduct benefited Marsh and not the individual employees.*"  Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 million*, N.Y. TIMES, February 1, 2005 (emphasis added).  These comments applied especially to Marsh's practice of obtaining contingent commissions.

67.     As far as the New York Attorney General was concerned, however, the settlement with Marsh achieved one of Mr. Spitzer's main objectives – to announce a marquee settlement with a big corporate defendant.  In fact, the Marsh settlement was the largest obtained by Mr. Spitzer up to that date.  According to the New York Times:

> Mr. Spitzer, who is seeking the Democratic nomination for governor in 2006, said the $850 million was the largest settlement with one company since he began investigating corporate wrongdoing three years ago. He has negotiated billions of dollars in penalties and restitution from banks and mutual funds for cheating customers. The largest single payment until now had been $300 million paid by Citigroup, whose analysts were accused of providing misleading advice on stocks

Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 million*, N.Y. TIMES, February 1, 2005.

## V.     WITH THE ASSISTANCE OF MARSH, AS WELL AS THE IDENTIFICATION OF WHOM TO TARGET, THE NEW YORK ATTORNEY GENERAL COMMENCES THE MALICIOUS PROSECUTION OF MESSRS. GILMAN AND MCNENNEY

68.     On or about September 15, 2005, the New York Attorney General's office announced an indictment against Messrs. Gilman and McNenney and others.  The indictment charged Messrs. Gilman and McNenney with 37 counts: one count of Scheme to Defraud in the

First Degree, N.Y. Penal Law § 190.65(1)(b); one count of Restraint of Trade & Competition, N.Y. Gen. Bus. Law §§ 340 & 341; four counts of Grand Larceny in the First Degree, N.Y. Penal Law § 155.42; thirty counts of Grand Larceny in the Second Degree, N.Y. Penal Law § 155.40(1); and one count of Grand Larceny in the Third Degree, N.Y. Penal Law § 155.35 (the "Gilman and McNenney Indictment"). The Gilman and McNenney Indictment was baseless.

69.     As described above, from the outset, the prosecution of Messrs. Gilman and McNenney was the product of the collusion between Marsh, Mr. Cherkasky, and the New York Attorney General and, thus, commenced in bad faith. For example, Joan Schneider, an executive at Marsh, was prominently described and quoted in the Marsh Complaint. Despite this, Ms. Schneider was never charged with any criminal acts. In addition, the Marsh Complaint discussed extensively the reliance on contingent commissions by the Global Broking Middle Market division of Marsh ("Middle Market"). Messrs. Gilman and McNenney were not, however, employed by the Middle Market division and no one from the Middle Market division was prosecuted by the New York Attorney General. Furthermore, Mr. McNenney was not mentioned in the Marsh Complaint and Mr. Gilman was only mentioned in a few instances. Yet, due to the collusion of Marsh, Mr. Cherkasky, and Mr. Spitzer, Messrs. Gilman and McNenney became the primary focus of the New York Attorney General's investigation.

70.     After an 11-month bench trial, Messrs. Gilman and McNenney were acquitted of all but one of the charges brought against them.[2] On February 20, 2008, Plaintiffs were convicted of one count of Restraint of Trade & Competition. However, on July 2, 2010, based on evidence not disclosed by the prosecutor, the trial judge vacated his own conviction finding *"the newly discovered contradictory evidence, undermines the Court's confidence in the*

---

[2]     Thirteen counts of Grand Larceny from the indictment were dismissed against both Plaintiffs prior to trial.

*verdict.*" *People of the State of New York v. Gilman*, Case No. 4800-2009, 28 Misc.3d 1217(A),

2010 N.Y. Slip Op. 51379(U), at 25 (N.Y. Cty. Sup. Ct. July 2, 2010) (emphasis added). The

Court indicated "the verdict here rested firmly upon the testimony of [six witnesses], and yet,

each one of them, after testifying with very favorable cooperation agreements, has, at times

before, during or shortly after trial, given sworn testimony discrediting, even contradicting, their

trial testimony." *Id.* at 25. "[T]aken as a whole, the evidence raises not only a possibility, but a

*probability* that its disclosure would have produced a different result." *Id.* at 24 (emphasis

added).

71.     On January 13, 2011, the New York Attorney General's office, then led by

Attorney General Eric Schneiderman, dismissed the remaining charge against Messrs. Gilman

and McNenney. All criminal charges brought against Messrs. Gilman and McNenney were

resolved in their favor.

## VI.    THE SEVERANCE AND STOCK AWARD PLANS

72.     During the time that Marsh employed Messrs. Gilman and McNenney, Marsh

engaged in a practice of providing their employees with a severance payment if Marsh

terminated their employment.

73.     Upon information and belief, the severance payment paid to terminated

employees was the equivalent of two weeks of salary for each year of employment with Marsh,

plus a special payment equal to a portion of the employee's bonus from the prior year.

74.     Messrs. Gilman and McNenney, as salaried employees of Marsh who were

terminated, are eligible participants in the Severance Plan.

75. Marsh did not provide Messrs. Gilman and McNenney with a severance payment pursuant to the Severance Plan.

76. Marsh never provided notice to Messrs. Gilman and McNenney that they were entitled to severance payments.

77. After their employment with Marsh ended, Messrs. Gilman and McNenney were two of several employees indicted by the New York Attorney General for alleged involvement in bid-rigging. Messrs. Gilman and McNenney were, and are, innocent of the charges brought against them by the New York Attorney General's office.

78. Marsh terminated the employment of several employees during the internal investigation of alleged bid rigging by the New York Attorney General. Upon information and belief, other employees terminated by Marsh as a result of these investigations received severance payments pursuant to Marsh' Severance Plan.

79. Messrs. Gilman and McNenney were also participants in Marsh' Stock Award Plan.

80. On March 1, 2004, pursuant to the Stock Award Plan, Marsh awarded Mr. Gilman 3,322 restricted shares of Stock Bonus Units.

81. On February 28, 2003, pursuant to the Stock Award Plan, Marsh awarded Mr. Gilman 3,870 restricted shares of Stock Bonus Units.

82. On March 1, 2004, pursuant to the Stock Award Plan, Marsh awarded Mr. McNenney 3,530 restricted shares of Stock Bonus Units.

83. On February 28, 2003, pursuant to the Stock Award Plan, Marsh awarded Mr. McNenney 1,935 restricted shares of Stock Bonus Units.

84. On March 1, 2002, pursuant to the Stock Award Plan, Marsh awarded Mr. McNenney 842 restricted shares of Stock Bonus Units.

85. In addition, over the course of several years, Marsh awarded Messrs. Gilman and McNenney stock options pursuant to the Stock Award Plan ("Stock Options") as part of their compensation. Some of the Stock Options had vested and others remained unvested when Marsh terminated the employment of Messrs. Gilman and McNenney. After the unjustified termination of Messrs. Gilman and McNenney, Marsh deemed the unvested stock options forfeited and caused the vested stock options to become unexercisable.

86. A copy of the Terms and Conditions for the Award of Stock Bonus Units is attached as Exhibit A. A copy of the Terms and Conditions for the Award of Stock Options is attached as Exhibit B.

87. Section IV of The Terms and Conditions for the Award of Stock Bonus Units states, in relevant part:

> TERMINATON OF EMPLOYMENT
>
> If your employment with the Company or any of its subsidiaries or affiliates terminates, your right to the Stock Bonus Units shall be as follows:
>
> E. By the Company without Cause
>
> If you are terminated by the Company without Cause prior to your Normal Retirement Date, the Stock Bonus Units will vest upon your date of termination. For purposes of these terms and conditions, Cause shall mean misappropriation of assets of the Company or any of its subsidiaries or affiliates; willful misconduct in the performance of the employee's duties; continued failure after notice, or refusal, to perform the duties of the employee; violation of a written code of conduct applicable to the employee; willful violation of an important policy of the Company or any of its subsidiaries or affiliates; breach of fiduciary duty or breach of trust; conviction of a felony, or any other crime involving moral turpitude; imprisonment for any crime; or any action

likely to bring substantial discredit to the Company or any of its subsidiaries or affiliates.

88.     Messrs. Gilman and McNenney did not commit any of the actions defined as "cause" in the Stock Award Plan.

89.     Given that Marsh terminated Messrs. Gilman and McNenney without cause, their awarded Stock Bonus Units should have vested on the dates their respective employments were terminated.  In addition, Messrs. Gilman's and McNenney's Stock Options should have been allowed to vest and remain exercisable.

90.     Also pursuant to the Stock Award Plan, Mr. Gilman's Stock Bonus Units and Stock Options should have vested upon his retirement.  However, as discussed above, Marsh, without justification, rejected Mr. Gilman's attempts to retire.

91.     Messrs. Gilman's and McNenney's Stock Bonus Units and Stock Options were not deemed vested by Marsh.  Instead, Marsh improperly deemed the Stock Bonus Units and Stock Options forfeited.

## FIRST CAUSE OF ACTION
### (AGAINST ALL DEFENDANTS)
### (MALICIOUS PROSECUTION)

92.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 91 above as if specifically set forth herein.

93.     Messrs. Gilman and McNenney are innocent of all charges brought against them. The prosecution and indictment have been resolved in their favor and the current and previous attorneys general for the State of New York have chosen not to appeal the decisions in favor of Plaintiffs.

94.    Marsh and Mr. Cherkasky, at all times relevant, knew that the charges lacked merit or recklessly disregarded the truth.    There was no probable cause to believe Messrs. Gilman and McNenney had committed any crimes.

95.    Nevertheless, Defendants maliciously targeted Messrs. Gilman and McNenney for prosecution without merit and for their own gain.    Defendants colluded with the New York Attorney General to prosecute Messrs. Gilman and McNenney for improper motives and without any good faith basis.    Among other reasons, Defendants improperly sought to avoid criminal prosecution themselves and to create public scapegoats for the allegations of the New York Attorney General.    Further, Defendant Cherkasky sought to gain, and did gain, a large economic benefit by becoming CEO of Marsh and receiving a lucrative employment contract through collusion with Mr. Spitzer.

96.    Due to the malicious prosecution by Defendants, Plaintiffs suffered damages including lost compensation, damage to their reputations, and loss of time and inconvenience in defending the Gilman and McNenney Indictment.    In addition, Defendants are liable for punitive damages due to Defendants' egregious and intentional conduct.

## SECOND CAUSE OF ACTION
### (AGAINST ALL DEFENDANTS)
### (ABUSE OF PROCESS)

97.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 96 above as if specifically set forth herein.

98.    Defendants targeted Messrs. Gilman and McNenney for criminal prosecution by the New York Attorney General which led to their indictment and criminal trial.

