UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM W. GILMAN AND
EDWARD J. McNENNEY, JR.

                          Plaintiffs,

  -against-

MARSH & McLENNAN COMPANIES, INC;
MARSH INC; MARSH USA INC., MARSH
GLOBAL BROKING INC., and MICHAEL
CHERKASKY

                    Defendants.

No.  10 Civ. 8158 (JPO)

ORAL ARGUMENT REQUESTED

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

---

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
(212) 310-8007 (fax)

*Attorneys for Defendants Marsh & McLennan
Companies, Inc., Marsh Inc., Marsh USA Inc., and
Marsh Global Broking Inc.*

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Defendant Michael Cherkasky*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTS ...........................................................................................................................6

    A.    The NYAG's Investigation of the Insurance Industry ...........................6

    B.    NYAG Files Felony Complaints Against AIG Employees Specifically
        Identifying Gilman and McNenney As Conspirators in the Alleged Fraud ...........6

    C.    The NYAG Files a Civil Complaint Against Marsh.................................8

    D.    Marsh and the NYAG Settle the NYAG's Civil Lawsuit.......................9

    E.    Plaintiffs' Indictments and Criminal Prosecutions ...............................9

    F.    Relief Sought under Benefit Plans.......................................................10

        1.    The Marsh USA Inc. Severance Pay Plan ................................10

        2.    The Stock Award Plan ..............................................................11

ARGUMENT .................................................................................................................12

I.      STANDARD OF REVIEW ..............................................................................12

II.    PLAINTIFFS' MALICIOUS PROSECUTION CLAIM MUST BE DISMISSED ..........12

    A.    Plaintiffs Plead No Facts Showing an Absence of Probable Cause.....................13

        1.    The Plea Allocutions That Plaintiffs Fail to Acknowledge in the
            SAC Establish Probable Cause for Plaintiffs' Prosecution as a
            Matter of Law ...........................................................................13

        2.    Plaintiffs' Indictment by a Grand Jury Creates a Presumption of
            Probable Cause, and Plaintiffs Have Failed to Rebut This
            Presumption .............................................................................14

    B.    Plaintiffs Do Not (And Cannot) Plead That Defendants Initiated a
        Criminal Prosecution Against Them......................................................20

    C.    Plaintiffs Do Not Allege That Defendants Were Motivated by Actual
        Malice ...................................................................................................25

III.   PLAINTIFFS' CLAIM FOR ABUSE OF PROCESS MUST BE DISMISSED ............27

IV.   PLAINTIFFS' CLAIM UNDER JUDICIARY LAW SECTION 487 AGAINST
      MR. CHERKASKY MUST BE DISMISSED ...................................................28

V.    PLAINTIFFS' CLAIMS FOR SEVERANCE BENEFITS MUST BE
      DISMISSED ...................................................................................................31

    A.    Plaintiffs Admit That They Failed to Exhaust Their Administrative
        Remedies..............................................................................................31

    B.    Plaintiffs' Breach of Contract Claim Is Preempted by ERISA............................33

VI.   PLAINTIFFS' CLAIMS UNDER THE STOCK AWARD PLAN FAIL........................34

    A.    Plaintiffs' NYLL Claim Fails Because Equity Awards Are Not Wages..............34

# TABLE OF AUTHORITIES

B.   Plaintiffs' Seventh Cause of Action Must Be Dismissed as Time-Barred ............35

C.   Plaintiffs' Quasi-Contractual Claims Must Be Dismissed....................................36

CONCLUSION...............................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*216 Garage, Inc. v. Roth*,
    12 Misc. 2d 1081, 174 N.Y.S.2d 478 (N.Y. County Sup. Ct. 1958) ......................................29

*Ackerman v. Local Union 363*,
    423 F. Supp. 2d 125 (S.D.N.Y. 2006)...........................................................................7

*Alcantara v. City of New York*,
    646 F. Supp. 2d 449 (S.D.N.Y. 2009).........................................................................20

*Alter v. Bogoricin*,
    1997 WL 691332 (S.D.N.Y. Nov. 6, 1997)...................................................................36

*Am. Med. Ass'n v. United HealthCare Corp.*,
    2007 WL 1771498 (S.D.N.Y. June 18, 2007) ..........................................................32, 33

*Angevine v. Anheuser-Busch Companies Pension Plan*,
    646 F.3d 1034 (8th Cir. 2011) ....................................................................................33

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)........................................................................................5, 6, 12, 21

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................6, 7

*Baer v. Sprint Long Distance*,
    60 F. Supp. 2d 209 (S.D.N.Y. 1999).........................................................................21

*Barrows v. Alexander*,
    78 A.D.3d 1693 (4th Dep't 2010)..............................................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................12, 21

*Berman v. Tyco Intern'l Ltd.*,
    2011 WL 1334851 (S.D.N.Y. Mar. 31, 2011) ..............................................................34

*Berry v. MVP Health Plan, Inc.*,
    2006 WL 4401478 (N.D.N.Y. Sept. 30, 2006) .............................................................34

*Bonham v. Jefferson Pilot Fin. Ins. Co.*,
    2010 WL 1405448 (W.D.N.C. Mar. 31, 2010)................................................................33

# TABLE OF AUTHORITIES

*Bradley v. Vill. of Greenwood Lake,*
   376 F. Supp. 2d 528 (S.D.N.Y. 2005) .................................................................25

*Brady v. Maryland,*
   373 U.S. 83 (1963) ...............................................................................................18

*Brown v. Sears, Roebuck & Co.,*
   297 A.D.2d 205 (1st Dep't 2002) ..................................................................13, 22

*Burke v. Kodak Ret. Income Plan,*
   336 F.3d 103 (2d Cir. 2003) .................................................................................31

*Cabble v. City of New York,*
   2009 WL 890098 (S.D.N.Y. Mar. 30, 2009) ............................................14, 15, 17

*Campos v. City of New York,*
   2010 WL 3912493 (S.D.N.Y. Sept. 13, 2010) ..................................................7, 28

*Carvel v. Ross,*
   2011 WL 856283 (S.D.N.Y. Feb 16, 2011) .........................................................30

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir. 2002) ...................................................................................6

*Colon v. City of New York,*
   60 N.Y.2d 78 (1983) ....................................................................................14, 15, 20

*Cook v. Sheldon,*
   41 F.3d 73 (2d Cir. 1994) .....................................................................................28

*Cornell v. Kapral,*
   2011 WL 94063 (N.D.N.Y. Jan. 11, 2011) ..........................................................15

*Curiano v. Suozzi,*
   102 A.D.2d 759 (1st Dep't 1984) .........................................................................27

*Delince v. City of New York,*
   2011 WL 666347 (S.D.N.Y. Feb. 7, 2011) .....................................................13, 21

*DeStefano v. Duncanson,*
   2011 WL 651452 (S.D.N.Y. Feb. 10, 2011) ...................................................22, 26

*Du Chateau v. Metro-North Commuter R.R. Co.,*
   253 A.D.2d 128 (1st Dep't 1999) .........................................................................25

# TABLE OF AUTHORITIES

*EBC I, Inc. v. Goldman Sachs & Co.,*
    5 N.Y.3d 11 (2005) ....................................................................................................36

*Econn v. Barclay's Bank PLC,*
    2010 U.S. Dist. LEXIS 143063 (S.D.N.Y. May 10, 2010) ....................................35

*Egan v. Marsh & McLennan Cos., Inc.,*
    2008 WL 245511 (S.D.N.Y. Jan. 28, 2008) ...........................................15, 19, 31, 34

*Fike v. Ruger,*
    754 A.2d 254 (Del. Ch. 1999).................................................................................36

*Fudge v. Town of Shandaken Police,*
    2010 WL 3258385 (N.D.N.Y. Aug. 16, 2010) .......................................................13

*Guiry v. Goldman Sachs & Co.,*
    31 A.D.3d 70 (1st Dep't 2006) ...............................................................................35

*Hahn v. Nat'l Westminster Bank, N.A.,*
    99 F. Supp. 2d 275 (E.D.N.Y. 2000) .....................................................................31

*Hanly v. Powell Goldstein, LLP,*
    290 Fed. Appx. 435 (2d Cir. 2008).........................................................................21

*Henry v. Brenner,*
    271 A.D.2d 647 (2d Dep't 2000) ............................................................................29

*Hill v. Melvin,*
    2006 U.S. Dist. LEXIS 43006 (S.D.N.Y. June 27, 2006) ......................................16

*Hornstein v. Wolf,*
    109 A.D.2d 129 (2d Dep't 1985) ............................................................................26

*Husbands ex rel. Forde v. City of New York,*
    2007 WL 2454106 (S.D.N.Y. Aug. 16, 2007) ..................................................18, 25

*In re Bank of Am. Corp.,*
    756 F. Supp. 2d 330 (S.D.N.Y. 2010).......................................................................6

*Int'l Bus. Machs. Corp. v. Martson,*
    37 F. Supp. 2d 613 (S.D.N.Y. 1999).......................................................................35

*Jenkins v. City of New York,*
    1999 WL 782509 (S.D.N.Y. Sept. 30, 1999), *aff'd* 216 F.3d 1072 (2d Cir. 2000) .................17

# TABLE OF AUTHORITIES

*Kirkendall v. Halliburton, Inc.*,
   2011 WL 2360058 (W.D.N.Y. June 9, 2011)......................................................31

*Levy v. Alfano*,
   47 F. Supp. 2d 488 (S.D.N.Y. 1999)................................................................18

*Llerando-Phipps v. City of New York*,
   390 F. Supp. 2d 372 (S.D.N.Y. 2005)..............................................................20

*Lopez v. City of New York*,
   901 F. Supp. 684 (S.D.N.Y. 1995)...................................................................27

*Lupski v. County of Nassau*,
   32 A.D.3d 997 (2d Dep't 2006)..........................................................4, 13, 22

*Madera v. Marsh USA, Inc.*,
   426 F.3d 56 (1st Cir. 2005)...........................................................................32

*Matter of Williams v. City of Hudson*,
   69 A.D.2d 921 (3d Dep't 1979).......................................................................17

*Meridian Horizon Fund, LP v. Tremont Group Holdings Inc.*,
   747 F. Supp. 2d 406 (S.D.N.Y. 2010)................................................................7

*Michigan v. DeFillippo*,
   443 U.S. 31 (1979).........................................................................................10

*Monagle v. Scholastic, Inc.*,
   2007 WL 766282 (S.D.N.Y. Mar. 9, 2007).......................................................35

*Morillo v. 1199 SEIU Benefit and Pension Funds*,
   783 F. Supp. 2d 487 (S.D.N.Y. 2011)..............................................................31

*Myers v. State of New York*,
   175 Misc. 2d 90 (N.Y. Ct. Cl. 1997)................................................................10

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995).......................................................................................34

*Nardelli v. Stamberg*,
   44 N.Y.2d 500 (1978).....................................................................................25

*Newton v. City of New York*,
   640 F. Supp. 2d 426 (S.D.N.Y. 2009)..............................................................19

## TABLE OF AUTHORITIES

*Nieves v. County of Monroe*,
   761 F. Supp. 2d 48 (W.D.N.Y. 2011) ................................................25, 26

*Nimkoff Rosenfeld & Schecter, LLP v. RKO Props., Ltd.*,
   2011 WL 832859 (S.D.N.Y. Mar. 4, 2011) ................................................30

*Northern Trust Bank of Florida/Sarasota v. Coleman*,
   632 F. Supp. 648 (S.D.N.Y. 1986)................................................28, 29

*O'Brien v. Alexander*,
   898 F. Supp. 162 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 1479 (2d Cir. 1996) ..............................29

*Parisi v. Suffolk County*,
   2009 WL 4405488 (E.D.N.Y. Dec. 3, 2009) ................................................19

*People v. Berry*,
   78 A.D.2d 1226 (3d Dep't 2010) ................................................14

*People v. Besser*,
   96 N.Y.2d 136 (2001) ................................................14

*People v. Gilman & McNenney*,
   No. 4800-2009, 2010 WL 3036983 (N.Y. Sup. Ct. July 2, 2010) ..........................9, 10, 17, 18

*People v. Highgate LTC Mgmt.*,
   69 A.D.3d 185 (3d Dep't 2009) ................................................21

*People v. Jackson*,
   65 A.D.3d 1164 (2d Dep't 2009) ................................................13

*People v. Lancaster*,
   69 N.Y.2d 20 (1986) ................................................19

*People v. McCann*,
   85 N.Y.2d 951 (1995) ................................................13