99.    Messrs. Gilman and McNenney are innocent of all charges brought against them. The prosecution and indictment have been resolved in their favor and the current and previous attorneys general for the State of New York have chosen not to appeal the decisions in favor of Plaintiffs.

100.    Defendants, at all times relevant, knew that the charges lacked merit or recklessly disregarded the truth. There was no probable cause to believe Messrs. Gilman and McNenney had committed any crimes. Nevertheless, Defendants facilitated the targeting and prosecution of Messrs. Gilman and McNenney for their own gain. Defendants colluded with the New York Attorney General to prosecute Messrs. Gilman and McNenney for improper motives and without any good faith basis. Among other reasons, Defendants improperly sought to avoid criminal prosecution themselves and to create public scapegoats for the allegations of the New York Attorney General. Further, Defendant Cherkasky sought to gain, and did gain, a large economic benefit by becoming CEO of Marsh and receiving a lucrative employment contract through collusion with the Mr. Spitzer.

101.    The actions of Defendants constitute an abuse of the criminal justice system and the processes thereof.

102.    Due to Defendants' actions, Plaintiffs suffered damages including lost compensation, damage to their reputations, and loss of time and inconvenience in defending the Gilman and McNenney Indictment. In addition, Defendants are liable for punitive damages due to Defendants egregious and intentional conduct.

## THIRD CAUSE OF ACTION
### (AGAINST DEFENDANT CHERKASKY)
### (VIOLATION OF JUDICIARY LAW § 487)

103.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 102 above as if specifically set forth herein.

104.    Messrs. Gilman and McNenney are innocent of all charges brought against them.

105.    However, Defendant Cherkasky, at all times relevant, knew that the charges lacked merit or recklessly disregarded the truth.

106.    Nevertheless, Defendant Cherkasky colluded to prosecute Messrs. Gilman and McNenney and deceive the Court and the public regarding the criminality of their actions.

107.    Due to the collusion with the New York Attorney General and deception by Defendant Cherkasky, Plaintiffs suffered damages including lost compensation, damage to their reputations, and loss of time and inconvenience in defending the Gilman and McNenney Indictment.  In addition, Defendant Cherkasky is liable for treble damages pursuant to Judiciary Law § 487.

## FOURTH CAUSE OF ACTION
### (AGAINST THE MARSH DEFENDANTS)
### (VIOLATION OF ERISA § 502(a)(1)(B) WITH RESPECT TO THE SEVERANCE PLAN)

108.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 107 above as if specifically set forth herein.

109.    By their actions, described above, Marsh's refusal to make severance payments to Messrs. Gilman and McNenney pursuant to Defendants' Severance Plan constitute a wrongful denial of benefits under § 502(a)(1)(B) of ERISA, 29 U.S.C § 1132(a)(1)(B).

110.    Marsh's refusal to make severance payments to Messrs. Gilman and McNenney under the Severance Plan was arbitrary and capricious.  Upon information and belief, others

terminated in connection with Marsh's investigation of alleged bid rigging did, in fact, receive severance payments pursuant to Marsh's Severance Plan.

111.    As a result of Marsh's actions and failure to perform their obligations, Messrs. Gilman and McNenney have suffered damages, including, but not limited to, two weeks of salary for each year of employment with Marsh and a special payment equal to a portion of their bonus from the prior year plus pre- and post-judgment interest, costs, and attorneys' fees.

## FIFTH CAUSE OF ACTION
### (AGAINST THE MARSH DEFENDANTS)
### (BREACH OF CONTRACT WITH RESPECT TO THE SEVERANCE PLAN)

112.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 115 above as if specifically set forth herein.

113.    Marsh's Severance Plan constituted a contract between Messrs. Gilman and McNenney and Marsh.

114.    Marsh had a long-standing policy and practice of paying severance to terminated employees. Prior to Marsh's termination of Messrs. Gilman and McNenney, terminated employees received severance based on this long-standing practice. Mr. Gilman, Mr. McNenney and Marsh mutually understood that severance compensation was paid to terminated employees. Messrs. Gilman and McNenney were aware of Marsh's long-standing practice of paying severance and relied upon this practice in rendering services to Marsh throughout the course of their employment.

115.    Marsh indicated by their practices and policies that the firm paid severance compensation to terminated employees, and that the amount of severance paid was based on the terminated employee's position, length of service, and total compensation.

116. Upon information and belief, other employees terminated in connection with Marsh's investigation of alleged bid rigging did receive severance payments pursuant to Marsh's Severance Plan.

117. Messrs. Gilman and McNenney performed under the contract by working for and by remaining employees of Marsh.

118. By failing to pay Messrs. Gilman and McNenney a severance payment upon the termination of their employment, Marsh breached the contract between the parties.

119. As a result of Marsh's actions and failure to perform its obligations under the contract, Messrs. Gilman and McNenney have suffered damages, including, but not limited to two weeks of salary for each year of employment with Marsh and a special payment equal to a portion of the employee's bonus from the prior year, plus pre-judgment interest and costs.

### SIXTH CAUSE OF ACTION
(AGAINST THE MARSH DEFENDANTS)
(VIOLATION OF NEW YORK LABOR LAW § 193 WITH RESPECT TO THE STOCK AWARD PLAN)

120. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 111 above as if specifically set forth herein.

121. For their work on behalf of Marsh, Messrs. Gilman and McNenney earned wages that Marsh chose to defer by paying Messrs. Gilman and McNenney in the form of Stock Bonus Units and Stock Options.

122. Messrs. Gilman and McNenney did not authorize Marsh in writing to defer a portion of their compensation.

123. In addition, the Stock Award Plan was not "for the benefit of" Messrs. Gilman and McNenney within the meaning of New York Labor Law § 193(1)(b). The Stock Award Plan permitted Marsh to avoid paying wages to its employees in cash at the time they were earned.

124. By their actions described above, Marsh violated Section 193 of the New York Labor Law.

125. Marsh has no basis to believe that the deferral of compensation was in compliance with law.

126. As a result of Marsh's violation of Section 193 of the New York Labor Law, Messrs. Gilman and McNenney are entitled to remedies pursuant to Section 198 of the New York Labor Law, including, but not limited to, the value of the Stock Bonus Units and the Stock Options plus liquidated damages, pre- and post-judgment interest, costs, and attorneys' fees.

**SEVENTH CAUSE OF ACTION**
(AGAINST THE MARSH DEFENDANTS)
(BREACH OF CONTRACT WITH RESPECT TO THE STOCK AWARD PLAN)

127. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 123 above as if specifically set forth herein.

128. Marsh's Stock Award Plan constituted a contract between Messrs. Gilman and McNenney and Marsh.

129. Messrs. Gilman and McNenney performed under the contract by working for and by remaining employees of Marsh.

130. By failing to allow the awarded Stock Bonus Units and Stock Options, to vest, Marsh breached the plain language of the contract between the parties as well as the covenant of good faith and fair dealing associated with the contract.

131. As a result of Marsh's actions and failure to perform their obligations, Messrs. Gilman and McNenney have suffered damages, including, but not limited to the value of the Stock Bonus Units and Stock Options plus pre- and post-judgment interest, costs, and attorneys' fees.

## EIGHTH CAUSE OF ACTION
### (AGAINST THE MARSH DEFENDANTS)
### (UNJUST ENRICHMENT)

132.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 128 above as if specifically set forth herein.

133.   In the event the Court finds that the Stock Award Plan is not a valid and enforceable contract, Marsh is liable to Messrs. Gilman and McNenney under the theory of unjust enrichment.

134.   Messrs. Gilman and McNenney bestowed a benefit on Marsh by working for them.

135.   Marsh obtained this benefit without adequately compensating Messrs. Gilman and McNenney.

136.   The circumstances are such that equity and good conscience require Marsh to make restitution to Messrs. Gilman and McNenney.

## NINTH CAUSE OF ACTION
### (AGAINST THE MARSH DEFENDANTS)
### (QUANTUM MERUIT)

137.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 133 above as if specifically set forth herein.

138.   In the event the Court finds that the Stock Award Plan is not a valid and enforceable contract, Marsh is liable to Messrs. Gilman and McNenney under the theory of *quantum meruit*.

139.   Messrs. Gilman and McNenney performed services in good faith.

140.   Marsh accepted services from Messrs. Gilman and McNenney.

141. As Marsh was aware, Messrs. Gilman and McNenney expected to be compensated for the services they rendered to Marsh.

142. Marsh owes Messrs. Gilman and McNenney the reasonable value of the services they rendered to Marsh including the awarded Stock Bonus Units and Stock Options.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Against all Defendants, compensatory damages in an amount to be determined at trial, including, but not limited to, lost employment compensation, damage to Plaintiffs' reputation, and lost time and inconvenience in defending against the Gilman and McNenney Indictment;

B. Against all Defendants, damages for emotional distress and mental anguish;

C. Against the Marsh Defendants, damages equal to the severance payment to which Plaintiffs are entitled;

D. Against the Marsh Defendants, damages equal to the value of the Stock Bonus Units;

E. Against the Marsh Defendants, damages equal to the value of the Stock Options;

F. Against the Marsh Defendants, liquidated dames pursuant to New York Labor Law § 198;

G. Against all Defendants, punitive damages;

H. Against Defendant Cherkasky, treble damages pursuant to Judiciary Law § 487.

I. Against all Defendants, prejudgment and postjudgment interest, costs and attorneys' fees; and

J.   All other relief the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: New York, New York
June 24, 2011

LIDDLE & ROBINSON, L.L.P.

By: _____
Jeffrey L. Liddle
James W. Halter
800 Third Avenue
New York, New York 10022
(212) 687-8500
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 24th day of June, 2011, I caused true and correct copies of the foregoing to be served, by e-mail and by overnight delivery, on:

Nicholas J. Pappas, Esq.
Jonathan D. Polkes, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
nicholas.pappas@weil.com
jonathan.polkes@weil.com
*Counsel for Defendants*

Dated: June 24, 2011
New York, New York

_____
James W. Halter

# EXHIBIT A

**This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under The Securities Act Of 1933.**

MARSH & McLENNAN COMPANIES
2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions for March 1, 2004 Award of Stock Bonus Units
to U.S. Grant Recipients

The award of Stock Bonus Units granted on March 1, 2004 under the Marsh & McLennan Companies (the "Company") 2000 Employee Incentive and Stock Award Plan (the "Plan") is subject to the following terms and conditions:

## I.   RIGHTS OF STOCK BONUS UNITS

You will receive dividend equivalent payments on the Stock Bonus Units. These payments will be included in your payroll checks. Unless and until both the vesting conditions of the award have been satisfied and you have received the shares of Company common stock in accordance with the terms and conditions described herein, you have none of the attributes of ownership to such shares of stock.