*People v. Mitchell*,
   82 N.Y.2d 509 (1993) ................................................19

*People v. Reese*,
   23 A.D.3d 1034 (4th Dep't 2005) ................................................19

*People v. Rosario*,
   9 N.Y.2d 286 (1961) ................................................18

# TABLE OF AUTHORITIES

*Present v. Avon Prods.*,
   253 A.D.2d 183 (1st Dep't 1999) ...................................................................22

*Prieto v. Election.com*,
   2005 WL 3560596 (E.D.N.Y. Dec. 29, 2005) .....................................................31

*Quigley v. Citigroup Supplemental Plan for Shearson Transfers*,
   2011 WL 1213218 (S.D.N.Y. March 29, 2011) ...................................................32

*Rafter v. Liddle*,
   2006 WL 2255093 (S.D.N.Y. Aug. 4, 2006), *aff'd*, 288 Fed. Appx. 768 (2d Cir. 2008)........30

*Reichelt v. Emhart Corp.*,
   921 F.2d 425 (2d Cir. 1990)...........................................................................34

*Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*,
   42 F. Supp. 2d 423 (D. Del. 1999)...................................................................36

*Rich v. JPMorgan Chase & Co.*,
   2006 WL 4682162 (N.Y. Sup. Oct. 3, 2006) ....................................................35

*Richardson v. City of New York*,
   2006 WL 2792768 (E.D.N.Y. Sept. 27, 2006) ..................................................16

*Romney v. Lin*,
   94 F.3d 74 (2d Cir. 1996) ..............................................................................34

*Rothstein v. Carriere*,
   373 F.3d 275 (2d Cir. 2004)...................................................................... passim

*Savino v. City of New York*,
   331 F.3d 63 (2d Cir. 2003)................................................................14, 15, 27

*Scully v. City of Watertown*,
   2005 WL 1244838 (N.D.N.Y. May 6, 2005)......................................................16

*Shawver v. R.H. Macy & Co., Inc.*,
   697 F.Supp. 1515 (W.D.Mo. 1988) ................................................................33

*Silver v. Kuehbeck*,
   2005 U.S. Dist. LEXIS 26956 (S.D.N.Y. Nov. 7, 2005)................................13, 18

*Smith v. Dunham-Bush, Inc.*,
   959 F.2d 6 (2d Cir. 1992) ..............................................................................34

# TABLE OF AUTHORITIES

*Smith-Hunter v. Harvey*,
  95 N.Y.2d 191 (2000) .................................................................................................2

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)..........................................................................................7

*State Univs. Ret. Sys. of Illinois v. Astrazeneca PLC*,
  334 Fed. Appx. 404 (2d Cir. 2009)................................................................................6

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
  425 F.3d 119 (2d Cir. 2005)..........................................................................................6

*Takacs v. City of New York*,
  2011 U.S. Dist. LEXIS 7055 (S.D.N.Y. Jan. 24, 2011) .............................................20

*Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*,
  2004 WL 2290499 (S.D.N.Y. Oct. 8, 2004) ...............................................................21

*Van Buskirk v. New York Times Co.*,
  325 F.3d 87 (2d Cir. 2003)..........................................................................................36

*Watson v. Grady*,
  2010 WL 3835047 (S.D.N.Y. Sept. 30, 2010)......................................................24, 25

*Wiggins v. Buffalo Police Dep't*,
  320 F. Supp. 2d 53 (W.D.N.Y. 2004) .........................................................................26

**STATUTES**

10 Del. C. § 8106 ....................................................................................................35, 36

CPLR § 214(6)........................................................................................................30, 31

N.Y. Crim. Proc. Law 190.50(5) ................................................................3, 15, 16, 19

N.Y. Crim. Proc. Law § 440.10 .................................................................................9, 10

N.Y. Penal Law § 20.20................................................................................................21

Defendants Marsh & McLennan Companies, Inc. ("MMC"); Marsh Inc.; Marsh (USA) Inc.; and Marsh Global Broking Inc. (collectively, "Marsh") and Defendant Michael Cherkasky (together with Marsh, "Defendants"), respectfully submit this joint memorandum of law and the accompanying Declaration of Jonathan D. Polkes, dated October 26, 2011, (the "Polkes Dec.") in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice.

## PRELIMINARY STATEMENT

On October 13, 2004, two employees of the American International Group, Inc. ("AIG") pleaded guilty to having engaged in a criminal scheme to defraud insurance clients.  In their sworn plea allocutions, these AIG employees named William Gilman and Edward McNenney, the Plaintiffs here, both of whom worked for Marsh, as co-conspirators in their criminal scheme. The next day, former New York Attorney General Eliot Spitzer ("NYAG") filed a civil complaint against Marsh, prominently accusing Plaintiff Gilman of wrongdoing.  Marsh terminated Plaintiffs' employment shortly thereafter.  Plaintiffs were subsequently indicted, tried, and convicted.  Because of prosecutorial error, Plaintiffs' convictions were later vacated, but they were never exonerated of wrongdoing.

Against this backdrop, Plaintiffs filed this lawsuit, in which they assert a series of meritless clams relating to their termination.  Defendants moved to dismiss, and Plaintiffs, rather than attempting to defend their complaint, chose to amend.  But the complaint remains as flimsy as before, for all the same reasons as before.

Plaintiffs' core claim (First Cause of Action) is that Defendants maliciously prosecuted Plaintiffs by "offer[ing] them up" as targets for criminal prosecution to secure a "lenient" settlement with the NYAG.  Defendants' previous motion to dismiss exposed the numerous fatal factual and legal defects in this claim, including as a threshold matter that Marsh received no "leniency" from its supposed "collusion" with the NYAG.  After all, Marsh paid $850 million in restitution as part of the settlement—the largest settlement that the NYAG had obtained up to that point—and an additional $435 million to settle the inevitable pile-on class actions.

Moreover, apart from the core claim's defective factual premise, Defendants also showed that Plaintiffs' allegations failed to overcome the formidable legal barriers courts have erected against such malicious prosecution claims.  The law "places a heavy burden on malicious prosecution plaintiffs" because imposing liability on well-intentioned law enforcement authorities and civilians would chill their willingness to prosecute or report perceived criminal activity and undermine the "public policy [that] favors bringing criminals to justice."  *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000).  Defendants demonstrated that Plaintiffs had failed to meet their "heavy burden" because they had not sufficiently alleged that (1) there was an absence of probable cause for their indictment; (2) Defendants "initiated" the prosecution against them; or (3) Defendants acted with actual malice.  Each of these failures was and remains an independent basis to dismiss the claim.  *See id*.

First, as to the absence of probable cause, the SAC, like its predecessor, omits that the two AIG employees named Plaintiffs as criminal co-conspirators in sworn plea allocutions.  As Defendants showed in their previous motion, the plea allocutions—which are matters of public record—are sufficient as a matter of law to establish probable cause for Plaintiffs' prosecution.  Indeed, with minimal corroboration, the testimony of the AIG employees would have been sufficient to satisfy the much higher evidentiary standard of proving Plaintiffs guilty beyond a reasonable doubt.

Independently, as Defendants previously also showed, Plaintiffs' indictment creates a presumption of probable cause that can be rebutted only by pleading that the indictment was procured through "fraud, perjury, suppression of evidence or other misconduct *in the grand jury*."  *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) (emphasis added).   Plaintiffs' attempt to rebut this presumption completely fails.  Plaintiffs lob the conclusory allegation that the NYAG procured their indictment through false testimony and withholding evidence, but they fail to support that claim with any factual allegation of misconduct in the grand jury.  Indeed, Plaintiffs so completely ignore their pleading burden that they fail to quote a single sentence of grand jury testimony.  Plaintiffs' failure is hardly surprising: to support their allegations of

misconduct, Plaintiffs rely exclusively on rewriting Justice Yates's decision vacating their convictions to suggest it found misconduct in the grand jury. But even a cursory view of that decision shows that it concerned purported misconduct *at trial*, saying absolutely nothing about the grand jury. Moreover, in accusing Marsh and the NYAG of failing to introduce exculpatory evidence in the grand jury, Plaintiffs betray a fundamental misunderstanding of grand jury practice in New York State: it is the target, not prosecutors and certainly not civilian third parties, that is responsible for introducing exculpatory evidence in grand jury proceedings. *See* N.Y. Crim. Proc. Law 190.50(5), (6).

Beyond this, not a single one of Plaintiffs' new allegations of prosecutorial misconduct has even an attenuated connection to Defendants. Plaintiffs allege that the *NYAG* withheld supposedly exculpatory evidence from the grand jury and that *AIG* employees testified falsely in grand jury proceedings. But Plaintiffs never attempt to attribute any of this alleged misconduct to Defendants or, particularly given the secrecy of grand jury proceedings, allege that Defendants had any knowledge whatsoever of the purported misconduct. Indeed, Plaintiffs utterly fail to explain how the NYAG's alleged misconduct could in any way demonstrate that *Defendants* maliciously prosecuted Plaintiffs.

Second, Plaintiffs still have not pleaded any facts remotely suggesting that Defendants "initiated" their prosecution. Significantly, Plaintiffs had earlier pleaded that Defendants began "targeting" Plaintiffs for prosecution only *after* the NYAG sued Marsh. As Defendants pointed out in their previous motion, that allegation doomed Plaintiffs' claim—because by the time that Defendants allegedly began targeting Plaintiffs, not only had the NYAG already obtained the guilty pleas and the plea allocutions that Plaintiffs never disclose, in which Plaintiffs were named as criminal co-conspirators, but the NYAG's complaint had already also targeted Plaintiff Gilman. Educated by the motion to dismiss, Plaintiffs in the SAC now omit that allegation, but they have not replaced it with any contrary factual allegation. Indeed, the facts available in the public record and the remaining allegations in the SAC continue to permit no inference other than that the NYAG had already begun targeting Plaintiffs before any of the "collusion" alleged

in the SAC.  Separately, when civilian third parties, such as Defendants, are accused of malicious prosecution, courts impose a legal presumption that the prosecutor exercised independent judgment in prosecuting the defendants.  To overcome this presumption and successfully plead that Defendants initiated their prosecution, Plaintiffs must plead that Defendants affirmatively induced the NYAG to prosecute "to the point where [he] is not acting of his own volition," or knowingly provided false information to the NYAG that led to the prosecution.  *Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2d Dep't 2006).  Plaintiffs do not even try to allege this. Instead, they rely on unsupported, conclusory, and legally insufficient allegations that Defendants "encouraged," "convinced" or "colluded with" the NYAG.

Third, Plaintiffs have not alleged that Defendants acted with actual malice.  Even crediting the fantastical theory that Marsh "offered up" Plaintiffs in exchange for a "lenient" settlement approaching $1 billion, Marsh was still compelled to cooperate with the government's investigation and respond to its lawful subpoenas.  Cooperation compelled by law cannot establish "malice."  Likewise, the pure speculation that Mr. Cherkasky, MMC's and Marsh, Inc.'s CEO, received a lucrative employment contract in exchange for colluding to prosecute Plaintiffs lacks even a scintilla of factual support.  At bottom, Plaintiffs' reckless malicious prosecution allegations confirm why courts have erected such high hurdles against these claims in the first place.  For all these reasons, Plaintiffs' malicious prosecution claim must be dismissed.

Plaintiffs' additional claims remain equally infirm.  Based on the same alleged "collusion" with the NYAG, Plaintiffs assert a vague claim for "abuse of process" (Second Cause of Action), without bothering to allege what process was "abused," beyond the "criminal justice system and the processes thereof."  Even assuming that Plaintiffs refer to their indictment, abuse of process here requires pleading that *after* the process issued, Marsh used the process against Plaintiffs to pursue some impermissible objective collateral to the criminal prosecution. But Marsh's "lenient" settlement with the Attorney General, the purported impermissible collateral objective, was inked nearly nine months *before* the indictment.  Therefore, Plaintiffs'

abuse of process claim fails.

Plaintiffs' claim under Judiciary Law Section 487 against Mr. Cherkasky (Third Cause of Action) also fails for numerous reasons.  For one thing, it is well established that Section 487 applies only to an attorney acting in his capacity as an attorney, and Plaintiffs never allege that Mr. Cherkasky was acting in that capacity at any point during the events in question.  Moreover, it is equally clear that Section 487 applies only to deceptive conduct occurring within the context of a judicial proceeding, and Plaintiffs nowhere allege that Mr. Cherkasky deceived any court or any party engaged in a judicial proceeding pending at the time of his alleged conduct.  Finally, and in any event, Plaintiffs claims are time-barred.  There is a three-year statute of limitations on Section 487 actions, and according to Plaintiffs' own allegations, the alleged deception and conclusion culminated in the settlement agreement reached in January 2005.  Plaintiffs did not assert this claim until June 2011, six and one-half years after the alleged misconduct.