## II.   VESTING PERIOD AND RIGHTS

The award is scheduled to vest on the earlier of (1) March 1, 2007 or (2) the date of your retirement (i.e., your Normal or Deferred Retirement Date or, subject to the provisions of Section IV-D, your Early Retirement Date, as such terms are defined in the Company's primary Retirement Plan applicable to you). Once the award vests and is available for distribution (which will occur within a reasonable time subsequent to the vesting date), you will receive one share of Company common stock for each of your Stock Bonus Units.

## III.   TAXES

The tax treatment associated with your award is as follows:

(1)   The value of Stock Bonus Units is not taxable at grant.
(2)   The receipt of dividend equivalents is taxable on a current basis as additional compensation.
(3)   Once the award vests and is distributed to you, the distribution will be includable in your taxable income; at that time, an appropriate number of shares will be withheld to satisfy your payroll tax obligation from the distribution.
(4)   For grant recipients who defer their distribution at least three years (or until the year following retirement) and are granted a supplemental award, such individuals will be subject to FICA withholding on the value of the units attributable to the supplement at the date of vesting.

## IV.   TERMINATION OF EMPLOYMENT

If your employment with the Company or any of its subsidiaries or affiliates terminates, your right to the Stock Bonus Units shall be as follows:

### A.   Death

If you die, the Stock Bonus Units will vest immediately to the person or persons to whom your rights shall pass by will or the laws of descent and distribution.

### B.   Permanent Disability

If you become totally and permanently disabled, as determined under the Company's Long-Term Disability Plan applicable to you, the Stock Bonus Units will vest immediately.

### C.   Normal or Deferred Retirement

If you retire on or after your Normal Retirement Date, the Stock Bonus Units will vest when you retire.

### D.   Early Retirement

If you retire before your Normal Retirement Date, the Stock Bonus Units will vest when you retire, provided that you execute the attached Non-Solicitation Agreement for Early Retirees, and in fact do comply with said Non-Solicitation Agreement for a period commencing with your Early Retirement Date and ending at the earlier of (i) three years thereafter or (ii) March 1, 2007, it being understood that failure to comply with said Non-Solicitation Agreement will cause your early retirement to be governed by the provisions of "F. All Other Employment Terminations", below.

### E.   By the Company without Cause

If you are terminated by the Company without Cause, the Stock Bonus Units will vest upon your date of termination. For purposes of these terms and conditions, Cause shall mean misappropriation of assets of the Company or any of its subsidiaries or affiliates; willful misconduct in the performance of the employee's duties; continued failure after notice, or refusal, to perform the duties of the employee; violation of a written code of conduct applicable to the employee; willful violation of an important policy of the Company or any of its subsidiaries or affiliates; breach of fiduciary duty or breach of trust; conviction of a felony, or of any other crime involving moral turpitude; imprisonment for any crime; or any other action likely to bring substantial discredit to the Company or any of its subsidiaries or affiliates.

### F.   All Other Employment Terminations

If you cease to be an active employee of the Company or any of its subsidiaries or affiliates before the end of the vesting period for any reason other than death, permanent disability, retirement (exclusive of early retirement if you fail to enter into the Non-Solicitation Agreement for Early Retirees), or termination without Cause, your right to such Stock Bonus Units shall be forfeited, except to the extent that the Compensation Committee of the Company's Board of Directors (the "Committee") may determine otherwise.

## V.  CHANGE IN CONTROL PROVISIONS

### A.  Change in Control

Upon the occurrence of a "change in control" of the Company, as defined in the Plan, or upon the sale of the business unit in which you work, any unvested Stock Bonus Units will vest and the shares from the vested award will be delivered to you as soon as practicable thereafter.

### B.  Additional Payment

Should you receive shares from the vesting of Stock Bonus Units that have been accelerated because of a change in control, all or part of the value (the total market price of the shares on the date of vesting) of those shares (the Accelerated Shares) may be subject to a 20% federal excise tax. The excise tax is imposed when the value of the Accelerated Shares (plus any other payments which are determined to be contingent on a change in control) is more than 2.999 times the average of your last five years W-2 earnings.

If a change in control occurs and you receive Accelerated Shares, the Company will determine if the 20% federal excise tax is payable. If it is payable, the Company will pay to you, within five days of making the computation, an amount of money (the Additional Payment) equal to the excise tax plus additional amounts for federal, state and local taxes so that the excise tax and income taxes on the excise tax payment will not cost you any money. If the Additional Payment is later determined to be less than the amount of taxes you owe, a further payment will be made to you. If the Additional Payment is more than the amount you owe, you will be required to reimburse the Company.

## VI.  OTHER PROVISIONS

### A.
This award of Stock Bonus Units does not give you any right to continue to be employed by the Company or any of its subsidiaries or affiliates, or limit, in any way, the right of your employer to terminate your employment, at any time, for any reason not specifically prohibited by law.

### B.
The Company is not liable for the non-issuance or non-transfer, nor for any delay in the issuance or transfer of any shares of common stock due to you upon the vesting of Stock Bonus Units which results from the inability of the Company to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of common stock of the Company, if counsel for the Company deems such authority necessary for the lawful issuance or transfer of any such shares. Your acceptance of this award constitutes your agreement that the shares of common stock subsequently acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

### C.
The Stock Bonus Units are subject to these terms and conditions and your acceptance hereof shall constitute your agreement to the administrative regulations of the Committee. In the event of any inconsistency between the award terms and conditions and the provisions of the Plan, the provisions of the Plan shall prevail. You may obtain a copy of the Plan by making a request to the Senior Vice President of Human Resources and Administration of the Company.

D.   The Stock Bonus Units are awarded in accordance with such additional administrative regulations as the Committee may, from time to time, adopt. All decisions of the Committee upon any questions arising under the Plan or under these terms and conditions shall be conclusive and binding.

E.   During your lifetime, no right hereunder related to these Stock Bonus Units shall be transferable except by will or the laws of descent and distribution.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the Exchange Act), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting Ms. Kelly Gamble, Manager, Global Compensation at 212/948-3523. She can also be reached via internal electronic mail (Lotus Notes) or the internet at Kelly.gamble@mmc.com.

MARSH & McLENNAN COMPANIES, INC.

2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

# MARSH & McLENNAN COMPANIES, INC.

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

| | | |
|---|---|---|
| 1. | Purposes. | 1 |
| 2. | Definitions. | 1 |
| 3. | Administration. | 3 |
| | (a) Authority of the Committee. | 3 |
| | (b) Manner of Exercise of Committee Authority. | 4 |
| | (c) Limitation of Liability. | 5 |
| 4. | Eligibility. | 5 |
| 5. | Stock Subject to the Plan; Adjustments. | 5 |
| | (a) Shares Reserved. | 5 |
| | (b) Manner of Counting Shares. | 6 |
| | (c) Type of Shares Distributable. | 6 |
| | (d) Adjustments. | 6 |
| 6. | Specific Terms of Awards. | 6 |
| | (a) General. | 6 |
| | (b) Options. | 6 |
| | (c) SARs. | 7 |
| | (d) Restricted Stock. | 7 |
| | (e) Deferred Stock Units. | 8 |
| | (f) Stock Bonuses and Stock Awards in Lieu of Cash Awards. | 9 |
| | (g) Dividend Equivalents. | 9 |
| | (h) Other Stock-Based Awards. | 9 |
| | (i) Unit-Based Awards. | 9 |
| 7. | Certain Provisions Applicable to Awards. | 9 |
| | (a) Stand-Alone, Additional, Tandem and Substitute Awards. | 9 |
| | (b) Terms of Awards. | 10 |
| | (c) Form of Payment Under Awards. | 10 |
| | (d) Buyouts. | 10 |
| | (e) Cancellation and Rescission of Awards. | 10 |
| | (f) Awards to Participants Outside the United States. | 10 |
| 8. | Performance Awards. | 10 |

9.    Change in Control Provisions. ................................................................. 11

      (a)    Acceleration Upon Change in Control. ........................................ 11
      (b)    "Change in Control" Defined. ...................................................... 11
      (c)    "Change in Control Price" Defined. ............................................. 12
      (d)    Additional Payments. ................................................................... 12
      (e)    Pooling of Interests. .................................................................... 13

10.   General Provisions. .................................................................................... 13
      (a)    Compliance with Legal and Exchange Requirements. ............... 13
      (b)    Nontransferability. ....................................................................... 13
      (c)    No Right to Continued Employment. ........................................... 13
      (d)    Taxes. ........................................................................................... 14
      (e)    Changes to the Plan and Awards. ............................................... 14
      (f)    No Rights to Awards; No Stockholder Rights. ............................ 14
      (g)    Unfunded Status of Awards and Trusts. ..................................... 14
      (h)    Nonexclusivity of the Plan. .......................................................... 15
      (i)    No Fractional Shares. .................................................................. 15
      (j)    Governing Law. ............................................................................ 15
      (k)    Effective Date. ............................................................................. 15
      (l)    Titles and Headings; Certain Terms. ........................................... 15

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

1.     *Purposes.* The purposes of the 2000 Employee Incentive and Stock Award Plan are to advance the interests of Marsh & McLennan Companies, Inc. and its stockholders by providing a means to attract, retain, and motivate employees of the Company and its Subsidiaries and Affiliates, and to strengthen the mutuality of interest between such employees and the Company's stockholders. This Plan shall be the successor to the Marsh & McLennan Companies, Inc. 1997 Employee Incentive and Stock Award Plan.

2.     *Definitions.* For purposes of the Plan, the following terms shall be defined as set forth below:

(a)     "Affiliate" means any entity other than the Company and its Subsidiaries that is designated by the Committee as a participating employer under the Plan, provided that the Company directly or indirectly owns at least 20% of the combined voting power of all classes of voting stock of such entity or at least 20% of the ownership interests in such entity.

(b)     "Award" means any Option, SAR, Restricted Stock, Deferred Stock Unit, Stock Bonus or Stock Award in Lieu of Cash, Dividend Equivalent, Other Stock-Based Award, or Unit-Based Award, including Performance Awards granted to a Participant under the Plan.

(c)     "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award.

(d)     "Beneficiary" means the person, persons, trust or trusts which have been designated by such Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under this Plan upon the death of the Participant, or, if there is no designated Beneficiary or surviving designated Beneficiary, then the person, persons, trust or trusts entitled by will or the laws of descent and distribution to receive such benefits.

(e)     "Board" means the Board of Directors of the Company.

(f)     "Change in Control" means Change in Control as defined with related terms in Section 9.

(g)     "Code" means the Internal Revenue Code of 1986, as amended from time to time. References to any provision of the Code shall be deemed to include successor provisions thereto and regulations thereunder.