Plaintiffs' claims for severance benefits (Fourth and Fifth Causes of Action) fare no better.  Their claims for remedies under the Severance Plan fail because Plaintiffs did not exhaust available administrative remedies under the Plan as ERISA requires, and although Plaintiffs now allege in conclusory terms that exhaustion would have been "futile," Plaintiffs also allege that other Marsh employees whose employment was terminated during the same internal investigation that involved Plaintiffs were paid severance benefits under the plan, thus refuting Plaintiffs' assertion of futility. And ERISA preempts Plaintiffs' related breach-of-contract claim under the Severance Plan.  Plaintiffs' claims for relief under the Stock Award Plan (Sixth and Seventh Causes of Action) are also without merit: their claim under the New York Labor Law ("NYLL") fails because the equity awards they seek are not "wages" under the statute, and Plaintiffs' breach of contract claim with respect to the Stock Award Plan, governed by Delaware law, is time-barred.  Finally, Plaintiffs' quasi-contract claims (Eighth and Ninth Causes of Action) must be dismissed because, as they admit, there is a valid and enforceable written contract governing this dispute.

The SAC continues to fall far short of what *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009),

demands: that its allegations must not just be possible, but plausible and at least as plausible as competing inferences consistent with an absence of liability.  Measured against the governing legal standards, the facts alleged, and the facts omitted but of which the Court may take judicial notice, Plaintiffs' allegations are flatly irresponsible.  And, because Plaintiffs have already proved unable to cure the fatal defects in their complaint, allowing further amendment would be futile.  The Court should dismiss the SAC with prejudice.

## FACTS[1]

### A.     The NYAG's Investigation of the Insurance Industry

In 2004, the NYAG launched an investigation into the insurance industry, including Marsh, with respect to "contingent commissions" between insurance brokers and insurance companies.  SAC ¶ 30.  In April 2004, the NYAG issued its first subpoena to MMC in connection with this investigation.  *See id.* at ¶ 29.

Mr. Gilman had commenced employment with Defendants in 1976 and had been promoted to Managing Director in 1988.  *Id.* at ¶¶ 24, 27.  Mr. McNenney had commenced employment with Defendants in 1990 and had been promoted to Managing Director in 1997.  *Id.* at ¶¶ 25, 27.  At the time of the investigation, Plaintiffs were employees of Marsh Global Broking.  *See id.* at ¶ 63 (incorporating by reference November 5, 2004 *New York Times* article that notes this fact).

### B.     NYAG Files Felony Complaints Against AIG Employees Specifically Identifying Gilman and McNenney As Conspirators in the Alleged Fraud

The NYAG's investigation also focused on AIG.  *See id.* at ¶ 63 (incorporating by reference November 5, 2004 *New York Times* article that notes this fact).  On October 13, 2004,

---

[1] The facts below are based on allegations of the SAC as well as documents attached to the SAC, and those incorporated into the complaint by reference.  *See, e.g., ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (court may consider any written instrument attached to complaint, statements or documents incorporated into the complaint by reference, and documents possessed by or known to plaintiff and upon which it relied in bringing suit); *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *State Univs. Ret. Sys. of Illinois v. Astrazeneca PLC*, 334 Fed. Appx. 404, 406 (2d Cir. 2009) (summary order); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *In re Bank of Am. Corp.*, 756 F. Supp. 2d 330, 336, 345 (S.D.N.Y. 2010).

the NYAG filed felony complaints against two AIG employees, Karen Radke and Jean-Baptist Tateossian, charging them with scheme to defraud in the first degree, in violation of Penal Law § 190.65(1)(b).[2]

Both complaints specifically identified "Bill Gilman" and "Ed McNenney" by name as Ms. Radke's and Mr. Tateossian's co-conspirators in the alleged fraud.  Polkes Dec. Ex. A, at 1-2 ("During this time period, Bill Gilman, Ed McNenny [*sic*], and others at Marsh periodically instructed Radke, [Tateossian], and others at AIG to submit specific quotes for insurance coverage that were less favorable than those of the incumbent carriers, and were designed to ensure that the incumbent carriers would retain [the] client's business."); Ex. B, at 1-2 (same). The *only* sources of information supporting the allegations in the complaints were "records provided to the OAG by attorneys representing American International, Group, Inc." and interviews by an NYAG investigator of Ms. Radke and Mr. Tateossian.  *Id*. Ex. A, at 1-2; Ex. B, at 1-2.  The felony complaints do not identify Marsh or any employee or agent of Marsh as the source of any of the complaints' allegations.

Also on October 13, 2004, Ms. Radke and Mr. Tateossian pleaded guilty to scheme to defraud in the first degree.  In her allocution, Ms. Radke named Plaintiffs as her co-conspirators:

> Assistant AG:   During this time period, Bill Gilman, Ed McKenny [*sic*], and others at Marsh periodically instructed you and others at AIG to submit specific quotes for insurance rates that you believed were higher than those of the incumbent carriers, were designed to ensure that the incumbent carriers would win certain business, and resulted in clients being tricked and deceived by a deceptive bidding process; is that true?

---

[2] Polkes Dec. Ex. A (*People of the State of New York v. Karen Radke*, Felony Complaint, dated October 13, 2004 ("Radke Complaint")); Ex. B (*People of the State of New York v. Jean-Baptist Tateossian*, Felony Complaint, dated October 13, 2004 ("Tateossian Complaint")).

On a motion to dismiss, this Court properly may consider matters subject to judicial notice.  *Ackerman v. Local Union 363*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006).  This includes court filings, particularly those, such as these complaints, from related litigation.  *See Campos v. City of New York*, 2010 WL 3912493, at *3 (S.D.N.Y. Sept. 13, 2010).  In addition, courts may take judicial notice of facts that are "matter[s] of public record thoroughly covered in the media," *Meridian Horizon Fund, LP v. Tremont Group Holdings Inc.*, 747 F. Supp. 2d 406, 410 (S.D.N.Y. 2010) (taking judicial notice of media reports of the NYAG's lawsuit); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (same), as well as documents required to be filed with the SEC.  *See ATSI Commc'ns Inc.*, 493 F.3d at 98.

Ms. Radke:      Yes.

Polkes Dec. Ex. C, at 6.  Similarly, Mr. Tateossian admitted that he "deal[t] exclusively with

Marsh Global Broking" and "participated in a scheme with individuals at Marsh to protect

incumbent insurance companies from competition when their business was up for renewal." *Id.*

at 10.  Tellingly, there is no mention of any of these facts in either the SAC or its predecessor.

### C.      The NYAG Files a Civil Complaint Against Marsh

The day after the Radke and Tateossian guilty pleas, on October 14, 2004, the NYAG

filed a civil complaint (the "NYAG Civil Complaint") against MMC and Marsh, Inc. asserting

claims for fraudulent business practices, antitrust violations, securities fraud, unjust enrichment,

and common law fraud.  *See* Polkes Dec. Ex. D (NYAG Civil Complaint); SAC ¶ 45.  The

NYAG's Civil Complaint mirrored the charges in the felony complaints against Radke and

Tateossian and specifically named "William Gilman" as a perpetrator of the allegedly wrongful

acts at Marsh.  Polkes Dec. Ex. D, at ¶ 50.

On October 15, 2004, Marsh, Inc. Chief Executive Officer Ray J. Groves resigned and

was replaced by Mr. Cherkasky, who had been the CEO of another MMC subsidiary.  Polkes

Dec. Ex. E, at Exhibit 99.1 (8-K);[3] *see also* SAC ¶ 46.  On October 25, 2004, MMC Chief

Executive Officer Jeffrey Greenberg resigned and was replaced by Mr. Cherkasky.  SAC ¶ 48.

On October 25, the NYAG announced that he would not pursue criminal charges against MMC

and would limit his prosecution to those individuals responsible for the alleged wrongdoing.  *Id.*

at ¶ 49. The SAC suggests that this announcement was part of a collusive scheme, but ignores

that it was consistent with the NYAG's widely reported practice of not prosecuting

corporations.[4]  On October 28, 2004 and November 2, 2004, Plaintiffs' employment was

---

[3] The Court may take judicial notice of SEC filings.  *See* n.2, *supra*.

[4] *See* Polkes Dec. Ex. F, Alex Berenson, *The Future of Marsh Depends on Spitzer*, N.Y. TIMES,
October 27, 2004 (noting that Mr. Spitzer was reluctant to bring corporate indictments and that
most large companies in high-profile investigations had not been indicted); Ex. G, *Spitzer
'Nuclear Option' on Hold*, EVENING STANDARD, April 14, 2005 (reporting on conference at
which Mr. Spitzer stated he uses indictments against companies as rarely as possible).  This
Court may properly take judicial notice of these media reports for purposes of establishing that it
was public knowledge that Mr. Spitzer rarely sought to indict corporate defendants.  *See* n.2,

terminated.  *See id.* at ¶¶ 53-54, 59.

    D.      **Marsh and the NYAG Settle the NYAG's Civil Lawsuit**

On January 30, 2005, Marsh entered into an agreement with the NYAG and the New York State Insurance Department (the "NYSID") to settle the NYAG Civil Complaint and the NYSID's citation of Marsh (the "Settlement Agreement").  *Id.* at ¶ 65.  Under the Settlement Agreement, Marsh agreed to establish a fund of $850 million (the "Fund"), payable over four years, for its policyholder clients.  *Id.*[5]  According to Plaintiffs, this was by far "the largest [settlement] obtained by Mr. Spitzer up to that date," the next largest settlement being a $300 million settlement with Citigroup.  *Id.* at ¶ 71.

    E.      **Plaintiffs' Indictments and Criminal Prosecutions**

On September 15, 2005, nearly one year after the two AIG employees had identified Gilman and McNenney as their co-conspirators, and the NYAG had targeted Gilman in its civil complaint against MMC and Marsh, Inc., a New York State grand jury indicted Plaintiffs Gilman and McNenney. *Id.* at ¶ 72.  The indictment charged Plaintiffs with four counts of grand larceny in the first degree, 30 counts of grand larceny in the second degree, one count of grand larceny in the third degree, one count of scheme to defraud in the first degree, and one count of violating the Donnelly Act (Gen. Bus. Law §§ 340, 341).  *Id.*  On February 20, 2008, after a bench trial, Plaintiffs were convicted of the Donnelly Act violation.  *Id.* at ¶ 77.

On or about May 2009, Plaintiffs learned that the NYAG had failed to produce certain documents to them during their criminal trial.  *See People v. Gilman & McNenney*, No. 4800-2009, 2010 WL 3036983, at *2 (N.Y. Sup. Ct. July 2, 2010) (incorporated by reference in the SAC).  These documents did not originate from Marsh, and had been produced to the NYAG by other parties.

On August 4, 2009, Plaintiffs filed a motion to vacate their convictions under New York

---

*supra*.

[5] In addition, March paid $435 million to settle the inevitable follow-on securities, derivative and ERISA class action lawsuits. *See* Polkes Dec. Ex. H, at Exhibit 99.1 (8-K).

Criminal Procedure Law § 440.10.  *Id.*  On July 2, 2010, the court vacated Plaintiffs' convictions because of the NYAG's error, and not because Plaintiffs had been exonerated from wrongdoing. *See id.* at *20.  In seeking to vacate their convictions, Plaintiffs did not challenge the reliability or truth of any of the documents that Marsh had produced to the NYAG, all of which the NYAG had concededly provided to Plaintiffs before their criminal trial.  *See id.* at *2 (summarizing the materials and evidence that Plaintiffs alleged the NYAG failed to produce).  The court's ruling vacating Plaintiffs' convictions left the NYAG free to retry Plaintiffs.  On January 11, 2011, the NYAG announced that it "would not be an efficient use of [ ] resources" to pursue a retrial of Plaintiffs, citing "the substantial amount of resources already expended on [the] case," and dismissed its complaints against Plaintiffs.  Polkes Dec. Ex. I at 2;[6] *see also* SAC ¶ 80.[7]

     F.    **Relief Sought under Benefit Plans**

Plaintiffs allege that Defendants owe them benefits under severance and stock award plans—even though they never allege that they filed an administrative claim for these benefits.