(h)     "Committee" means the Compensation Committee of the Board, or such other Board committee as may be designated by the Board to administer the Plan. The Committee shall consist solely of two or more directors of the Company.

(i)     "Company" means Marsh & McLennan Companies, Inc., a corporation organized under the laws of the State of Delaware, or any successor corporation.

(j) "Deferred Stock Unit" means an award, granted to a Participant under Section 6(e), representing the right to receive either Stock or cash or any combination thereof at the end of a specified deferral period.

(k) "Dividend Equivalent" means a right, granted to a Participant under Section 6(g), to receive cash, Stock, or other property equal in value to dividends paid with respect to a specified number of shares of Stock or to periodic distributions on other specified equity securities of the Company or any Subsidiary or Affiliate. Dividend Equivalents may be awarded on a free-standing basis or in connection with another Award and may be paid currently or on a deferred basis.

(l) "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time. References to any provision of the Exchange Act shall be deemed to include successor provisions thereto and regulations thereunder.

(m) "Fair Market Value" means, with respect to Stock, Awards, or other property, the fair market value of such Stock, Awards, or other property determined by such methods or procedures as shall be established from time to time by the Committee. Unless otherwise determined by the Committee in good faith, the Fair Market Value of Stock as of any given date shall mean the per share value of Stock as determined by using the mean between the high and low selling prices of such Stock on the immediately preceding date (or, if the NYSE was not open that day, the next preceding day that the NYSE was open for trading and the Stock was traded) as reported for such date in the table titled "NYSE—Composite Transactions," contained in The Wall Street Journal or an equivalent successor table.

(n) "Option" means a right, granted to a Participant under Section 6(b), to purchase Stock. No Options will qualify as incentive stock options within the meaning of Section 422 of the Code.

(o) "Other Stock-Based Award" means a right, granted to a Participant under Section 6(h), that is denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Stock or other securities of the Company or any Subsidiary or Affiliate, including, without limitation, rights convertible or exchangeable into Stock or such other securities, purchase rights for Stock or such other securities, and Awards with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

(p) "Participant" means a person who, as an employee of the Company, a Subsidiary or Affiliate, has been granted an Award under the Plan.

(q) "Performance Award" means an Award of one of the types specified in Section 6 the grant, exercise, or settlement of which is subject to achievement of performance goals and other terms specified under Section 8.

(r) "Plan" means this 2000 Employee Incentive and Stock Award Plan, as amended from time to time.

- 2 -

(s)    "Preexisting Plan and Share Resolutions" mean the 1997 Employee Incentive and Stock Award Plan and the resolutions adopted by the Board on November 16, 1993 (superseding resolutions adopted on March 17, 1992), as amended and supplemented by resolutions adopted on March 16, 1995 and May 15, 1996, relating to the authorization of two million (2,000,000) shares of Stock for deferred stock units or other compensation purposes.

(t)    "Qualified Member" means a member of the Committee who is a "Non-Employee Director" within the meaning of Rule 16b-3(b)(3).

(u)    "Restricted Stock" means an award of shares of Stock to a Participant under Section 6(d) that may be subject to certain restrictions and to a risk of forfeiture.

(v)    "Rule 16b-3" means Rule 16b-3, as from time to time in effect and applicable to the Plan and Participants, promulgated by the Securities and Exchange Commission under Section 16 of the Exchange Act.

(w)    "Stock" means the Common Stock, $1.00 par value per share, of the Company or such other securities as may be substituted or resubstituted therefor pursuant to Section 5.

(x)    "SAR" or "Stock Appreciation Right" means the right, granted to a Participant under Section 6(c), to be paid an amount measured by the appreciation in the Fair Market Value of Stock from the date of grant to the date of exercise of the right, with payment to be made in cash, Stock, other Awards, or other property as specified in the Award or determined by the Committee.

(y)    "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations (other than the last corporation in the unbroken chain) owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in the chain.

(z)    "Unit-Based Award" means a unit, granted to a Participant under Section 6(i), with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

3.    *Administration.*

(a)    *Authority of the Committee.*  The Plan shall be administered by the Committee. The Committee shall have full and final authority to take the following actions, in each case subject to and consistent with the provisions of the Plan:

(i)    to select Participants to whom Awards may be granted;

(ii)    to designate Affiliates;

(iii)    to determine the type or types of Awards to be granted to each Participant;

(iv)     to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate, the terms and conditions of any Award granted under the Plan (including any exercise price, grant price, or purchase price, any restriction or condition, any schedule for lapse of restrictions or conditions relating to transferability or forfeiture, exercisability, or settlement of an Award, and waivers or accelerations thereof, and waivers of performance conditions relating to an Award, based in each case on such considerations as the Committee shall determine), and all other matters to be determined in connection with an Award;

(v)     to determine whether, to what extent, and under what circumstances an Award may be settled, or the exercise price of an Award may be paid, in cash, Stock, other Awards, or other property, or an Award may be canceled, forfeited, exchanged, or surrendered;

(vi)     to determine whether, to what extent, and under what circumstances cash, Stock, other Awards, or other property payable with respect to an Award will be deferred either automatically, at the election of the Committee, or at the election of the Participant, and whether to create trusts and deposit Stock or other property therein;

(vii)     to prescribe the form of each Award Agreement, which need not be identical for each Participant;

(viii)     to adopt, amend, suspend, waive, and rescind such rules and regulations and appoint such agents as the Committee may deem necessary or advisable to administer the Plan;

(ix)     to correct any defect or supply any omission or reconcile any inconsistency in the Plan and to construe and interpret the Plan and any Award, rules and regulations, Award Agreement, or other instrument hereunder; and

(x)     to make all other decisions and determinations as may be required under the terms of the Plan or as the Committee may deem necessary or advisable for the administration of the Plan.

Other provisions of the Plan notwithstanding, the Board may perform any function of the Committee under the Plan, including for the purpose of ensuring that transactions under the Plan by Participants who are then subject to Section 16 of the Exchange Act in respect of the Company are exempt under Rule 16b-3. In any case in which the Board is performing a function of the Committee under the Plan, each reference to the Committee herein shall be deemed to refer to the Board, except where the context otherwise requires.

(b)     *Manner of Exercise of Committee Authority.* At any time that a member of the Committee is not a Qualified Member, any action of the Committee relating to an Award to be granted to a Participant who is then subject to Section 16 of the Exchange Act in respect of the Company may be taken either (i) by a subcommittee composed solely of two or more Qualified Members, or (ii) by the Committee but with each such member who is not a Qualified Member abstaining or recusing himself or herself from such action, provided that, upon such abstention or recusal, the Committee remains composed solely of two or more Qualified Members. Such

action, authorized by such a subcommittee or by the Committee upon the abstention or recusal of such non-Qualified Member(s), shall be the action of the Committee for purposes of the Plan. Any action of the Committee with respect to the Plan shall be final, conclusive and binding on all persons, including the Company, Subsidiaries, Affiliates, Participants, any person claiming any rights under the Plan from or through any Participant, and stockholders. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee. The Committee may delegate to officers or managers of the Company or any Subsidiary or Affiliate the authority, subject to such terms as the Committee shall determine, to perform administrative functions and such other functions as the Committee may determine, to the extent permitted under applicable law and, with respect to any Participant who is then subject to Section 16 of the Exchange Act in respect of the Company, to the extent performance of such function will not result in a subsequent transaction failing to be exempt under Rule 16b-3(d).

(c)  *Limitation of Liability*. Each member of the Committee shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any Subsidiary or Affiliate, the Company's independent certified public accountants, or other professional retained by the Company to assist in the administration of the Plan. No member of the Committee, nor any officer or employee of the Company acting on behalf of the Committee, shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and all members of the Committee and any officer or employee of the Company acting on their behalf shall, to the fullest extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

4.   *Eligibility*. Employees of the Company and Subsidiaries and Affiliates, other than senior executives who are then eligible to be granted awards under the 2000 Senior Executive Incentive and Stock Award Plan or any successor plan thereto, are eligible to be granted Awards under the Plan. In addition, any person who has been offered employment by the Company or a Subsidiary or Affiliate is eligible to be granted Awards under the Plan, provided that such prospective employee may not receive any payment or exercise any right relating to an Award until such person has commenced employment with the Company or a Subsidiary or Affiliate.

5.   *Stock Subject to the Plan; Adjustments.*

(a)   *Shares Reserved*. Subject to adjustment as hereinafter provided, the total number of shares of Stock reserved for issuance in connection with Awards under the Plan shall be forty million (40,000,000), plus the additional number of shares of Stock specified in the succeeding sentence. There shall be added to the number of shares of Stock reserved for issuance under this Section 5(a) the number of shares authorized and reserved for awards under the Preexisting Plan and Share Resolutions to the extent (A) that such shares were available for grants of awards under the Preexisting Plan and Share Resolutions immediately prior to the Effective Date or (B) that such shares were subject to outstanding awards under the Preexisting Plan and Share Resolutions and thereafter an event occurs or occurred (including expiration or forfeiture) which would result in such shares again being available for Awards under the Plan (as determined pursuant to Section 5(b)). No Award may be granted if the number of shares to which such Award relates, when added to the number of shares previously

issued under the Plan and the number of shares to which other then-outstanding Awards relate, exceeds the number of shares reserved under this Section 5(a). Shares of Stock issued under the Plan shall be counted against this limit in the manner specified in Section 5(b).

(b)    *Manner of Counting Shares.*  If any shares subject to an Award or award pursuant to the Preexisting Plan and Share Resolutions are or were forfeited, canceled, exchanged, or surrendered or such Award or award is or was settled in cash or otherwise terminates or was terminated without a distribution of shares to the Participant, including (i) the number of shares withheld in payment of any exercise or purchase price of or tax obligation relating to such an Award or award and (ii) the number of shares equal to the number surrendered in payment of any exercise or purchase price of or tax obligation relating to any Award or award, such number of shares will again be available for Awards under the Plan. The Committee may make determinations and adopt regulations for the counting of shares relating to any Award to ensure appropriate counting, avoid double counting (in the case of tandem or substitute awards), and provide for adjustments in any case in which the number of shares actually distributed differs from the number of shares previously counted in connection with such Award.

(c)    *Type of Shares Distributable.*  Any shares of Stock distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued shares or treasury shares, including shares acquired by purchase in the open market or in private transactions.

(d)    *Adjustments.*  In the event that any large, special and non-recurring dividend or other distribution (whether in the form of cash or property other than Stock), recapitalization, forward or reverse split, Stock dividend, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange, liquidation, dissolution or other similar corporate transaction or event affects the Stock such that an adjustment is determined by the Committee to be appropriate under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of (i) the number and kind of shares of Stock which may thereafter be issued in connection with Awards, (ii) the number and kind of shares of Stock issued or issuable in respect of outstanding Awards or, if deemed appropriate, make provisions for payment of cash or other property with respect to any outstanding Award, and (iii) the exercise price, grant price, or purchase price relating to any Award.