     1.    **The Marsh USA Inc. Severance Pay Plan**

Plaintiffs allege that Defendants "engaged in a practice of providing their employees with a severance payment if Marsh terminated their employment" (SAC ¶¶ 81, 124), and, "as salaried employees of Marsh who were terminated, [Plaintiffs] are eligible participants in the Severance Plan."  *Id.* at ¶ 83.  While Plaintiffs do not identify the "Severance Plan" by name, the plan appears to be the Marsh USA Inc. Severance Pay Plan (the "Severance Plan").  *See* Polkes Dec. Ex. K.[8]

---

[6] The Court may take judicial notice of this court transcript.  *See* n.2, *supra.*

[7] Tateossian's and Radke's pleas were subsequently dismissed "in the interest of justice," at the NYAG's request.  *See* Polkes Dec. Ex. J at 3 (the Court may take judicial notice of well-known facts in this article, *see* n.2, *supra*).  But the fact that the State subsequently dropped all charges against them does not negate that probable cause existed for Plaintiffs' indictment at the time of prosecution.  *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) ("the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest" in the first place); *Myers v. State of New York*, 175 Misc. 2d 90, 94 (N.Y. Ct. Cl. 1997) (inquiry regarding probable cause must be based on facts known at time of the arrest, not on subsequent events).

[8] Although Plaintiffs did not attach a copy of this plan to the SAC, their reliance on the terms of the plan in the SAC allows this Court to consider this plan in deciding this motion.  *See* n.1,

The Severance Plan provides severance benefits to salaried employees of Marsh USA Inc. "who are notified of their involuntary termination on or after October 1, 2003," if they are not terminated for cause, among other exclusions.  *Id.* at §§ 1-2.  The Severance Plan, by its terms, is governed by ERISA and expressly provides that it "supersedes all previous policies, practices, programs or plans that may have been followed by the Company (or any predecessor, merged or acquired entity) for employees covered by this Plan."  *Id.* at § 1.  The Severance Plan also sets forth specific claims procedures for claiming benefits and review of any denial of benefits before bringing suit under Section 502(a) of ERISA.  *Id.* at §§ 5, 10, 14.

2.      **The Stock Award Plan**

Plaintiffs also allege that they received a number of awards of restricted Stock Bonus Units and stock options under The Marsh & McLennan Companies, Inc. 2000 Employee Incentive and Stock Award Plan (the "Stock Award Plan" or the "SAP").  *See* SAC ¶¶ 89-93. Plaintiffs assert that Defendants breached the terms of the SAP and violated the NYLL by refusing to consider Plaintiffs' restricted stock awards and options as vested, and instead considering those shares forfeited upon termination of Plaintiffs' employment.  *Id.* at ¶¶ 94-98, 130-136.

Stock bonus unit awards under the Stock Award Plan vest over three years.[9]  The stock option awards vest 25% per year, beginning on the first anniversary of the grant.  *Id.* at Ex. B, Stock Option Terms and Conditions, § I.  By its terms, the Stock Award Plan is governed by Delaware law.  *Id.* at Ex. A, SAP § 10.j.

---

*supra.*

[9] Under the Terms and Conditions for March 1, 2004 awards of Stock Bonus Units, awards granted on March 1, 2004 vest on the earlier of (1) March 1, 2007 or (2) the date of the recipient's retirement.  *Id.*, Ex. A, Terms and Conditions for March 1, 2004 Award of Stock Bonus Units to U.S. Grant Recipients, § II.

**ARGUMENT**

**I.      STANDARD OF REVIEW**

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all *well pleaded facts* as true; but the Court need not assume the truth of Plaintiffs' conclusory allegations, nor are Plaintiffs entitled to the benefit of having the Court view unwarranted deductions of fact or argumentative inferences in their favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'").  Mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action" will not suffice to survive a motion to dismiss.  *Id.*; *Iqbal*, 129 S. Ct. at 1949.  Instead, a plaintiff must plead "*factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added).

Furthermore, a complaint must plead enough facts to *plausibly* suggest that the plaintiff will be entitled to relief; a mere possibility that the plaintiff might some day uncover sufficient facts is not enough.  *See Iqbal*, 129 S. Ct. at 1949 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'") (quoting *Twombly*, 550 U.S. at 546).  The theory of liability offered by the plaintiff must be at least as plausible as competing benign inferences that could be drawn from the same alleged facts.  *Iqbal*, 129 S. Ct. 1959-60 (describing allegations in *Twombly*, which failed to state a claim because they were "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy . . .").

**II.     PLAINTIFFS' MALICIOUS PROSECUTION CLAIM MUST BE DISMISSED**

The New York Court of Appeals has held that the law "'places a heavy burden on malicious prosecution plaintiffs.'"  *Rothstein*, 373 F.3d at 282 (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)).  Thus, to establish a malicious prosecution claim, a plaintiff must plead and prove that (1) there was no probable cause for the criminal proceeding; (2) the defendant initiated the criminal proceeding; (3) the defendant acted maliciously; and (4) the

proceeding terminated in the plaintiff's favor.  *See, e.g.*, *Rothstein*, 373 F.3d at 282; *Delince v. City of New York*, 2011 WL 666347, at *5 (S.D.N.Y. Feb. 7, 2011); *Lupski*, 32 A.D.3d at 998.  A plaintiff's failure to establish any one of these elements necessitates dismissal of plaintiff's claim.  *See Brown v. Sears, Roebuck & Co.*, 297 A.D.2d 205, 208 (1st Dep't 2002).

A.      **Plaintiffs Plead No Facts Showing an Absence of Probable Cause**

On the basis of the SAC and facts in the public record, probable cause existed to criminally prosecute Plaintiffs as a matter of law.  "For purposes of the tort of malicious prosecution," probable cause means "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of or whether a discreet and prudent person would be led to the belief that a crime had been committed by the person charged."  *Silver v. Kuehbeck*, 2005 U.S. Dist. LEXIS 26956, at *55 (S.D.N.Y. Nov. 7, 2005) (quotations and citations omitted).  "The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the defendant at that time."  *Id.*  For two independent reasons, probable cause existed for Plaintiffs' prosecution as a matter of law.

1.      **The Plea Allocutions That Plaintiffs Fail to Acknowledge in the SAC Establish Probable Cause for Plaintiffs' Prosecution as a Matter of Law**

First, standing alone, the October 13, 2004 plea allocutions of the two AIG employees identifying Plaintiffs as co-conspirators constitute probable cause for Plaintiffs' prosecution.  *See People v. Jackson*, 65 A.D.3d 1164, 1165 (2d Dep't 2009) ("Statements of codefendants or accomplices are sufficient to establish probable cause.") (citing *People v. Cantanzaro*, 236 A.D.2d 418 (2d Dep't 1997)); *People v. McCann*, 85 N.Y.2d 951, 953 (1995) (accomplice statement established probable cause for search warrant); *see also Fudge v. Town of Shandaken Police*, 2010 WL 3258385, at *7 (N.D.N.Y. Aug. 16, 2010) (holding that "[u]ncorroborated testimony from an accomplice is sufficient to support the standard of proof needed for probable cause," and stating that a "co-accomplice may be particularly reliable because of their unique position to possess knowledge of information connected with the crime.").   Indeed, the

testimony of two co-conspirators does much more than establish probable cause—it is sufficient, with minimal corroboration, to support conviction by the far higher standard of proof beyond a reasonable doubt.  *See People v. Besser*, 96 N.Y.2d 136, 143-44 (2001) ("[T]he People's burden [to convict] is merely to offer some nonaccomplice evidence 'tending to connect' defendant to the crime charged."); *see also People v. Berry*, 78 A.D.2d 1226, 1227 (3d Dep't 2010) (describing "the minimal requirements for corroborative evidence" of co-conspirator testimony) (internal quotation marks and citation omitted).

Because the AIG employees' plea allocutions naming Plaintiffs conclusively establish probable cause for Plaintiffs' prosecutions, this argument figured prominently in Marsh's motion to dismiss Plaintiffs' Amended Complaint, in which Marsh also pointed out that Plaintiffs had failed to disclose the plea allocutions to the Court.  Conspicuously, Plaintiffs once again omit any reference to the plea allocutions in the SAC.

> 2. **Plaintiffs' Indictment by a Grand Jury Creates a Presumption of Probable Cause, and Plaintiffs Have Failed to Rebut This Presumption**

Second, and independently, Plaintiffs' grand jury indictment (*see* SAC ¶ 72) creates a presumption of probable cause "founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly."  *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983); *see also Cabble v. City of New York*, 2009 WL 890098, at *3 (S.D.N.Y. Mar. 30, 2009) ("[O]n the face of the complaint, Plaintiff has in effect pled, by virtue of his acknowledgement of the grand jury indictment, that there was probable cause for the prosecution.").  This presumption "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon*, 60 N.Y.2d at 83).  In New York, "evidence tending to show the absence of probable cause" is insufficient to rebut the presumption of probable cause that arises by virtue of a grand jury indictment.  *Colon*, 60 N.Y.2d at 83.  "Indeed, the presumption of probable cause created by an indictment is not even vitiated, at least in New York State, by a dismissal of the indictment based on a discovery that the people

lack evidence to establish a prima facie case of guilt." *Cornell v. Kapral*, 2011 WL 94063, at \*9 & nn.9-10 (N.D.N.Y. Jan. 11, 2011) (collecting cases). Rather, actual misconduct in the grand jury must be alleged. *Colon*, 60 N.Y.2d at 83.

Plaintiffs have the burden of rebutting the presumption with specific, factual allegations of misconduct in the grand jury: "The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" *Rothstein*, 373 F.3d at 284 (citing *Colon*, 60 N.Y.2d at 82); *Savino*, 331 F.3d at 73 (a plaintiff may not rely on "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith."); *Cabble*, 2009 WL 890098, at \*3-4.

Plaintiffs allege no facts that would begin to carry this burden. The most Plaintiffs do is to allege that the *NYAG* "obtained the Gilman and McNenney Indictment through false testimony and by withholding exculpatory evidence." SAC ¶ 75. But, beyond the vague suggestion that Defendants "colluded" with the NYAG, Plaintiffs have made not one allegation that *Defendants* procured false testimony, withheld evidence, or were involved in any misconduct before the grand jury. This omission is telling. The notion that *Defendants* were aware of and responsible for allegedly false grand jury testimony or other misconduct is simply implausible: the grand jury operates behind a cloak of secrecy, and thus third-parties, like Defendants, have no way of knowing what witnesses testify to in the grand jury. Here, the witnesses who allegedly offered false testimony in the grand jury, Ms. Radke and Mr. Tateossian, were employees of AIG, not Marsh, and there is certainly no allegation that Defendants communicated in any way with Ms. Radke or Mr. Tateossian regarding their grand jury testimony. Moreover, as discussed in more detail below, the suggestion that *Marsh* infected the grand jury process by withholding exculpatory evidence is just as far fetched: in New York, it is the target, and not some third-party, who is responsible for supplying exculpatory evidence to the grand jury. *See, e.g.*, N.Y. Crim. Proc. Law §§ 190.50(5), (6). Indeed, had Marsh wanted to present exculpatory evidence

to the grand jury, it would likely have been barred from doing so.  *See id.* § 190.50(1) ("Except as provided in this section, no person has a right to call a witness or appear as a witness in a grand jury proceeding.").  At bottom, although Plaintiffs attempt to revive their complaint with conclusory allegations of misconduct by the NYAG and third-party civilian witnesses in the grand jury, they completely fail to connect any of that misconduct to Defendants and never provide any explanation for how that misconduct supports their allegations that *Defendants* maliciously prosecuted Plaintiffs.