6.    *Specific Terms of Awards.*

(a)    *General.*  Awards may be granted on the terms and conditions set forth in this Section 6. In addition, the Committee may impose on any Award or the exercise thereof, at the date of grant or thereafter (subject to Section 10(e)), such additional terms and conditions, not inconsistent with the provisions of the Plan, as the Committee shall determine, including terms regarding forfeiture of Awards or continued exercisability of Awards in the event of termination of employment by the Participant.

(b)    *Options.*  The Committee is authorized to grant Options to participants on the following terms and conditions:

(i)    *Exercise Price.*  The exercise price per share of Stock purchasable under an Option shall be determined by the Committee; provided, however, that, except as

provided in Section 7(a), such exercise price shall be not less than the Fair Market Value of a share on the date of grant of such Option, and in no event shall the exercise price for the purchase of shares be less than par value.

(ii) Time and Method of Exercise. The Committee shall determine at the date of grant or thereafter the time or times at which an Option may be exercised in whole or in part, the methods by which such exercise price may be paid or deemed to be paid, the form of such payment, including cash, Stock, other Awards, shares or units valued by reference to shares issued under any other plan of the Company or a Subsidiary or Affiliate (including shares or units subject to restrictions, so long as an equal number of shares issued upon exercise of the Option are subject to substantially similar restrictions), or notes or other property, and the methods by which Stock will be delivered or deemed to be delivered to Participants (including deferral of delivery of shares under a deferral arrangement).

(c)    SARs. The Committee is authorized to grant SARs to Participants on the following terms and conditions:

(i)    Right to Payment. An SAR shall confer on the Participant to whom it is granted a right to receive with respect to each share subject thereto, upon exercise thereof, the excess of (1) the Fair Market Value of one share of Stock on the date of exercise (or, if the Committee shall so determine in the case of any such right, the Fair Market Value of one share at any time during a specified period before or after the date of exercise, or the Change in Control Price as defined in Section 9(c)) over (2) the grant price of the SAR as of the date of grant of the SAR, which shall be not less than the Fair Market Value of one share of Stock on the date of grant of such SAR (or, in the case of an SAR granted in tandem with an Option, shall be equal to the exercise price of the underlying Option).

(ii)    Other Terms. The Committee shall determine, at the time of grant or thereafter, the time or times at which an SAR may be exercised in whole or in part, the method of exercise, method of settlement, form of consideration payable in settlement, method by which Stock will be delivered or deemed to be delivered to Participants, whether or not an SAR shall be in tandem with any other Award, and any other terms and conditions of any SAR. An SAR granted in tandem with an Option may be granted at the time of grant of the related Option or at any time thereafter.

(d)    Restricted Stock. The Committee is authorized to grant Restricted Stock to Participants on the following terms and conditions:

(i)    Issuance and Restrictions. Restricted Stock shall be subject to such restrictions on transferability and other restrictions, if any, as the Committee may impose at the date of grant or thereafter, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as the Committee may determine. Except to the extent restricted under the Award Agreement relating to the Restricted Stock, a Participant granted Restricted Stock shall have all of the rights of a stockholder including the right to vote Restricted Stock and the right to receive dividends thereon.

(ii)     Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable restriction period, Restricted Stock, and any accrued but unpaid dividends or Dividend Equivalents, that is or are then subject to a risk of forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents will be waived in whole or in part in the event of terminations resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents.

(iii)     Certificates for Stock.  Restricted Stock granted under the Plan may be evidenced in such manner as the Committee shall determine.  If certificates representing Restricted Stock are registered in the name of the Participant, such certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock, the Company shall retain physical possession of the certificate, and the Company may require the Participant to deliver a stock power, endorsed in blank, relating to the Restricted Stock.

(iv)     Dividends.  Dividends paid on Restricted Stock shall be either paid at the dividend payment date in cash or in shares of unrestricted Stock having a Fair Market Value equal to the amount of such dividends, or the payment of such dividends shall be deferred or the amount or value thereof automatically reinvested in additional Restricted Stock, Deferred Stock Units, other Awards, or other investment vehicles, as the Committee shall determine or permit the Participant to elect.  Stock distributed in connection with a Stock split or Stock dividend, and other property distributed as a dividend, shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Stock with respect to which such Stock or other property has been distributed.

(e)     Deferred Stock Units.  The Committee is authorized to grant Deferred Stock Units to Participants, subject to the following terms and conditions:

(i)     Award and Restrictions.  Delivery of Stock or cash, as the case may be, will occur upon expiration of the deferral period specified for Deferred Stock Units by the Committee (or, if permitted by the Committee, as elected by the Participant).  In addition, Deferred Stock Units shall be subject to such restrictions as the Committee may impose, if any, at the date of grant or thereafter, which restrictions may lapse at the expiration of the deferral period or at earlier or later specified times, separately or in combination, in installments or otherwise, as the Committee may determine.

(ii)     Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable deferral period or portion thereof to which forfeiture conditions apply (as provided in the Award Agreement evidencing the Deferred Stock Units), or upon failure to satisfy any other conditions precedent to the delivery of Stock or cash to which such Deferred Stock Units relate, all Deferred Stock Units, and any accrued but unpaid Dividend Equivalents, that are at that time subject to a risk of

- 8 -

forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Deferred Stock Units and any accrued but unpaid Dividend Equivalents will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Deferred Stock Units and any accrued but unpaid Dividend Equivalents.

(f)   *Stock Bonuses and Stock Awards in Lieu of Cash Awards.*  The Committee is authorized to grant Stock as a bonus, or to grant other Awards, in lieu of Company commitments to pay cash under other plans or compensatory arrangements.  Stock or Awards granted hereunder shall have such other terms as shall be determined by the Committee.

(g)   *Dividend Equivalents.*  The Committee is authorized to grant Dividend Equivalents to Participants.  The Committee may provide, at the date of grant or thereafter, that Dividend Equivalents shall be paid or distributed when accrued or shall be deemed to have been reinvested in additional Stock, or other investment vehicles as the Committee may specify.

(h)   *Other Stock-Based Awards.*  The Committee is authorized, subject to limitations under applicable law, to grant to Participants Other Stock-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan.  The Committee shall determine the terms and conditions of such Awards at the date of grant or thereafter.  Stock or other securities or property delivered pursuant to an Award in the nature of a purchase right granted under this Section 6(h) shall be purchased for such consideration, paid for at such times, by such methods, and in such forms, including, without limitation, cash, Stock, other Awards, notes or other property, as the Committee shall determine, subject to any required corporate action.

(i)   *Unit-Based Awards.*  The Committee is authorized to grant to Participants Unit-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan.  Such Awards may be paid or settled in cash, Stock, other Awards or property.

7.    *Certain Provisions Applicable to Awards.*

(a)   *Stand-Alone, Additional, Tandem and Substitute Awards.*  Awards granted under the Plan may, in the discretion of the Committee, be granted either alone or in addition to, in tandem with, or in exchange or substitution for, any other Award granted under the Plan or any award granted under any other plan of the Company, any Subsidiary or Affiliate, or any business entity to be acquired by the Company or a Subsidiary or Affiliate, or any other right of a Participant to receive payment from the Company or any Subsidiary or Affiliate.  Awards may be granted in addition to or in tandem with such other Awards or awards may be granted either as of the same time as or a different time from the grant of such other Awards or awards.  The per share exercise price of any Option, grant price of any SAR, or purchase price of any other Award conferring a right to purchase Stock which is granted, in connection with the substitution of awards granted under any other plan of the Company or any Subsidiary or Affiliate or any business entity to be acquired by the Company or any Subsidiary or Affiliate, shall be determined by the Committee, in its discretion, and may, to the extent the Committee

- 9 -

determines necessary in order to preserve the value of such other award, be less than the Fair Market Value of a share on the date of grant of such substitute Award.

(b)    *Terms of Awards.* The term of each Award shall be for such period as may be determined by the Committee.

(c)    *Form of Payment Under Awards.* Subject to the terms of the Plan and any applicable Award Agreement, payments to be made by the Company or a Subsidiary or Affiliate upon the grant, maturation, or exercise of an Award may be made in such forms as the Committee shall determine at the date of grant or thereafter, including, without limitation, cash, Stock, or other property, and may be made in a single payment or transfer, in installments, or on a deferred basis. The Committee may make rules relating to installment or deferred payments with respect to Awards, including the rate of interest to be credited with respect to such payments.

(d)    *Buyouts.* The Committee may at any time offer to buy out any outstanding Award for a payment in cash, Stock, other Awards (subject to Section 7(a)), or other property based on such terms and conditions as the Committee shall determine.

(e)    *Cancellation and Rescission of Awards.* The Committee may provide in any Award Agreement that, in the event a Participant violates a term of the Award Agreement or other agreement with or policy of the Company or a Subsidiary or Affiliate, takes or omits to take actions that are deemed to be in competition with the Company or its Subsidiaries or Affiliates, an unauthorized solicitation of customers, suppliers, or employees of the Company or its Subsidiaries or Affiliates, or an unauthorized disclosure or misuse of proprietary or confidential information of the Company or its Subsidiaries or Affiliates, or takes or omits to take any other action as may be specified in the Award Agreement, the Participant shall be subject to forfeiture of such Award or portion, if any, of the Award as may then remain outstanding and also to forfeiture of any amounts of cash, Stock, other Awards, or other property received by the Participant upon exercise or settlement of such Award or in connection with such Award during such period (as the Committee may provide in the Award Agreement) prior to the occurrence which gives rise to the forfeiture.

(f)    *Awards to Participants Outside the United States.* The Committee may modify the terms of any Award under the Plan granted to a Participant who is, at the time of grant or during the term of the Award, resident or primarily employed outside of the United States in any manner deemed by the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then resident or primarily employed, or so that the value and other benefits of the Award to the Participant, as affected by foreign tax laws and other restrictions applicable as a result of the Participant's residence or employment abroad, shall be comparable to the value of such an Award to a Participant who is resident or primarily employed in the United States. An Award may be modified under this Section 7(f) in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation.

8.    *Performance Awards.* The right of a Participant to exercise or receive a grant or settlement of any Award, and the timing thereof, may be subject to such performance conditions as may be specified by the Committee. The Committee may use such business

criteria and other measures of performance as it may deem appropriate in establishing any performance conditions, and may exercise its discretion to reduce or increase the amounts payable under any Award subject to performance conditions. Achievement of performance goals in respect of such Performance Awards shall be measured over a performance period specified by the Committee. Settlement of such Performance Awards shall be in cash, Stock, other Awards, or other property, in the discretion of the Committee. The Committee shall specify the circumstances in which such Performance Awards shall be forfeited in the event of termination of employment by the Participant prior to the end of a performance period or settlement of Performance Awards, and other terms relating to such Performance Awards in accordance with Section 6 and this Section 8.