In any event, Plaintiffs' conclusory pleading is insufficient to meet their burden to allege facts demonstrating misconduct in the grand jury, and instead evidences a misunderstanding of New York grand jury practice.  As an initial matter, although Plaintiffs allege that former AIG employees Radke and Tateossian later recanted or contradicted their testimony, *see id.* at ¶ 74, Plaintiffs have not pleaded anything about the substance of Ms. Radke's or Mr. Tateossian's grand jury testimony, let alone which parts of their testimony they allegedly recanted, or how any of their subsequent statements contradicted their grand jury testimony.  This defect is fatal to their claim: absent any allegations regarding the content of the supposedly false grand jury testimony, the "argument that [the witnesses] *must* have testified falsely to the grand jury amounts to rank speculation."  *Rothstein*, 373 F.3d at 284 (emphasis added); *see also Hill v. Melvin*, 2006 U.S. Dist. LEXIS 43006, at *60-62 (S.D.N.Y. June 27, 2006) ("Hill's malicious prosecution claim fails because he has not supplied the Court with any grand jury testimony. The Court thus has no idea which defendants, if any, testified, nor what their grand jury testimony was.");  *Scully v. City of Watertown*, 2005 WL 1244838 at *11 (N.D.N.Y. May 6, 2005) (plaintiff failed to rebut presumption of probable cause because "Plaintiff neither provide[d] defendants' grand jury testimony").  Moreover, to overcome the presumption of probable cause on the basis of false testimony, the "alleged fabrication must be both material, *i.e.*, 'likely to influence a jury's decision,' and the 'legally cognizable' cause of" their indictment.  *Richardson v. City of New York*, 2006 WL 2792768, at *7 n.4 (E.D.N.Y. Sept. 27, 2006) (internal citations omitted).  Plaintiffs have not identified any purportedly false grand jury testimony, nor have they alleged

16

facts demonstrating that any allegedly false testimony caused, and was material to, their indictments.

But even putting aside these defects, Plaintiffs never allege, as they also must, that prosecutors, let alone Defendants, procured Ms. Radke's and Mr. Tateossian's purportedly false testimony before the grand jury. *See, e.g.*, *Cabble*, 2009 WL 890098, at *3 (plaintiff who alleged that grand jury indictment was obtained through perjury "fail[ed] to state a plausible malicious prosecution claim" because "[e]vidence of perjury by civilian witnesses is not . . . sufficient to overcome the probable cause presumption without proof that the prosecuting authorities were complicit in the perjury); *Jenkins v. City of New York,* 1999 WL 782509, at *9, (S.D.N.Y. Sept. 30, 1999), *aff'd* 216 F.3d 1072 (2d Cir. 2000) (holding that perjury committed by civilian witnesses before the grand jury is insufficient to rebut the presumption of probable cause because "perjury must be attributable to the police" in order to overcome the presumption). Indeed, Plaintiffs do not allege that prosecutors or Defendants were even aware of any purportedly false testimony by Ms. Radke and Mr. Tateossian at the time of the grand jury proceedings. *See, e.g.*, *Matter of Williams v. City of Hudson*, 69 A.D.2d 921, 922 (3d Dep't 1979) ("[P]laintiff has alleged no facts to support his contention that the [defendant] knew the informant had committed perjury.").

Because they cannot present any concrete allegations of misconduct in the grand jury, Plaintiffs fall back on Justice Yates's decision vacating their convictions, *see* SAC ¶ 78 (citing *Gilman*, 2010 WL 3036983, at *9-11), but their reliance is unavailing.  The decision concerned purported inconsistencies between Ms. Radke's and Mr. Tateossian's *trial* testimony and their *subsequent* deposition testimony in an unrelated civil proceeding—Justice Yates's decision says nothing whatsoever about Ms. Radke's and Mr. Tateossian's *grand jury* testimony.  Thus, the SAC affirmatively misleads to the extent it suggests that Justice Yates found contradictions between Ms. Radke's grand jury testimony and her deposition.  *Compare* SAC ¶ 79 ("[O]ne of the witnesses the Court referred to was Karen Radke who had, in fact, given additional testimony in another proceeding . . . that was diametrically opposed to her trial *and grand jury* testimony.")

17

(emphasis added), *with Gilman*, 2010 WL 3036983, at *9 ("It is alleged that [Ms. Radke's] testimony in the civil proceeding was directly contrary to her testimony at the *criminal trial*") (emphasis added).  Moreover, the allegedly inconsistent testimony occurred several *years* after the indictments had issued and the grand jury proceedings had concluded.  As noted above, it is axiomatic that the existence of probable cause is judged on the basis of facts known at the time of the initiation of the criminal prosecution, not in hindsight based on subsequent developments. *See, e.g.*, *Silver*, 2005 U.S. Dist. LEXIS 26956, at *55; *Levy v. Alfano*, 47 F. Supp. 2d 488, 494 (S.D.N.Y. 1999) ("It is axiomatic that 'probable cause' is determined with reference to the facts known" at the initiation of the proceeding, "not the results of the subsequent criminal prosecution."); *see also Husbands ex rel. Forde v. City of New York*, 2007 WL 2454106, at *9 (S.D.N.Y. Aug. 16, 2007) (noting that while "[w]ith the benefit of hindsight," there was "certainly a basis for doubt" about whether the evidence that led to the plaintiff's prosecution was "mistaken," "[t]hat, however, is not the correct inquiry for a probable cause determination.").  Plaintiffs could not possibly allege that the NYAG knowingly withheld the deposition testimony from the grand jury because the indictments were issued years before the depositions ever took place.  And, in any event, as Justice Yates found, even at the time of the trial, the NYAG did not have "either actual or constructive knowledge of the timing or contents of [Mr. Tateossian's] deposition."  *Gilman*, 2010 WL 3036983, at *11; *see also id.* at *10 (same finding regarding Ms. Radke).[10]

In addition, Plaintiffs allege that the prosecution withheld potentially exculpatory evidence from the grand jury, and point to documents produced by the Liberty Insurance Company that prosecutors allegedly failed to disclose.  SAC ¶ 78.  This allegation suffers from similar defects.  The NYAG did not obtain these documents until October 2007, more than two years after Plaintiffs' indictment, and so could not possibly have disclosed them to the grand

---

[10] Thus, although the SAC suggests otherwise, Justice Yates specifically found that the prosecution's failure to disclose Ms. Radke's and Mr. Tateossian's subsequent deposition testimony did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), or *People v. Rosario*, 9 N.Y.2d 286 (1961).  *See Gilman*, 2010 WL 3036983, at *10 (as to Radke); *id.* at *11 (as to Tateossian).

jury. *See Gilman*, 2010 WL 3036983, at *3. But Plaintiffs' claim fails in any event because the prosecutors had no obligation to present those materials to the grand jury in the first place. In New York, "the People generally enjoy wide discretion in presenting their case to the Grand Jury . . . and are not obligated to search for evidence favorable to the defense or to present all evidence in their possession that is favorable to the accused." *People v. Lancaster*, 69 N.Y.2d 20, 25-26 (1986) (internal citation omitted); *see also People v. Mitchell*, 82 N.Y.2d 509, 515 (1993) ("The People maintain broad discretion in presenting their case to the Grand Jury and need not seek evidence favorable to the defendant or present all of their evidence tending to exculpate the accused."); *Newton v. City of New York*, 640 F. Supp. 2d 426, 447 (S.D.N.Y. 2009) (noting that the "district attorney was not required to present exculpatory evidence."); *People v. Reese*, 23 A.D.3d 1034, 1036 (4th Dep't 2005) ("[T]he concerns of *Brady* [*v. Maryland*] are not implicated during grand jury proceedings."). Thus, the "simple act of not disclosing to the grand jury all evidence that could potentially benefit the accused at a grand jury hearing" is insufficient as a matter of law to overcome the presumption of probable cause that arises by virtue of a grand jury indictment. *Parisi v. Suffolk County*, 2009 WL 4405488, at *10 (E.D.N.Y. Dec. 3, 2009).

Similarly, Plaintiffs' allegation that Marsh never "attempted to refute the New York Attorney's General theory of the case or otherwise explain that Gilman and McNenney had not done anything wrong," SAC ¶ 73, rests on a misconception of the grand jury process and thus fails to allege misconduct. *Marsh*, as a civilian third-party, certainly was under no obligation to present exculpatory testimony to the grand jury, even if that testimony actually existed. Rather, "[i]n the ordinary case, it is the *defendant* who, through the exercise of his own right to testify and have others called to testify on his behalf before the Grand Jury . . . brings exculpatory evidence to the attention of the grand jury." *Lancaster*, 69 N.Y.2d at 26 (internal citation omitted and emphasis added); *see also* N.Y. Crim. Proc. Law § 190.50(5) ("Although not called as a witness by the people or at the instance of the grand jury, a person has a right to be a witness in a grand jury proceeding . . . When a criminal charge against a person is being or is about to be or has been submitted to a grand jury."); *id.* § 190.50(6) ("A defendant or person against whom a

criminal charge is being or is about to be brought in a grand jury proceeding may request the grand jury, either orally or in writing, to cause a person designated by him to be called as a witness in such proceeding."). Indeed, Plaintiffs' allegations ring especially hollow because Plaintiffs make no allegation that they ever testified, or caused any witnesses to testify, before the grand jury to present exculpatory evidence.

In sum, it not enough for Plaintiffs to allege facts consistent with the absence of probable cause that were discovered months or years after their indictments. *See Colon*, 60 N.Y.2d at 82-83. Instead, to overcome the presumption of probable cause arising from their indictment, Plaintiffs must allege facts demonstrating fraud or misconduct in the *grand jury*. Plaintiffs have failed to allege any such facts. Indeed, as in *Rothstein*, Plaintiffs' "failure even to attempt to make [this] showing requires the dismissal of [their] claim." 373 F.3d at 283.

### B. Plaintiffs Do Not (And Cannot) Plead That Defendants Initiated a Criminal Prosecution Against Them

Obviously, Defendants, a civilian corporate entity and civilian individual, did not commence the criminal prosecution of Plaintiffs: the NYAG did. And the law creates a presumption that the NYAG exercised its independent judgment in deciding to prosecute Plaintiffs. *See Takacs v. City of New York*, 2011 U.S. Dist. LEXIS 7055, at *12 (S.D.N.Y. Jan. 24, 2011) (a "showing of misconduct is required to overcome the presumption . . . that the prosecutor exercised independent judgment in deciding whether to initiate the criminal proceeding").[11]

The presumption of independent prosecutorial discretion can be overcome only upon a showing that a civilian defendant made the prosecutor's "intelligent exercise of discretion" impossible by knowingly providing false information to the prosecutor, or exerting pressure

---

[11] *See also Alcantara v. City of New York*, 646 F. Supp. 449, 458-59 (S.D.N.Y. 2009) ("Even if [ ] defendants [had] forwarded information to prosecutors, or to have participated in the arrest . . ., they would not be subject to a malicious prosecution action 'in the absence of evidence that [they] misled or pressured the official who . . . exercise[d] independent judgment.'"); *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 383 (S.D.N.Y. 2005) ("[T]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding . . .").

sufficient to supplant the prosecutor's judgment, leading the prosecutor to file a complaint when he "would not otherwise have done so." *Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*, 2004 WL 2290499, *5 n.8 (S.D.N.Y. Oct. 8, 2004) (a civilian defendant can be found to have initiated a prosecution when defendant has "induced prosecution by providing false information to the authorities, . . . knowingly withholding highly material information, . . . or convincing a person to file a complaint who would not otherwise have done so.").[12]

As an initial matter, the notion that Defendants would have initiated a criminal prosecution of two of its former employees is highly implausible.  Under the doctrine of *respondeat superior*, Gilman and McNenney's prosecution could well have resulted in adverse consequences for Marsh, including Marsh's potential criminal prosecution.  *See, e.g.*, *People v. Highgate LTC Mgmt.*, 69 A.D.3d 185, 188 (3d Dep't 2009) (discussing the "long-standing rule as set forth by the Court of Appeals . . . that a corporation could be held liable for the intentional acts of its agents"); *see also* N.Y. Penal Law § 20.20.  Thus, Marsh had no incentive to convince or encourage the NYAG to proceed with Plaintiffs' prosecution.