9. *Change in Control Provisions.*

(a) *Acceleration Upon Change in Control.* Except as provided in Section 9(e) or in an Award Agreement, in the event of a "Change in Control," as defined in this Section:

(i) any Award carrying a right to exercise that was not previously exercisable and vested shall become fully exercisable and vested; and

(ii) the restrictions, deferral limitations, and forfeiture conditions applicable to any other Award granted under the Plan shall lapse, such Awards shall be deemed fully vested, any performance conditions imposed with respect to Awards shall be deemed to be fully achieved, and payment of such Awards shall be made in accordance with the terms of the Award Agreements.

(b) *"Change in Control" Defined.* For purposes of the Plan, a "Change in Control" shall have occurred if:

(i) any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, any trustee or other fiduciary holding securities under an employee benefit plan of the Company or any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company), is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding voting securities;

(ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (i), (iii), or (iv) of this Section 9(b)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(iii)    the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than (A) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or parent entity) 50% or more of the combined voting power of the voting securities of the Company or such surviving or parent entity outstanding immediately after such merger or consolidation or (B) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no "person" (as hereinabove defined) acquired 50% or more of the combined voting power of the Company's then outstanding securities; or

(iv)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets (or any transaction having a similar effect).

(c)    "Change in Control Price" Defined.  For purposes of the Plan, "Change in Control Price" means the higher of (i) the highest price per share paid in any transaction constituting a Change in Control or (ii) the highest Fair Market Value per share at any time during the 60-day period preceding or following a Change in Control.

(d)    Additional Payments.  If any payment attributable to any Award under the Plan or to any award under the Preexisting Plan and Share Resolutions (the "Payments") will be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code (or any similar tax that may hereafter be imposed), the Company shall pay at the time specified below an additional amount (the "Gross-Up Payment") such that the net amount retained by a Participant after deduction of any Excise Tax on such Payments and any federal, state and local income and employment tax and Excise Tax upon the payment provided for by this Section, shall be equal to the Payments. For purposes of determining whether any of the Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all payments or benefits received or to be received by a Participant in connection with a Change in Control of the Company or the Participant's termination of employment with the Company, a parent corporation thereof, a Subsidiary or Affiliate (pursuant to the Plan or any other plan, agreement or arrangement of the Company, its Subsidiaries or Affiliates) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all "excess parachute payments" within the meaning of Section 280G(b)(1) shall be treated as subject to the Excise Tax, unless in the opinion of tax counsel selected by the Company's independent auditors and acceptable to the Participant such payments or benefits (in whole or in part) do not constitute parachute payments, or such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered within the meaning of Section 280G(b)(4) of the Code in excess of the base amount within the meaning of Section 280G(b)(3) of the Code, or are otherwise not subject to the Excise Tax; (ii) the amount of the Payments which shall be treated as subject to the Excise Tax shall be equal to the lesser of (1) the total amount of the Payments or (2) the amount of excess parachute payments within the meaning of Section 280G(b)(1) (after applying clause (i) above); and (iii) the value of any non-cash benefits or any deferred payment or benefit shall be determined by the Company's independent auditors in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.  For purposes of determining the amount of the Gross-Up Payment, the Participant shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up

Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Participant's residence on the date such Gross-Up Payment is made, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes. In the event that the Excise Tax is subsequently determined to be less than the amount taken into account hereunder at the time of the Gross-Up Payment, the Participant shall repay to the Company at the time that the amount of such reduction in Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (plus the portion of the Gross-Up Payment attributable to the Excise Tax and federal and state and local income tax imposed on the Gross-Up Payment being repaid by the Participant if such repayment results in a reduction in Excise Tax and/or a federal and state and local income tax deduction) plus interest on the amount of such repayment at the rate provided in Section 1274(b)(2)(B) of the Code. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder at the time of the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (plus any interest payable with respect to such excess) at the time that the amount of such excess is finally determined. Any Gross-Up Payment to be made to the Participant under this paragraph shall be payable within thirty (30) days of the date of the Change in Control.

(e)     *Pooling of Interests.* Notwithstanding the provisions of this Section 9, in the event that consummation of a Change in Control is contingent on the ability to account for such Change in Control under "pooling of interests" accounting methodology, the provisions of Sections 9(a) and 9(d) hereof shall not be implemented to the extent such implementation would prevent the Change in Control transaction from being accounted for in such manner. In such event, the Committee may in its discretion take such action as it deems appropriate, without precluding the Change in Control transaction from being so accounted for, to enable holders of Awards to realize substantially similar economic results as would have been realized through application of Sections 9(a) and 9(d) hereof.

10.     *General Provisions.*

(a)     *Compliance with Legal and Exchange Requirements.* The Plan, the granting and exercising of Awards thereunder, and the other obligations of the Company under the Plan and any Award Agreement, shall be subject to all applicable federal and state laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required. The Company, in its discretion, may postpone the issuance or delivery of Stock under any Award until completion of such stock exchange listing or registration or qualification of such Stock or other required action under any state, federal or foreign law, rule or regulation as the Company may consider appropriate, and may require any Participant to make such representations and furnish such information as it may consider appropriate in connection with the issuance or delivery of Stock in compliance with applicable laws, rules and regulations.

(b)     *Nontransferability.* Except as otherwise provided in this Section 10(b), Awards shall not be transferable by a Participant other than by will or the laws of descent and distribution or pursuant to a designation of a Beneficiary, and Awards shall be exercisable during the lifetime of a Participant only by such Participant or his guardian or legal representative. In addition, except as otherwise provided in this Section 10(b), no rights under

the Plan may be pledged, mortgaged, hypothecated, or otherwise encumbered, or subject to the claims of creditors. The foregoing notwithstanding, the Committee may, in its sole discretion, provide that Awards (or rights or interests therein) shall be transferable, including permitting transfers, without consideration, to a Participant's immediate family members (i.e., spouse, children, grandchildren, or siblings, as well as the Participant), to trusts for the benefit of such immediate family members, and to partnerships in which such family members are the only parties, or other transfers deemed by the Committee to be not inconsistent with the purposes of the Plan.

(c)     *No Right to Continued Employment.* Neither the Plan nor any action taken thereunder shall be construed as giving any employee the right to be retained in the employ of the Company or any of its Subsidiaries or Affiliates, nor shall it interfere in any way with the right of the Company or any of its Subsidiaries or Affiliates to terminate any employee's employment at any time.

(d)     *Taxes.* The Company or any Subsidiary or Affiliate is authorized to withhold from any Award granted, any payment relating to an Award under the Plan, including from a distribution of Stock, or any payroll or other payment to a Participant, amounts of withholding and other taxes due in connection with any transaction involving an Award, and to take such other action as the Committee may deem advisable to enable the Company and Participants to satisfy obligations for the payment of withholding taxes and other tax obligations relating to any Award. This authority shall include authority to withhold or receive Stock or other property and to make cash payments in respect thereof in satisfaction of a Participant's tax obligations. Other provisions of the Plan notwithstanding, only the minimum amount of Stock deliverable in connection with an Award necessary to satisfy statutory withholding requirements will be withheld.

(e)     *Changes to the Plan and Awards.* The Board may amend, alter, suspend, discontinue, or terminate the Plan or the Committee's authority to grant Awards under the Plan; provided, however, that, without the consent of an affected Participant, no amendment, alteration, suspension, discontinuation, or termination of the Plan may materially adversely affect the rights of such Participant under any Award theretofore granted to him or her. The Committee may waive any conditions or rights under, or amend, alter, suspend, discontinue, or terminate any Award theretofore granted and any Award Agreement relating thereto; provided, however, that, without the consent of an affected Participant, no such amendment, alteration, suspension, discontinuation, or termination of any Award may materially adversely affect the rights of such Participant under such Award. Following the occurrence of a Change in Control, the Board may not terminate this Plan or amend this Plan with respect to Awards that have already been granted in any manner adverse to employees.

(f)     *No Rights to Awards; No Stockholder Rights.* No Participant or employee shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants and employees. No Award shall confer on any Participant any of the rights of a stockholder of the Company unless and until Stock is duly issued or transferred to the Participant in accordance with the terms of the Award.

(g)     *Unfunded Status of Awards and Trusts.* The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any payments not

yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Committee may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan to deliver cash, Stock, other Awards, or other property pursuant to any Award, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Committee otherwise determines. If and to the extent authorized by the Committee, the Company may deposit into such a trust Stock or other assets for delivery to the Participant in satisfaction of the Company's obligations under any Award. If so provided by the Committee, upon such a deposit of Stock or other assets for the benefit of a Participant, there shall be substituted for the rights of the Participant to receive delivery of Stock and other payments under this Plan a right to receive the assets of the trust (to the extent that the deposited Stock or other assets represented the full amount of the Company's obligation under the Award at the date of deposit). The trustee of the trust may be authorized to dispose of trust assets and reinvest the proceeds in alternative investments, subject to such terms and conditions as the Committee may specify and in accordance with applicable law.

(h)     *Nonexclusivity of the Plan.* The adoption of the Plan by the Board shall not be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including the granting of stock options and other awards otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

(i)     *No Fractional Shares.* No fractional shares of Stock shall be issued or delivered pursuant to the Plan or any Award. The Committee shall determine whether cash, other Awards, or other property shall be issued or paid in lieu of such fractional shares or whether such fractional shares or any rights thereto shall be forfeited or otherwise eliminated.

(j)     *Governing Law.* The validity, construction, and effect of the Plan, any rules and regulations relating to the Plan, and any Award Agreement shall be determined in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of laws, and applicable federal law.

(k)     *Effective Date.* The Plan shall become effective upon approval by the Board of Directors (the "Effective Date").

(l)     *Titles and Headings; Certain Terms.* The titles and headings of the sections in the Plan are for convenience of reference only. In the event of any conflict, the text of the Plan, rather than such titles or headings, shall control. The term "including," when used in the Plan, means in each case "including without limitation."

# EXHIBIT B

**This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under The Securities Act Of 1933.**

MARSH & McLENNAN COMPANIES
2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions for March 17, 2004 Award of Nonqualified Stock Options
to U.S. Grant Recipients

The award of nonqualified stock options granted on March 17, 2004 under the Marsh & McLennan Companies (MMC) 2000 Employee Incentive and Stock Award Plan (the Plan) is subject to the following terms and conditions:

I.   VESTING OF OPTION

Subject to your continued employment, twenty-five percent (25%) of the aggregate number of shares covered by these options will vest and become exercisable each March 17 beginning March 17, 2005. Subject to the provisions of Section V herein, in the event of your Death, Permanent Disability, Early, Normal or Deferred Retirement, unvested options will vest at such termination and become exercisable. For all other terminations of employment, unvested options will not vest and vested options will cease to be exercisable as of the date of such termination.