In any event, Plaintiffs fail to allege any facts contradicting this presumption and instead merely allege that Defendants "encouraged," "convinced" or "colluded with" the NYAG in "offer[ing] up Messrs. Gilman and McNenney as targets for criminal prosecution."  *See, e.g.*, SAC ¶¶ 32, 38-42, 104.  These sweeping conclusions, devoid of any factual particulars, are insufficient as a matter of law to establish Defendants' alleged "initiation" of the NYAG's prosecution of Plaintiffs.  *See Delince* 2011 WL 666347, at *5-6 ("bare allegation" that defendant "acted in concert" with co-defendant insufficient under *Twombly* and *Iqbal* to establish initiation); *see also Hanly v. Powell Goldstein, LLP*, 290 Fed. Appx. 435, 440 (2d Cir. 2008) (summary order) (conclusory allegations of an "active connection" between defendant and

---

[12] *See also Delince,* 2011 WL 666347, at *5 ("defendant must have affirmatively induced the officer to act . . . to the point where the officer is not acting of his own volition.") (citing *Lupski,* 32 A.D.3d at 998); *Baer v. Sprint Long Distance*, 60 F. Supp. 2d 209, 212 (S.D.N.Y. 1999) ("[I]f defendant merely states what he believes, leaving the decision to prosecute entirely to the uncontrolled discretion of the officer," the defendant has not initiated the prosecution) (citations omitted ).

prosecution, such that defendants provided "substantial assistance" or "additional assistance" to prosecution were insufficient to support claim on a motion to dismiss).[13]

Although Plaintiffs contend that Marsh produced more than 130,000 pages of documents and at least 23 employee interview memoranda in response to the NYAG's subpoenas, *see* SAC ¶¶ 31, 37, Plaintiffs have not alleged anything specific to suggest that any of the information Marsh provided to the NYAG was false, let alone sufficient to have caused the NYAG to file a complaint when he otherwise would not have done so.[14]  *See DeStefano v. Duncanson*, 2011 WL 651452, at *2-3 (S.D.N.Y. Feb. 10, 2011) (dismissing claim and rejecting plaintiff's contention that the allegedly false information provided by defendants served as a basis for the indictment, which was the result of an independent criminal investigation).  Moreover, mere cooperation with law enforcement authorities is insufficient as a matter of law to hold a civilian party liable for malicious prosecution.  *See, e.g., Lupski*, 32 A.D.3d at 998 ("[A] civilian defendant who merely furnishes information to law enforcement authorities who are then free to exercise their own independent judgment as to whether an arrest will be made and criminal charges filed will not be held liable for malicious prosecution."); *Brown*, 297 A.D.2d at 209.[15]  Similarly, Plaintiffs allege that "Marsh facilitated the *New York Attorney General's* control of information," SAC ¶ 41(emphasis added), but this hardly shows that Marsh prevented the NYAG from "exercis[ing its] own independent judgment"; rather, it suggests that the NYAG was firmly in control of the prosecutorial decision-making.

---

[13] *See also DeStefano*, 2011 WL 651452, at *3 (dismissing claim for failure to offer any facts, "beyond bald, conclusory allegations" to infer that defendants played and active role in prosecution or provided "anything nearing 'advice and encouragement.'").

[14] Indeed, Plaintiffs do not even allege that any of the 130,000 pages of documents or 23 employee interview memoranda that Marsh produced in response to the NYAG's subpoenas even related to Plaintiffs, and, if so, how.  *See* SAC ¶¶ 31, 37, 65.  Thus, the SAC offers no basis on which to conclude that any aspect of Marsh's production to the NYAG was even relevant to Plaintiffs' indictment.

[15] *Present v. Avon Prods.*, 253 A.D.2d 183, 189 (1st Dep't 1999) ("One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding.").

Plaintiffs suggest that Marsh's actions went "beyond" mere compliance with subpoenas because it waived the attorney-client privilege, but there is nothing inherently nefarious about providing relevant documents to governmental officials during an investigation. And Plaintiffs forget that, at the time, prosecutors routinely demanded privilege waivers from targets before giving credit for cooperation.[16] Further, and in any event, the SAC does not allege that Marsh waived privilege only for documents pertaining to Plaintiffs, so there is no basis to infer from the waiver that Marsh was specifically targeting them.

Not only do the SAC's allegations provide no basis for setting aside the presumption of prosecutorial independence but the public record also decisively demonstrates that Marsh did not "initiate" the prosecution. As discussed on pages 7-8, *supra*, on October 13, 2004, two AIG employees pleaded guilty to having engaged in a criminal scheme to defraud and identified Plaintiffs, by name, as their co-conspirators. And the felony complaints against the AIG employees, in which the NYAG also named Plaintiffs as participants in the scheme, do not list Marsh as a source of information underlying the criminal charges. *See* Polkes Dec. Exs. A-B. The next day, the NYAG filed the NYAG Civil Complaint against MMC and Marsh, Inc., targeting Plaintiff Gilman. *See* Polkes Dec. Ex. D. These events occurred *before* any of Marsh's alleged acts of "cooperation" or "collusion" set forth in the SAC. Indeed, although Plaintiffs no longer expressly allege, as they had before, that Marsh did not begin "targeting Messrs. Gilman and McNenney" until "*after the Marsh Complaint was filed on October 14, 2004*," Amended Complaint ¶ 46, the allegations of the SAC permit no other inference. For example, Plaintiffs allege that Mr. Spitzer *refused* to negotiate a settlement with Marsh while Jeffrey Greenberg was still CEO, and that it was "soon *after* the Marsh Complaint was filed" that Mr. Spitzer indicated he would negotiate with Mr. Cherkasky. SAC ¶ 46. In addition, Plaintiffs allege that Marsh

---

[16] *See, e.g.*, Memorandum from Larry D. Thompson, Deputy Attorney General, to Heads of Department Components, *Principles of Federal Prosecution of Business Organizations*, Jan. 20, 2003, at Section VI, *available at*, http://www.justice.gov/dag/cftf/corporate_guidelines.htm ("One factor the prosecutor may weigh in assessing the adequacy of a corporation's cooperation is the completeness of its disclosure including, if necessary, a waiver of the attorney-client and work product protections.").

waived the attorney-client privilege only two months before January 30, 2005, *see id.* at ¶ 65—still after the NYAG Civil Complaint was filed.  Plaintiffs also allege that *after* Mr. Cherkasky became CEO he "acted quickly to continue the collusion with the [NYAG] and create public targets" out of Plaintiffs. *See id.* at ¶ 50.  Although Plaintiffs suggest that Mr. Cherkasky "continued" Marsh's supposed collusion with the NYAG once he became CEO, given Plaintiffs' contradictory allegation that the NYAG refused to negotiate with Marsh under its previous leadership, *see id.* at ¶ 46, what purported collusion Mr. Cherkasky "continued" is unclear.

Plaintiffs' allegation that Defendants "began a public campaign in the media to portray [Plaintiffs] as 'bad actors'" (*id.* at ¶¶ 62-64) fares no better.  Plaintiffs do not allege that any statements to the media by Marsh played any role whatsoever in the NYAG's decision to prosecute Plaintiffs, nor could they.  The *only* press statement by Marsh that Plaintiffs identify in the SAC—hardly the "media campaign" that Plaintiffs allege—occurred on October 26, 2004. *Id.* at ¶ 62.  Again, this was *after* the AIG employees' plea allocutions, after the NYAG's filing of the felony complaints against the AIG employees, and after the NYAG Civil Complaint.[17] *See Watson v. Grady*, 2010 WL 3835047, at *5, *13 (S.D.N.Y. Sept. 30, 2010) (allegation that defendant "play[ed] an active role in the [plaintiff's] prosecution" by making a press statement was implausible in light of plaintiff's allegation that prosecutors began investigating plaintiff before the press statement, and plaintiff's failure to allege "that anyone from the prosecutors' office was present at the press conference or that the prosecutors relied" on the statement).

Finally, Plaintiffs allege, once again in conclusory fashion, that Mr. Spitzer used the settlement with Marsh "as an opportunity to install" Mr. Cherkasky, alleged to be a close friend, as MMC's CEO and to bestow on him economic gains.  *See, e.g.*, SAC ¶ 44.  Although

---

[17] Marsh noted in its motion to dismiss Plaintiffs' Amended Complaint that Plaintiffs' identification of a single press statement by Marsh hardly constituted a "media campaign," and also pointed out that the only press statement identified in Plaintiffs' Amended Complaint occurred on October 26, 2004, *after* the plea allocutions, felony complaints, and the NYAG's Civil Complaint.  *See* Memorandum of Law in Support of Marsh Defendants' Motion to Dismiss Amended Complaint, Doc. No. 16, at 15.  Tellingly, Plaintiffs have pointed to *no* additional press statements in the SAC, let alone press statements by Marsh before the plea allocutions, felony complaints, and NYAG Civil Complaint.

Plaintiffs suggest that this "guaranteed Marsh's cooperation" in prosecuting Marsh's employees, Plaintiffs offer nothing but sheer speculation to support their conclusory allegation that Mr. Cherkasky's selection as CEO had anything to do with their subsequent indictment and prosecution.  Indeed, as discussed immediately above, the NYAG already had initiated Plaintiffs' prosecutions *before* the meeting that allegedly led to Mr. Cherkasky's appointment.  *See id.* at ¶¶ 45-48.  Moreover, the allegation that Mr. Spitzer "installed" Mr. Cherkasky as CEO, if credited, would undercut Plaintiffs' contention that Marsh was able to overwhelm Mr. Spitzer's exercise of his independent prosecutorial judgment.

In short, Plaintiffs have failed to overcome the presumption of prosecutorial independence.

### C.   Plaintiffs Do Not Allege That Defendants Were Motivated by Actual Malice

Separately, Plaintiffs' allegations are insufficient to satisfy the "malice" element of their malicious prosecution claim.  To establish malice, Plaintiffs must allege specific facts establishing that Defendants "commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served."  *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03 (1978); *Nieves v. County of Monroe*, 761 F. Supp. 2d 48, 52 (W.D.N.Y. 2011) (conclusory allegations and speculation are not enough to establish malice); *Du Chateau v. Metro-North Commuter R.R. Co.*, 253 A.D.2d 128, 132 (1st Dep't 1999).  Specifically, malice requires "conscious falsity" on the part of the defendant.  *Bradley v. Vill. of Greenwood Lake*, 376 F. Supp. 2d 528, 534-35 (S.D.N.Y. 2005).  And the existence of probable cause for the indictment generally precludes a finding of malice because there can be no "wrong or improper motive" in prosecuting someone lawfully indicted.  *See Husbands*, 2007 WL 2454106, at *9.

Plaintiffs allege that Defendants were motivated by a desire to "create public scapegoats" for the NYAG's allegations (SAC ¶ 104) and "offered up [Plaintiffs] as targets for [the] criminal prosecution" in exchange for a "lenient" settlement from the NYAG (*id.* at ¶ 39) and "to avoid criminal prosecution" of the company.  *Id.* at ¶ 104.  These allegations are conclusory and

insufficient.[18]  Moreover, as discussed above, these allegations are implausible in light of the public record.  First, Defendants could not have "offered up" Plaintiffs as targets because the NYAG already had an independent basis to prosecute Plaintiffs.  *See* pages 13-20, *supra*.  Second, the idea that Defendants were able to secure a lenient settlement is preposterous considering its $850 million payment and additional payment of $435 million to settle the inevitable class actions.  *See* Polkes Dec. Ex. H, at Exhibit 99.1 (8-K).[19]  Furthermore, Marsh's criminal prosecution was extremely unlikely.  *See* n.4, *supra*.  Finally, and critically, Marsh's alleged "cooperation" was compelled by law: Marsh had received subpoenas from the NYAG and was legally obligated to produce requested documents and information to the government.  Where, as here, a defendant's alleged actions were compelled by law, the defendant cannot have been acting "due to a wrong or improper motive."  *See Nieves*, 761 F. Supp. 2d at 53 (finding no malice when "what few actions the [defendants] did take were authorized, if not compelled, by law").

Moreover, the public record amply demonstrates that Marsh had everything to lose and nothing to gain from Plaintiffs' criminal prosecution, and certainly had no motivation to maliciously engineer Plaintiffs' prosecution.  Marsh paid more than a billion dollars to settle the NYAG complaint and the pile-on class action lawsuits.  Further, within 12 days of the filing of the NYAG Civil Complaint, the price of MMC's stock had declined by 37%, or about $ 9 billion, of its market value.  *See* David Plumb & Helen Stock, *Marsh's New Chief Forms Compliance Unit: Shares Rise (Update2)*, Bloomberg, Oct. 26, 2004 (cited at SAC ¶ 62).  Marsh had every incentive to defend its employees and seek to establish that no wrongdoing occurred.  Indeed, Plaintiffs never have disputed that Marsh paid huge sums in attorneys' fees to defend Plaintiffs

---

[18] *See DeStefano*, 2011 WL 651452, at *3 ("Plaintiff alleges no facts that suggest [defendant] had any 'improper or wrongful motive'…or that [defendant] acted to 'recklessly disregard' [plaintiff's] rights.") (citing *Fulton v. Robinson*, 289 F.3d 188 (2d Cir. 2002) (same)); *Wiggins v. Buffalo Police Dep't*, 320 F. Supp. 2d 53, 58 (W.D.N.Y. 2004) (dismissing claim because plaintiff failed to allege, other than in conclusory terms, that law enforcement officers acted with malice); *Hornstein v. Wolf*, 109 A.D.2d 129, 133 (2d Dep't 1985) (same).