II.  METHOD OF EXERCISE

When you decide to exercise a stock option, you must follow the steps set forth below. Your option exercise will be effective the date on which we receive your stock option exercise letter (the Notice of Exercise of Option Letter), option exercise payment and Non-Solicitation Agreement or, if received on different days, the later of those dates.

A.  Notice of Exercise of Option Letter

Send your Notice of Exercise of Option Letter to:

For MMC Insiders (i.e.,
MMC Executive Officer, MMC Controller)
Kelly Gamble
Senior Manager, Global Compensation
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036-2774
Facsimile Number: (212) 345-4767

For All Other Option Holders
Emmanuel C. Victorino
Senior Executive Compensation Administrator
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036-2774
Facsimile Number: (212) 345-4767

The Notice of Exercise of Option Letter should follow the format of one of the attached sample letters. Your letter must set forth the following information:

1. The number of shares that you wish to acquire through your option exercise, the grant date of the option; and

2. The method of payment for exercising the option: U.S. dollars, MMC common stock, or a combination of U.S. dollars and MMC common stock; and

3. The method of payment for applicable withholding taxes: cash payment or share withholding; and

4. The method of share distribution:

    a. For shares distributed electronically in book entry form; include company name, contact person, Depository Trust Company (DTC) number, telephone and facsimile number.

    b. For shares distributed in stock certificate form; include the number of certificates to be prepared, the address to which they should be distributed, and (if different) the address to which other shareholder communications and dividends (with respect to these certificates) should be directed.

We will not accept oral notices of exercise of options, and you must purchase a minimum of 200 shares (unless acquiring all vested shares from the option grant).

## B. Payment

Notice of Exercise of Option Letters will not be processed until we receive payment. Payment may be made with (1) U.S. dollars, (2) MMC common stock or (3) a combination of U.S. dollars and MMC common stock as follows:

1. Payment with U.S. Dollars

Send a certified or bank check, payable to Marsh & McLennan Companies, Inc., for the full amount of the exercise price, or wire transfer the full amount in U.S. dollars to account number 910-2-741874 (ABA #021000021) at Chase Manhattan Bank in New York. Wire transfers are not considered "received" until the date on which Chase confirms that the funds have been transferred to our account.

2. Payment with Shares of MMC Common Stock

You may pay for the exercise of an option by tendering shares of MMC common stock (including shares acquired from the Stock Purchase Plan, a stock option exercise or a stock award vesting) which you have owned for at least six months prior to the exercise date, having a value equal to or greater than the aggregate exercise price, as follows:

a. Delivery of Stock Certificate(s)

The stock certificate(s) must be delivered to MMC

(1) endorsed to Marsh & McLennan Companies, Inc. (the assignee)
- or -
(2) accompanied by a stock power endorsed to Marsh & McLennan Companies, Inc.

The endorsement must be identical to the registrant's name indicated on the face of the certificate. The signature of endorsement must be guaranteed by a commercial bank or stockbroker. Attached is a sample of an endorsed stock certificate. [Note: If the certificate is mailed, you might consider making the endorsement on a stock power (2 above), and then mailing it separately.]

b. Valuation of Shares

Any shares delivered as either partial or full payment of the exercise price of an option will be valued at the Fair Market Value of MMC common stock. Fair Market Value on a given date means the per share value of stock as determined by using the average of the high and low selling prices of such stock on the immediately preceding date (or, if the New York Stock Exchange was not open that day, the next preceding day that the NYSE was open for trading and the stock was traded) as reported for such date in the table entitled "NYSE Composite Transactions", contained in The Wall Street Journal or an equivalent successor table. For example, for a stock option exercise on April 5th, the Fair Market Value of shares tendered, on a per share basis, would be the average of the high and low selling prices of MMC common stock on April 4th.

If the stock submitted for payment exceeds the number of shares required, the excess shares will be returned to you.

3. Payment with a Combination of U.S. Dollars and MMC Common Stock

As noted in "Valuation of Shares" above, shares used in payment of your stock option exercise will be valued at the Fair Market Value of MMC common stock. Once the value of the shares tendered has been determined, you will owe MMC a check if the aggregate exercise price exceeds the value of the tendered shares. Failure to pay the full purchase price within five days of the date of exercise may void the Notice of Exercise of Option Letter.

C. Non-Solicitation Agreement

You must sign a Non-Solicitation Agreement in order to exercise the March 17, 2004 stock option, unless you are exercising the option after taking Normal or Deferred Retirement.

1. While Employed

A Non-Solicitation Agreement must accompany your Notice of Exercise of Option Letter. The Agreement must follow the form of the sample Agreement attached in this package and be signed and dated by you. We recommend you retain a copy of the Agreement for your records and consult an attorney before signing the Agreement.

2. Upon Early Retirement

If you take early retirement, you must sign the Non-Solicitation Agreement that is described in Section V in order to keep a vested option from expiring. A sample Agreement is attached for your use if you take early retirement and have a vested option.

III. WITHHOLDING TAXES

Payment of withholding taxes (including FICA) is required by law when a nonqualified stock option is exercised. An election to satisfy all applicable withholding taxes, either (1) by check or (2) by having a sufficient number of the shares resulting from the option exercise retained by MMC, must be made on or before the exercise date (see sample letters). If such an election is not made by that time then, by default, shares will be retained to satisfy the tax withholding obligation. The election to have shares withheld is irrevocable but is subject to disapproval by the Compensation Committee of the MMC Board of Directors (the Committee). Such shares will be valued at the Fair Market Value of MMC common stock.

IV. REGISTRATION AND DISTRIBUTION OF SHARES

A. The shares from your stock option exercise will be registered as specified in your Notice of Exercise of Option Letter, after you have fully paid for your exercise. The shares may be registered only in your name or that of you and your spouse as joint tenants.

B. The shares from your stock option exercise will be distributed as specified in your Notice of Exercise of Option Letter, after you have satisfied your payroll tax obligation.

C. When you exercise your stock option, you will receive written confirmation of the transaction.

D. Shares received upon your exercise of a stock option will be registered in your name (or you and your spouse as joint tenants, at your request) as of the date of exercise, and you will receive the quarterly dividend so long as you remain a registered shareholder on the dividend record date.

## V.  TERMINATION OF EMPLOYMENT

If your employment with MMC or any of its subsidiaries or affiliates (the Company) terminates, the following shall apply:

### A.  Death

In the event of your death, any unvested option will vest and become exercisable.  The person or persons to whom your rights under the option shall pass by will or the laws of descent and distribution shall be entitled to exercise such option within one year after the date of death, but in no event shall the option be exercised beyond the expiration date of the grant.

### B.  Permanent Disability

Should you terminate due to total and permanent disability as determined under MMC's long-term disability program, any unvested option will vest at such termination and become exercisable.  Vested option shares shall be exercisable after your termination of employment, but in no event beyond the expiration date of the grant.

### C.  Normal or Deferred Retirement

In the event of retirement from the Company, any unvested option will vest at such termination and become exercisable.  Vested option shares shall be exercisable after your Retirement Date (whether such Retirement Date is a Normal Retirement Date or Deferred Retirement Date), but in no event beyond the expiration date of the grant.

### D.  Early Retirement

In the event of retirement from the Company, any unvested option will vest at such termination and become exercisable.  In the case of your Retirement Date being an Early Retirement Date, any then vested option shares shall continue to be exercisable for five years from your Early Retirement Date, but in no event beyond the expiration date of the grant, provided that you execute the attached Non-Solicitation Agreement for Early Retirees, and in fact do, comply with said Non-Solicitation Agreement, for a period of three years commencing with your Early Retirement Date, or such lessor period as may be applicable, it being understood that failure to comply with said Non-Solicitation Agreement will cause your early retirement to be governed by the provisions of "F.  All Other Employment Terminations", below.

### E.  Definitions

As used in Section V. C. and D., the terms Retirement Date, Normal Retirement Date, Deferred Retirement Date and Early Retirement Date shall have the respective meanings given such terms (or any comparable substitute terms or concepts) set forth in the Company's primary retirement plan applicable to you upon your retirement.

### F.  All Other Employment Terminations

All option shares will cease to be exercisable on the date of termination due to termination for any other reason than specified above, except to the extent that the Committee may determine otherwise.

## VI. CHANGE IN CONTROL PROVISIONS

### A. Change in Control

Upon the occurrence of a "change in control" of MMC, as defined in the Plan, all stock options you hold will become fully exercisable and vested, and any restrictions contained in the terms and conditions of the option grants shall lapse.

### B. Additional Payment

If you exercise option shares that have become exercisable because of a change in control, all or a portion of the gain (the total market price for the shares on the date of exercise minus the total exercise price) on those shares may be subject to a 20% federal excise tax. The excise tax is imposed when the gain (plus any other payments, which are determined to be contingent on a change in control) is more than 2.999 times the average of your last five years W-2 earnings.

If a change in control occurs and you exercise stock options whose vesting has been accelerated, MMC will determine if the excise tax is payable. If it is payable, MMC will pay to you, within five days of making the computation, an amount of money (the Additional Payment) equal to the excise tax plus additional amounts for federal, state and local taxes so that the excise tax and income taxes on the excise tax payment will not cost you any money. If the Additional Payment is later determined to be less than the amount of taxes you owe, a further payment will be made to you. If the Additional Payment is more than the amount you owe, you will be required to reimburse MMC for the difference.

## VII. OTHER PROVISIONS

A. Neither the granting of an award nor any exercise thereof gives you any right to continue to be employed by the Company, or restricts, in any way, the right of your employer to terminate your employment at any time for any reason not specifically prohibited by law.

B. During your lifetime, an option shall be exercisable only by you, and no right thereunder shall be transferable except by will or the laws of descent and distribution.

C. Neither you nor any person entitled to exercise your rights in the event of your death shall have any of the rights of a stockholder with respect to the shares of MMC common stock subject to an option, unless, and until, you have exercised the option, paid the full price thereof, and have received the shares so acquired.

D. MMC is not liable for the non-issuance or non-transfer or any delay in the issuance or transfer of any shares of MMC common stock subject to an option or otherwise pursuant to the Plan which results from the inability of MMC to obtain, or in any delay in obtaining, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of MMC common stock, if counsel for MMC deems such authority necessary for the lawful issuance or transfer of any such shares.