[19] This Court may take judicial notice of this SEC filing.  *See* n.2, *supra*.

against criminal prosecution.

### III.   PLAINTIFFS' CLAIM FOR ABUSE OF PROCESS MUST BE DISMISSED

As Marsh observed in its initial motion, Plaintiffs' claim for abuse of process is framed in the vaguest of terms and largely repeats their conclusory and insufficient malicious prosecution allegations.  The SAC adds no clarity or specificity.  Plaintiffs continue to allege, cryptically, that Defendants' purported "collusion" with, and "convincing" of, the NYAG in exchange for supposed "leniency," constituted an "abuse of the criminal justice system and the processes thereof."  SAC ¶ 110.  As an initial matter, this claim should be dismissed as duplicative. Beyond that, Plaintiffs have failed to allege a cognizable abuse of process claim: they have identified no specific process that Defendants allegedly abused, nor have Plaintiffs identified any purportedly illicit goal Defendants hoped to gain *after* causing any process to issue.

To state a claim for abuse of process, Plaintiffs must allege that the defendants "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of process."  *Savino*, 331 F.3d at 70 (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

"[T]he pursuit of a collateral objective must occur *after* the process is issued; the mere act of issuing process does not give rise to a claim."  *Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) (internal citations omitted) (emphasis in original); *Curiano v. Suozzi*, 102 A.D.2d 759, 759 (1st Dep't 1984) (affirming dismissal of abuse of process claim arising out of defendants' filing of a civil action for libel, when plaintiffs had not alleged "an improper use of process after it was issued and a wrongful interference with person or property under color of process, both of which [ ] were necessary to such an action").

Here, Plaintiffs' claim fails even under the most generous reading of the SAC.  Plaintiffs do not even identify the specific legal process Defendants supposedly abused, and so the claim should be dismissed for that reason alone.  But, even assuming that this process is the indictment, Plaintiffs have not alleged any facts establishing that Defendants pursued an improper collateral

objective *after* the indictment was issued.  Plaintiffs' claim stems from Defendants' alleged

"collu[sion] with the New York Attorney General to prosecute [Plaintiffs]" in order to "avoid

criminal prosecution themselves."  SAC ¶ 109.  As discussed above, Marsh reached a settlement

with the NYAG whereby it agreed to pay $850 million to a fund for its clients on January 30,

2005.  *Id*. at ¶ 65.  But Plaintiffs were not indicted until on or about September 15, 2005.  *Id*. at ¶

72.  Process did not issue, therefore, until nearly *nine months after* the allegedly improper

activity between Defendants and the NYAG.  Because "[t]he gist of abuse of process is the

improper use of process *after* it is issued," *see Cook*, 41 F.3d 73 at 80 (emphasis supplied), and

Plaintiffs do not (and cannot), allege any facts establishing that Defendants used the Plaintiffs'

indictment to achieve some improper objective after it was issued, their claim fails.  *See Campos*

*v. City of New York*, 2010 WL 3912493, *4 (S.D.N.Y. Sept. 13, 2010) (dismissing abuse of

process claim when "the complaint contain[ed] no allegations relating to any abuse of process

subsequent to the filing of criminal charges[.]").

## IV.   PLAINTIFFS' CLAIM UNDER JUDICIARY LAW SECTION 487 AGAINST MR. CHERKASKY MUST BE DISMISSED

Section 487 of the New York Judiciary Law provides:

> An attorney or counselor who: (1) [i]s guilty of any deceit or collusion, or
> consents to any deceit or collusion, with intent to deceive the court or any
> party; or (2) [w]ilfully delays his client's suit with a view to his own gain;
> or, wilfully receives any money or allowance for or on account of any
> money which he has not laid out, or becomes answerable for, [i]s guilty of a
> misdemeanor, and in addition to the punishment prescribed therefor by the
> penal law, he forfeits to the party injured treble damages, to be recovered in
> a civil action.

Although Plaintiffs purport to allege a violation of Section 487 by Mr. Cherkasky, as a matter of

law, the statute is not applicable here and, thus, the claim must be dismissed.

First, numerous decisions emphasize that Section 487 applies only to an attorney acting

*in his capacity as an attorney*.  *See Northern Trust Bank of Florida/Sarasota v. Coleman*, 632 F.

Supp. 648, 650 (S.D.N.Y. 1986) ("Section 487 is aimed at actions by an attorney in his or her

role *as an attorney*.  The mere fact that a wrongdoer is an attorney is insufficient to impose

liability for treble damages under section 487.") (emphasis in original); *Barrows v. Alexander*, 78

A.D.3d 1693, 1693 (4th Dep't 2010) ("Section 487 applies only to an attorney acting in his or

her capacity as an attorney, not to a party who is represented by counsel and who, incidentally, is

an attorney") (internal quotation omitted);  *216 Garage, Inc. v. Roth*, 12 Misc. 2d 1081, 1082,

174 N.Y.S.2d 478, 479 (N.Y. County Sup. Ct. 1958) (holding that the precursor to Judiciary Law

§ 487 "refers to transactions had by attorneys as attorneys.  It does not purport to put an extra

liability on a person sued merely because he happens to be admitted to the Bar").

Plaintiffs have not alleged—because they cannot—that Mr. Cherkasky was acting in his

capacity as an attorney at any point during the events in question.  Mr. Cherkasky was the Chief

Executive Officer and President of Marsh – not its legal counsel.  SAC ¶ 11.[20]  Although

Plaintiffs allege, correctly, that Mr. Cherkasky is an attorney licensed in New York (*id.*), because

Plaintiffs concede that Mr. Cherkasky was not even employed by Marsh *as an attorney*, no claim

under Section 487 may be stated.  *See Northern Trust*, 632 F. Supp. at 650.

Second, Plaintiffs' misuse of Section 487 is further demonstrated by controlling case law

holding that offending conduct must occur during the course of a "pending judicial proceeding."

*See O'Brien v. Alexander*, 898 F. Supp. 162, 168-69 (S.D.N.Y. 1995) ("Since no lawsuit was

pending when the alleged representations in question were made . . . plaintiff's claim must be

dismissed, for section 487 by its terms applies only to statements made *to the court or any party*

*to a lawsuit*.") (emphasis added), *aff'd*, 101 F.3d 1479 (2d Cir. 1996); *Henry v. Brenner*, 271

A.D.2d 647, 648 (2d Dep't 2000) ("the statute only applies to wrongful conduct by an attorney in

---

[20] As provided in the Amended Complaint itself, as well as many of the news articles cited
therein, during the events in question Mr. Cherkasky served as Chief Executive Officer and
President of Kroll, Inc., Marsh, Inc. and then Marsh & McLennan Companies, Inc.  (SAC ¶¶ 46,
48).

a suit actually pending").  Plaintiffs do not and cannot allege that Mr. Cherkasky deceived any

court or any party engaged in any judicial proceeding pending at the time of his alleged conduct.

Indeed, the allegations against Mr. Cherkasky exclusively concern purported conduct that

predates the indictments against Plaintiffs.

Third, even assuming, *arguendo*, that Mr. Cherkasky's alleged conduct could constitute a

violation of Judiciary Law § 487, Plaintiffs' cause of action would be barred by the applicable

three-year statute of limitations.  *See* N.Y. CPLR § 214(6); *see also Carvel v. Ross*, 2011 WL

856283, at *32 (S.D.N.Y. Feb 16, 2011) (dismissing Section 487 claim pursuant to CPLR 214(6)

three-year statute of limitations).[21]  Mr. Cherkasky's alleged "deceit and collusion" took place in

October and November of 2004 and purportedly culminated in the January 30, 2005 Settlement

Agreement between MMC and the NYAG.  SAC ¶¶ 46-50, 62-65.  Plaintiffs' original Complaint

was filed on October 12, 2010; the Judiciary Law claim against Mr. Cherkasky was not asserted

until June 24, 2011, in the Amended Complaint.  In light of the nearly six and one-half years that

elapsed between Mr. Cherkasky's alleged conduct and the claim first being brought against him,

Plaintiffs' Judiciary Law cause of action is untimely and must be dismissed.[22]

---

[21] Counsel for Plaintiffs is well aware of this three-year limitations period, as he himself has been a defendant in an action where a Section 487 claim was dismissed on these grounds.  *See Rafter v. Liddle*, 2006 WL 2255093, at *7, *11 (S.D.N.Y. Aug. 4, 2006) ("Like claims for legal malpractice generally, a claim asserting violation of Judiciary Law § 487 is governed by a three year statute of limitations."), *aff'd*, 288 Fed. Appx. 768 (2d Cir. 2008).

[22] Even if the claim were not deficient for all of the reasons stated above, the claim still would fail because Plaintiffs do not allege any facts from which an intent to deceive or defraud can be inferred.  *Nimkoff Rosenfeld & Schecter, LLP v. RKO Props., Ltd.*, 2011 WL 832859, at *4 (S.D.N.Y. Mar. 4, 2011) ("To survive a motion to dismiss, a claim under New York Judiciary Law § 487 must plausibly allege an intent to deceive.").  Plaintiffs have not plead factual content that allows the Court to draw a reasonable inference that Cherkasky intended to deceive any court or any party to a lawsuit.  *Id.* at *1.

## V.   PLAINTIFFS' CLAIMS FOR SEVERANCE BENEFITS MUST BE DISMISSED

### A.   Plaintiffs Admit That They Failed to Exhaust Their Administrative Remedies

The Court must dismiss Plaintiffs' Fourth Cause of Action under ERISA § 502(a)(1)(B) because Plaintiffs failed to exhaust administrative remedies available under the Severance Plan before suing. *Id.* at ¶ 119.  Exhaustion is a necessary prerequisite to filing suit seeking benefits under ERISA § 502(a)(1)(B), and a plaintiff's failure to plead and prove exhaustion requires dismissal of the plaintiff's claim.  *See Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 107 (2d Cir. 2003); *Morillo v. 1199 SEIU Benefit and Pension Funds*, 783 F. Supp. 2d 487, 493 (S.D.N.Y. 2011) ("Where a plan participant or beneficiary has not exhausted her administrative remedies, a plan defendant is entitled to dismissal…"); *Kirkendall v. Halliburton, Inc.*, 2011 WL 2360058, at *5 (W.D.N.Y. June 9, 2011) (noting that "federal courts regularly dismiss" ERISA claims for failure to exhaust).

The Severance Plan contains an express claims procedure that must be followed to obtain benefits under the plan.  Employees who believe they are eligible for benefits must submit their claims to the Plan Administrator within 30 days of their Termination Date.  *See* Polkes Dec. Ex. K, § 10 at 5.[23]  The Severance Plan also sets forth detailed claims procedures under which an individual may obtain review of a benefits denial, requiring an initial level of consideration and an appeal process before an individual may sue.  *Id.* at pp. 5-6.  Plaintiffs failed to make application to the Plan Administrator seeking benefits under the Severance Plan at any time, let alone within 30 days of their termination.  Because Plaintiffs have failed to exhaust administrative remedies, their claim for benefits fails as a matter of law.  Indeed, in *Egan v. Marsh & McLennan Cos., Inc.*, 2008 WL 245511, at *10 (S.D.N.Y. Jan. 28, 2008), Judge Scheindlin of this Court dismissed a claim for benefits under ERISA § 502(a)(1)(B) under the

---

[23] "[W]here the record contains the undisputed terms of the disputed plan ... a Court may decide the applicability of ERISA as a matter of law in the context of a Rule 12(b)(6) motion." *Hahn v. Nat'l Westminster Bank, N.A.,* 99 F. Supp. 2d 275, 277 (E.D.N.Y. 2000) (quoting *Albers v. The Guardian Life Ins. Co. of Am.,*1999 WL 228367, at *2 (S.D.N.Y. April 19, 1999)); *see also Prieto v. Election.com*, 2005 WL 3560596, at *3 (E.D.N.Y. Dec. 29, 2005).

Marsh USA Severance Plan – *the very same severance plan at issue here* – for failure to allege exhaustion of administrative remedies under the plan.