E. An award is subject to all of the terms and conditions of the Plan and your acceptance of an award shall constitute your agreement to the terms and conditions of the Plan and the administrative regulations of the Committee. Your acceptance of an award constitutes your agreement that the shares of MMC common stock acquired hereunder will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations. In the event of any conflict between the Plan and the terms and conditions of the Plan, the Plan shall prevail.

F. An option shall be exercised in accordance with, and awards shall be subject to, such additional administrative regulations as the Committee may from time to time adopt. All decisions of the Committee upon any questions arising under the Plan or under these terms and conditions shall be conclusive and binding.

G. The Plan, and the granting and exercising of options or awards thereunder, and the obligations of MMC and employees under the Plan, shall be subject to all applicable governmental laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required, including, but not limited to, tax and securities regulations. This provision takes precedence over all aforementioned terms and conditions.

Please retain this document in your permanent records. If you have any questions regarding the Plan or your stock option grant, please contact Ms. Kelly Gamble, Senior Manager, Global Compensation, at (212) 948-3523 or Mr. Emmanuel C. Victorino, Senior Executive Compensation Administrator, at (212) 345-3543. Both also can be reached via internal electronic mail (Lotus Notes) or the internet (kelly.gamble@mmc.com; emmanuel.c.victorino@mmc.com).

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the Exchange Act), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting Ms. Kelly Gamble or Mr. Emmanuel C. Victorino as indicated above.

Attachments
Non-Solicitation Agreements
Notice of Exercise of Option Letters
Sample Endorsement of Stock Certificate
Tax Information Memorandum

t&c\03172004option-usa
March 8, 2004

In order to receive the benefits afforded by the Marsh & McLennan Companies 1988 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1992 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1997 Employee Incentive and Stock Award Plan, the Marsh & McLennan Companies 2000 Employee Incentive and Stock Award Plan, or any successor plan thereto (collectively, the Plan), as each may be amended from time to time, I, the undersigned, agree that if my employment with Marsh & McLennan Companies, Inc. or one of its subsidiaries (the Company) terminates for any reason other than death or total disability within three (3) years after exercising the option granted to me on _____ under the Plan, I will not, for a period of two (2) years from date of termination, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation except for the benefit of the Company:

(a) solicit or accept business of the type offered by the Company during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company or its affiliates who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b) solicit any employee of the Company who reported to me directly or indirectly to terminate his employment with the Company for the purpose of competing with the Company.

I recognize and acknowledge that the Company's trade secrets and confidential or proprietary information, including such trade secrets or information as may exist from time to time, are valuable, special and unique assets of the Company's business, access to and knowledge of which were essential to the performance of my duties while in the employ of the Company. I will not, during or after the term hereof, in whole or in part, disclose such secrets or confidential or proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall I make use of any such property for my own purposes or for the benefit of any person, firm, corporation or other entity (except the Company) under any circumstances, during or after the term hereof, provided that after the term hereof, these restrictions shall not apply to such secrets or information which are then in the public domain (provided that I was not responsible, directly or indirectly, for such secrets or information entering the public domain without the Company's consent).

Without limiting any other remedies which may be available to it under applicable law, the Company shall be entitled to monetary damages under this agreement, which may include, but not be limited to, the gain on exercise of the option computed as the difference between the option price and the market price on the date of exercise multiplied by the number of shares exercised.

I understand that the agreement applies only to this particular option grant and does not take precedence over or affect other non-solicitation agreements that I may have with the Company.

This agreement shall be construed in accordance with the laws of the State of New York.

Name (Print): _____      SS#: _____

Signature: _____      Date: _____

t&c\03172004option-usa
March 8, 2004

In order to extend the expiration date of Participant's stock option granted on <u>(grant date(s))</u> under the Marsh & McLennan Companies 1988 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1992 Incentive and Stock Award Plan, the Marsh & McLennan Companies 1997 Employee Incentive and Stock Award Plan, the Marsh & McLennan Companies 2000 Employee Incentive and Stock Award Plan, or any successor plan thereto (collectively, the Plan), as each may be amended from time to time, beyond <u>(early retirement date)</u>, his Early Retirement Date at <u>(employer)</u>, to the earlier of <u>(expiration date)</u> or the original expiration date of the applicable grant, Participant agrees that until <u>(non-solicitation date)</u> he will not, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation:

(a) solicit or accept business of the type offered by Marsh & McLennan Companies, Inc. or one of its subsidiaries (the Company) during my term of employment with the Company, or perform or supervise the performance of any services related to such type of business, from or for (i) clients or prospects of the Company who were solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (ii) any former client of the Company or its affiliates who was such within two (2) years prior to my termination of employment and who was solicited or serviced directly by me or where I supervised, directly or indirectly, in whole or in part, the solicitation or servicing activities related to such former clients; or

(b) solicit any employee of the Company who reported to me directly or indirectly to terminate his employment with the Company for the purpose of competing with the Company.

Participant recognizes and acknowledges that the Company's trade secrets and confidential or proprietary information, including such trade secrets or information as may exist from time to time, are valuable, special and unique assets of the Company's business, access to and knowledge of which are essential to the performance of the duties of Participant hereunder. Participant will not, during or after the term hereof, in whole or in part, disclose such secrets or confidential or proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall Participant make use of any such property for his own purposes or for the benefit to any person, firm, corporation or other entity (except the Company) under any circumstances, during or after the term hereof, provided that after the term hereof these restrictions shall not apply to such secrets or information which are then in the public domain (provided that he was not responsible, directly or indirectly, for such secrets or information entering the public domain without the Company's consent).

Name (Print): _____     SS#: _____

Signature: _____     Date: _____

t&c\03172004option-usa
March 8, 2004

Date

Mr. Emmanuel C. Victorino
Senior Executive Compensation Administrator
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

**[Note: Those employees who are insiders
(i.e., MMC Executive Officer or MMC Controller) should
direct their correspondence to Ms. Kelly Gamble, Senior Manager,
Global Compensation.]**

Dear Manny:

I would like to exercise the stock option granted to me on _____ to acquire _____ shares of Marsh & McLennan Companies, Inc. common stock at U.S.$_____ per share. Enclosed is a check for U.S.$_____ representing the full payment for this option exercise.

Also, enclosed is a non-solicitation agreement signed by me.

Please <u>register</u> the shares as follows:

  Name:  _____   Empl. ID #: _____

  Address:  _____

        _____

**(Include <u>one</u> of the two following sentences.)**

Please <u>distribute</u> the shares via book entry form as follows:

  Company:  _____   DTC #: _____

  Contact:  _____   Tele. #: _____

                   Fax #: _____

Please <u>distribute</u> the shares in stock certificate form as follows:

  _____ certificates for _____ shares each and 1 certificate for _____ shares to:

  Name:  _____

  Address:  _____

        _____

**(Include <u>one</u> of the following sentences for nonqualified stock option exercises only.)**

I authorize the Company to withhold a sufficient number of shares from the amount I would otherwise be due to receive as a result of this option exercise, in order to cover all applicable payroll taxes.

I agree to remit a check for all applicable payroll taxes upon the Company's request and understand that the shares will not be released until the tax payment has been received by you. (My office telephone number is _____.)

Sincerely,

Date

Mr. Emmanuel C. Victorino
Senior Executive Compensation Administrator
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774

**[Note: Those employees who are insiders
(i.e., MMC Executive Officer or MMC Controller) should
direct their correspondence to Ms. Kelly Gamble, Senior Manager,
Global Compensation.]**

Dear Manny:

I would like to exercise the stock option granted to me on _____ to acquire _____ shares of Marsh & McLennan Companies, Inc. common stock at U.S.$_____ per share. Enclosed is a check for U.S.$_____ representing the full payment for this option exercise.

Also, enclosed is a non-solicitation agreement signed by me.

Please register the shares as follows:

    Name: _____    Empl. ID #: _____

    Address: _____

                  _____

**(Include one of the two following sentences.)**

Please distribute the shares via book entry form as follows:

    Company: _____    DTC #: _____

    Contact: _____    Tele. #: _____

                                      Fax #: _____

Please distribute the shares in stock certificate form as follows:

    _____ certificates for _____ shares each and 1 certificate for _____ shares to:

    Name: _____

    Address: _____

                  _____

**(Include one of the following sentences for nonqualified stock option exercises only.)**

I authorize the Company to withhold a sufficient number of shares from the amount I would otherwise be due to receive as a result of this option exercise, in order to cover all applicable payroll taxes.

I agree to remit a check for all applicable payroll taxes upon the Company's request and understand that the shares will not be released until the tax payment has been received by you. (My office telephone number is _____.)

Sincerely,

# MARSH & McLENNAN COMPANIES, INC.

MARSH & McLENNAN COMPANIES, INC. WILL FURNISH WITHOUT CHARGE TO EACH STOCK-HOLDER WHO SO REQUESTS A STATEMENT OR SUMMARY OF THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF WHICH THE CORPORATION IS AUTHORIZED TO ISSUE AND OF THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS. ANY SUCH REQUEST IS TO BE ADDRESSED TO THE TRANSFER AGENT NAMED ON THE FACE OF THIS CERTIFICATE.

This certificate also evidences and entitles the holder hereof to certain Rights as set forth in the Rights Agreement dated as of September 17, 1987 (as amended from time to time, the "Rights Agreement"), the terms of which are hereby incorporated herein by reference and a copy of which is on file at the principal offices of the Company. Under certain circumstances, as set forth in the Rights Agreement, such Rights will be evidenced by separate certificates and will no longer be evidenced by this certificate. The Company will mail to the holder of this certificate a copy of the Rights Agreement, as in effect on the date of mailing, without charge promptly after receipt of a written request therefor. Under certain circumstances set forth in the Rights Agreement, Rights issued to, or held by, any Person who is, was or becomes an Acquiring Person or any Affiliate or Associate thereof (as such terms are defined in the Rights Agreement), whether currently held by or on behalf of such Person or by any subsequent holder, may become null and void.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM —as tenants in common
TEN ENT —as tenants by the entireties
JT TEN  —as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT/TRANSFERS MIN ACT—_____Custodian_____
(Cust)          (Minor)
under Uniform Gifts to Minors
Act_____
(State)

Additional abbreviations may also be used though not in the above list.

*For value received,_____ hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

| 36-2668272 |
| --- |

Marsh & McLennan Companies, Inc.

1166 Avenue of the Americas, New York, NY 10036

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE.

One Thousand (1,000) *Shares*

*of the capital stock represented by the within Certificate, and do hereby irrevocably constitute and appoint_____*

Leave Blank

*Attorney to transfer the said stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated,* April 1, 2001

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

(Signature as name appears on face of certificate)

Signature guaranteed by
(Commercial Bank or New York Stock Exchange Member Firm)

Signature (Stamp) _____
Date _____