Plaintiffs attempt to circumvent the exhaustion requirement by alleging that "Marsh never provided notice to Messrs. Gilman and McNenney that they were entitled to severance payments or that Marsh was declining to give them severance payments." SAC ¶ 85. The First Circuit Court of Appeals rejected this argument in *Madera v. Marsh USA, Inc.*, 426 F.3d 56 (1st Cir. 2005), with respect to another written severance plan maintained by Marsh USA Inc. with nearly identical claims procedures to the plan at issue here. *Id.* at 60. The plaintiff in *Madera* was a former employee of Marsh USA Inc. whose employment was terminated "for cause," and who did not, therefore, receive severance benefits under the terms of the plan. *Id.* The district court "dismissed [plaintiff's] ERISA claim on the sole ground that he failed to exhaust [] administrative remedies." *Id.* at 61. On appeal, the plaintiff argued that his failure to exhaust should be excused because "Marsh did not provide him with written notice of the denial of severance benefits." *Id.* at 62. The First Circuit rejected this argument, holding that exhaustion may be excused on those grounds only "where an employee has made a claim for benefits." *Id.* "Since [the plaintiff] never made a claim, there was nothing for Marsh to deny in writing . . ." *Id.*

Plaintiffs also seek excuse their failure to exhaust on grounds of futility, alleging that "[a]ny administrative procedure provided by the Severance Plan would have been futile given Marsh's malicious prosecution of Messrs. Gilman and McNenney . . ." SAC ¶ 119. In light of the "'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases,'" the futility exception to the exhaustion requirement is "narrow" and strictly construed and requires a "clear and positive showing" that pursuing a claim through the internal claims process would be futile. *Quigley v. Citigroup Supplemental Plan for Shearson Transfers*, 2011 WL 1213218, at *6 (S.D.N.Y. March 29, 2011) (quoting *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006)); *see also Am. Med. Ass'n v. United HealthCare Corp.*, 2007 WL 1771498, at *8 (S.D.N.Y. June 18, 2007) ("[T]he threshold required by the futility exception

is very high" and imposes a "substantial burden on plaintiffs").

Far from making the "clear and positive showing" of futility necessary to excuse their failure to exhaust, Plaintiffs do no more than make a single conclusory assertion in their Second Amended Complaint that exhaustion "would have been futile." *See* SAC ¶ 119.  This is insufficient as a matter of law.  *See, e.g.*, *Bonham v. Jefferson Pilot Fin. Ins. Co.,* 2010 WL 1405448, at *2 (W.D.N.C. Mar. 31, 2010) ("A plaintiff must plead more than 'bare allegations' of futility; the allegations must clearly show that he was, or would have been, denied access to the claims procedures provided for in the benefits plan.").  Moreover, the *only* factually detailed allegation that Plaintiffs make on this subject affirmatively demonstrates that exhaustion was *not* futile.  Plaintiffs allege that "others terminated in connection with Marsh's investigation of alleged bid rigging did, in fact, receive payments pursuant to Marsh's Severance Plan" (SAC ¶ 120; *see also* SAC ¶¶ 87, 126), thus proving that it was not a foregone conclusion that severance benefits would be denied to employees, such as Plaintiffs, whose employment was terminated in connection with the investigation.  *See, e.g.*, *Am. Med. Ass'n*, 2007 WL 1771498, at *11 (holding that exhaustion was not futile, given that some participants "actually received additional reimbursements through the administrative appeals process."); *Shawver v. R.H. Macy & Co., Inc.*, 697 F.Supp. 1515, 1522 -1523 (W.D.Mo. 1988) ("Plaintiffs fail to establish a futility exception to the exhaustion requirement.  It is clear from the facts stipulated to by all the parties … that it was not futile to follow the express procedures set out in the Plan because numerous employees did receive benefits."); *Angevine v. Anheuser-Busch Companies Pension Plan*, 646 F.3d 1034, 1038 (8th Cir. 2011) (futility not shown because when plaintiff filed suit, the "Plan administrator had not denied any similar claims.").

### B.     Plaintiffs' Breach of Contract Claim Is Preempted by ERISA

In their Fifth Cause of Action, Plaintiffs seek benefits under the Severance Plan. Plaintiffs acknowledge that "[t]he Severance Plan is, and at all times relevant hereto was, an "employee benefit plan" within the meaning of ERISA § 3(3) . . ." AC ¶ 14.  Accordingly, Plaintiffs' claim is preempted by ERISA both because it (i) "relates to" an ERISA plan, and

ERISA expressly provides that it "supersede[s] any and all State laws . . . [that] relate to any employee benefit plan," ERISA § 514(a), 29 U.S.C. § 1144(a), and (ii) falls directly within the scope of ERISA's civil enforcement provisions, the exclusive avenues for enforcing claims for benefits provided under ERISA plans.  *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995).

To conclude that Plaintiffs' Fifth Cause of Action is preempted, this Court need look no further than *Egan v. Marsh & McLennan Cos., Inc.*, 2008 WL 245511 (S.D.N.Y. Jan. 30, 2008), which held that ERISA preempts breach of contract claims with respect to *the very same ERISA-governed severance plan at issue here.*  In dismissing the breach of contract claim, the *Egan* court held that because that claim was based "directly" on the terms of ERISA-governed plans, the existence of the ERISA plans was "a critical factor in establishing liability under the state law claims."  *Id.* at *8.

Like the plaintiff in *Egan*, Plaintiffs base their breach of contract claim directly on the terms of the Severance Plan, and Defendants' "potential liability . . . derives entirely from the particular rights and obligations established by the [Severance Plan]."  *Berry v. MVP Health Plan, Inc.*, 2006 WL 4401478, at *5 (N.D.N.Y. Sept. 30, 2006).  These are precisely the circumstances requiring preemption under ERISA § 514(a).  *Id.*  In addition, the relief that Plaintiffs seek is precisely the relief provided by ERISA § 502(a)(1)(B)—recovery of benefits provided under the plan.  As a result, the Fifth Cause of Action falls directly within the scope of ERISA's civil enforcement provisions and is completely preempted.  *See Romney v. Lin*, 94 F.3d 74, 80-81 (2d Cir. 1996); *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6, 11 (2d Cir. 1992).[24]

## VI.    PLAINTIFFS' CLAIMS UNDER THE STOCK AWARD PLAN FAIL

### A.    Plaintiffs' NYLL Claim Fails Because Equity Awards Are Not Wages

The deferred compensation Plaintiffs seek in their Sixth Cause of Action (*see* AC ¶¶ 120-

---

[24]For these reasons, courts within this Circuit routinely hold that ERISA preempts breach of contract claims seeking recovery of severance benefits.  *See, e.g.*, *Reichelt v. Emhart Corp.*, 921 F.2d 425, 431 (2d Cir. 1990); *Berman v. Tyco Intern'l Ltd.*, 2011 WL 1334851, at *7 n.6 (S.D.N.Y. Mar. 31, 2011).

26) does not constitute "wages" under the NYLL.  Equity-based award compensation programs whose objectives are to provide employees an incentive to stay with the employer are not "wages" under the NYLL.  *See Guiry v. Goldman Sachs & Co.*, 31 A.D.3d 70, 73 (1st Dep't 2006); *Econn v. Barclay's Bank PLC*, 2010 U.S. Dist. LEXIS 143063, at *14-15 (S.D.N.Y. May 10, 2010).  Additionally, such compensation does not constitute "wages" when "the ultimate value of [the] equity-based compensation would depend on [the employer's] stock price after the rights vested" and thus "on [the employer's] 'overall financial success,' not simply on the employee's personal productivity." *Guiry*, 31 A.D.3d at 73.[25]

Here, the SAP states it is designed to incentivize employees and align employees' and shareholders' interests.  *See* SAC, Ex. A, SAP § 1.  Additionally, because the equity awarded under the SAP does not vest when it is announced (SAC, Ex. A at § II; Ex. B, §I), the ultimate value of awards depends on Marsh's overall financial success, rather than on the personal productivity of an individual employee.  Thus, the stock awards and stock options do not fall within the definition of "wages" and their forfeiture cannot give rise to liability under §193.[26]

B.      **Plaintiffs' Seventh Cause of Action Must Be Dismissed as Time-Barred**

The statute of limitations bars Plaintiffs' breach of contract claim based on the Stock Award Plan.  The SAP provides that it is governed by Delaware law:

> The validity, construction, and effect of the Plan, any rules and regulations relating to the Plan, and any Award Agreement shall be determined in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of laws, and applicable federal law.

SAC, Ex. A, SAP § 10.j.  Under Delaware law, a plaintiff must assert a claim for breach of

---

[25] *See also Econn*, 2010 U.S. Dist. LEXIS 143063, at *14-15 (restricted stock and option awards not "wages" because they were entirely discretionary and it was "incontrovertible that the value of the shares would be based on overall financial success" of company rather than individual productivity); *Int'l Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613, 617-18 (S.D.N.Y. 1999) (stock options under LTIP not wages); *Rich v. JPMorgan Chase & Co.*, 2006 WL 4682162 (N.Y. Sup. Oct. 3, 2006) (deferred equity awards not wages).

[26] Even assuming that the equity awards under the SAP do constitute "wages" under the NYLL (which they do not), an alleged failure to pay wages is not a "deduction" from wages subject to NYLL § 193.  *See Monagle v. Scholastic, Inc.*, 2007 WL 766282, at *2 (S.D.N.Y. Mar. 9, 2007).

contract within three years of the alleged breach.  *See* 10 Del. C. § 8106.  The "breach" occurred

when Plaintiffs' employment was terminated (on October 28, 2004 and November 2, 2004), and

Marsh forfeited Plaintiffs' shares under the Stock Award Plan.  SAC ¶¶ 54, 59; *Fike v. Ruger*,

754 A.2d 254, 260 (Del. Ch. 1999) (under Section 8106, "[a] cause of action accrues at the

moment of the wrongful act, even if the plaintiff is ignorant of the wrong."); *Res. Ventures, Inc.

v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999) (a cause of action accrues when the

contract is breached).  Yet Plaintiffs did not file the Complaint until October 27, 2010.

     C.     **Plaintiffs' Quasi-Contractual Claims Must Be Dismissed**

Plaintiffs assert two quasi-contractual claims for compensation with respect to the Stock

Award Plan:  (1) unjust enrichment (Eighth Cause of Action); and (2) *quantum meruit* (Ninth

Cause of Action).  But "the existence of a valid and enforceable written contract governing a

particular subject matter generally precludes recovery on a theory of *quantum meruit* or unjust

enrichment for events arising out of the same subject matter."  *Alter v. Bogoricin*, 1997 WL

691332, at *10 (S.D.N.Y. Nov. 6, 1997) (citation omitted); *see also EBC I, Inc. v. Goldman

Sachs & Co.*, 5 N.Y.3d 11, 23 (2005) (internal quotation marks and citation omitted).  The Stock

Award Plan is a valid and enforceable written contract and bars Plaintiffs' attempts to recover

benefits governed by that plan under quasi-contractual theories.  Plaintiffs have alleged no facts

that support deviation from this general rule.  *See Alter*, 1997 WL 691332, at *10 (dismissing

quasi-contractual claim and rejecting plaintiff's effort to avoid general rule).

*      *      *

Finally, the Court should dismiss the Second Amended Complaint with prejudice because

any further amendment would be futile.  *See Van Buskirk v. New York Times Co.*, 325 F.3d 87,

92 (2d Cir. 2003).  Defendants already once demonstrated that Plaintiffs' malicious prosecution

claim is doomed to failure, and Plaintiffs' attempt to buttress their allegations has failed:

Plaintiffs still have not (and cannot) plead: (a) a lack of probable cause for their prosecution,

because they were identified as co-conspirators in the plea allocutions and because of the

presumption of probable cause arising from their indictments; (b) that Defendants initiated their

36

prosecution; and (c) that Defendants acted with malice.  Plaintiffs' claim for abuse of process must fail because the indictment—the only process asserted here—came months after the allegedly illicit settlement agreement between Marsh and the NYAG.  Plaintiffs' remaining claims, already the subject of two amendments, fare no better.

## CONCLUSION

For the foregoing reasons, the Second Amended Complaint should be dismissed in its entirety with prejudice.


Dated:   New York, New York
          October 26, 2011

                                        Respectfully submitted,


                                        /s/ Jonathan D. Polkes
                                        Jonathan D. Polkes
                                        Nicholas J. Pappas
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        (212) 310-8000
                                        jonathan.polkes@weil.com

                                        *Attorneys for Defendants Marsh & McLennan
                                        Companies, Inc., Marsh Inc., Marsh USA Inc., and
                                        Marsh Global Broking Inc.*


                                        Andrew W. Stern
                                        Cliff Fonstein
                                        James O. Heyworth
                                        SIDLEY AUSTIN LLP
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        (212) 839-5300
                                        astern@sidley.com

                                        *Attorneys for Defendant Michael Cherkasky*