UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
WILLIAM W. GILMAN &                                 :
EDWARD J. MCNENNEY, JR.,                             :
                              Plaintiffs,           :          10 Civ. 8158 (JPO)
                                                    :
          -against-                                 :          MEMORANDUM AND
                                                    :               ORDER
MARSH & MCLENNAN COMPANIES, INC.,                   :
et al.,                                             :
                              Defendants.           :
                                                    :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        Plaintiffs William W. Gilman and Edward J. McNenney, Jr. (together, "Plaintiffs")

brought this action on October 27, 2010.  (Dkt. No. 1.)  On October 11, 2011, they filed their

second amended complaint.  (Second Amended Complaint, Dkt. No. 23, (the "SAC").)  The

SAC purports to state nine causes of action: (1) malicious prosecution; (2) abuse of process; (3)

misconduct by an attorney under New York Judiciary Law § 487; (4) violations of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*; (5)

contractual breach of a severance payment agreement; (6) violations of New York Labor Law

("NYLL") § 193; (7) contractual breach of a stock award plan; (8) unjust enrichment; and (9)

*quantum meruit*.  (*Id.*)

        On October 26, 2011, defendants Marsh & McLennan Companies, Inc. ("MMC"); Marsh

Inc.; Marsh (USA) Inc.; and Marsh Global Broking Inc. (collectively, "Marsh") and defendant

Michael Cherkasky (together with Marsh, "Defendants") filed the instant motion to dismiss the

SAC.  (Dkt. No. 26 (the "Motion").)  For the reasons discussed below, the Motion will be

granted in part and denied in part.

I.      **Background**[1]

    A.      **Attorney General's Investigation of Marsh**

In April 2004, New York Attorney General Eliot Spitzer initiated an investigation into Marsh's use of contingent commissions, which are fees paid by an insurer to an insurance broker, such as Marsh, that brings business to the insurer.  The Attorney General alleged that these contingent commissions illegally suppressed competition and resulted in bid-rigging. Through a number of subpoenas, the Attorney General sought and received from Marsh thousands of pages of documents related to Marsh's contingent commissions practices.

Marsh also began its own internal investigation of its contingent commission practices. Marsh interviewed Gilman in June 2004 and McNenney in September 2004; both men submitted voluntarily to these interviews.

The SAC asserts that all of Plaintiffs' contingent commissions activities had been approved by Marsh's legal department and that Plaintiffs never violated any law in their work for Marsh.  It further asserts that Marsh knew that Plaintiffs had done nothing improper or illegal.

Allegedly, Marsh and Cherkasky (who became MMC's CEO in 2004) "ultimately convinced the New York Attorney General to focus on specific individuals—with [Plaintiffs] being the primary targets—instead of Marsh itself."  (SAC ¶ 32.)  The SAC goes on to assert that, "[s]pecifically, in return for offering up Messrs. Gilman and McNenney, the New York Attorney General agreed not to criminally prosecute Marsh itself, but instead, would target Messrs. Gilman and McNenney for prosecution."  (*Id.* ¶ 39.)

The Attorney General did, however, bring a civil suit (the "Marsh Civil Suit"), announced on October 14, 2004, against MMC and Marsh, Inc. relating to their use of contingent

---

[1] Unless otherwise noted, the facts in this background section are drawn from the SAC and the documents attached thereto.  On a motion to dismiss, facts in a plaintiff's complaint are assumed to be true.  *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).

commissions.  The SAC alleges that Attorney General Spitzer insisted that he would not

negotiate a settlement of the Marsh Civil Suit "so long as then-CEO, Jeff Greenberg, was part of

Marsh's management," but would instead negotiate with Defendant Cherkasky, "who, at the

time, was transitioning from CEO of Kroll, Inc. to Marsh, Inc., both subsidiaries of [MMC]."

(SAC ¶ 46.)  The SAC alleges that Spitzer "used the negotiation of the Marsh settlement as an

opportunity to install his close friend, Mr. Cherkasky, as the CEO of Marsh."  (SAC ¶ 44.)  The

board of Marsh & McLennan Companies, Inc. did appoint Cherkasky as CEO on October 25,

2004.  The same day, the Attorney General issued a press release, stating:

> The actions announced today by the Board of Directors of Marsh & McLennan
> Companies permit[] Marsh and [the New York Attorney General's] office to
> move forward toward a civil resolution of our lawsuit.
> > *We are persuaded that the goals that would have been advanced by a*
> > *criminal prosecution of the corporation—punishment, restitution, general*
> > *deterrence, and industry reform—will be better accomplished by criminal*
> > *prosecution of individuals . . . .*

(SAC ¶ 49 (quoting Press Release, New York Attorney General, Statement by Attorney General

Eliot Spitzer Regarding the Marsh & McLennan Companies (Oct. 25, 2004)) (emphasis in

SAC)).[2]

On or about October 28, 2004, Marsh informed Plaintiff McNenney that his employment

was terminated.  On or about November 1, 2004, Plaintiff Gilman informed Marsh that he was

retiring and completed paperwork to do so.  On or about November 2, 2004, a Marsh

representative called Gilman's counsel and informed him that Marsh would not accept Gilman's

retirement and instead terminated his employment.  Neither plaintiff was terminated for cause.

In a press interview the day after becoming CEO, Defendant Cherkasky asserted that

"bid-rigging appears to have been confined to William Gilman, a managing director at Marsh

---

[2] The SAC's citation erroneously lists the date of this press release as October 25, 2005.

3

Global Broking, and his group."  (SAC ¶ 62 (quoting David Plumb & Helen Stock, *Marsh's New Chief Forms Compliance Unit; Shares Rise (Update 12)*, Bloomberg, Oct. 26, 2004).)

Marsh waived its attorney-client privilege and produced to the Attorney General at least twenty-three interview memoranda prepared by its counsel.  On January 30, 2005, Marsh and the Attorney General entered into an agreement to resolve the Marsh Civil Suit (the "Settlement Agreement"), which required Marsh to pay $850 million into a fund to be disbursed to Marsh's policyholder clients.  The Settlement Agreement also required Marsh to implement certain changes in its business practices and to "fully and promptly cooperate with the Attorney General with regard to his [i]nvestigation, and related proceedings and actions, of any other person, corporation or entity, including but not limited to Marsh's current and former employees, concerning the insurance industry."  (SAC ¶ 65.)

The SAC quotes a *New York Times* article stating that "Mr. Spitzer said that a written apology was included in the [Settlement] [A]greement, ***noting that 'certain Marsh employees unlawfully deceived their customers' had been a 'precondition for a settlement.'***"  [*Sic.*]  (SAC ¶ 67 (quoting Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 million*, Feb. 1, 2005) (emphasis in SAC).)  In a press release issued at the same time as announcement of the Settlement Agreement, Cherkasky stated, "[w]e deeply regret that certain of our people failed to live up to our history of dedicated client service.  The acts of these employees were inconsistent with the integrity and ethics on which this company was founded . . . ."  (SAC ¶ 68 (quoting Press Release, Marsh & McLennan Companies, MMC Reaches Settlement Agreement with New York State Attorney General and Superintendent of new York State Insurance Department (Jan. 31, 2005)).)

B.     **Related Prosecutions of AIG Employees**

On October 13, 2004, the New York Attorney General filed felony complaints against two employees of American International Group ("AIG"), Karen Radke (later Karen Radke Jacobson) and Jean-Baptist Tateossian, charging them with Scheme to Defraud in the First Degree, in violation of Penal Law § 190.65(1)(b).   (*See* Declaration of Jonathan D. Polkes in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Polkes Dec."), Dkt. No. 28, Ex. A, *People of the State of New York v. Karen Radke*, Felony Complaint, dated October 13, 2004 ("Radke Complaint"); Ex. B, *People of the State of New York v. Jean-Baptist Tateossian*, Felony Complaint, dated October 13, 2004 ("Tateossian Complaint").)[3]   These complaints identified Gilman and McNenney by name as Radke's and Tateossian's co-conspirators in the alleged fraud.   (Radke Complaint at 2 ("During this time period, Bill Gilman, Ed McNenny [*sic*], and others at Marsh periodically instructed Radke and others at AIG to submit specific quotes for insurance coverage that were less favorable than those of the incumbent carriers, and were designed to ensure that the incumbent carriers would retain [the] client's business."); Tateossian Complaint at 2 (same, substituting "Tateossian" for "Radke").)

The only sources of information supporting the allegations in the complaints were "records provided to the [Attorney General's office] by attorneys representing American International Group, Inc." and interviews by an investigator in the Attorney General's office of Ms. Radke and Mr. Tateossian.   (Radke Complaint at 1-2; Tateossian Complaint at 1-2.)   The

---

[3] On a motion to dismiss, the Court may consider matters subject to judicial notice. *Ackerman v. Local Union 363*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006). Such matters include court filings, particularly those from related litigation. *See Campos v. City of New York*, 2010 WL 3912493, at *3 (S.D.N.Y. Sept. 13, 2010). In addition, courts may take judicial notice of facts that are "matter[s] of public record thoroughly covered in the media." *Meridian Horizon Fund, LP v. Tremont Group Holdings Inc.*, 747 F. Supp. 2d 406, 410 (S.D.N.Y. 2010) (taking judicial notice of media reports of a lawsuit brought by the New York Attorney General); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (same).

felony complaints identify neither Marsh nor any employee or agent of Marsh as the source of any of the complaints' allegations.

Also on October 13, 2004, Radke and Tateossian each pleaded guilty to the charge against them.  (Polkes Dec., Ex. C, Dkt. No. 28-3.)  Under oath during her plea allocution, Radke answered in the affirmative that she and others received and complied with instructions from "Bill Gilman, Ed McKenny [*sic*], and others at Marsh . . . to submit specific quotes for insurance rates that [she] believed were higher than those of the incumbent carriers, were designed to ensure that the incumbent carriers would win certain business, and resulted in clients being tricked and deceived by a deceptive bidding process."  (*Id.* at 6:8-21.)

### C.     Investigation, Prosecution, and Conviction of Gilman and McNenney

The Attorney General's office conducted an investigation into the activities of Gilman and McNenney, though the dates of the investigation are not entirely clear from the SAC. During that investigation, Gilman's counsel allegedly asserted to the Attorney General's office in February 2005 that contingent commissions were not an improper practice.  The SAC alleges that an assistant attorney general responded, "in sum and substance, 'if we can't prosecute [Gilman] under a theory based on contingent commissions, then we'll just prosecute him under something else.'"  (SAC ¶ 43.)

The SAC alleges that a grand jury heard testimony concerning Gilman and McNenney from March through July 2005.  Marsh is alleged to have "provided" at least eleven witnesses for presentment before the grand jury.  (*Id.* ¶ 73.)  The SAC alleges that some or all of these witnesses received immunity from prosecution due to their testimony and that none of these witnesses contradicted the Attorney General's theories for prosecuting Plaintiffs.  The SAC

alleges that Karen Radke was a key witness against Gilman and McNenney before the grand jury.  (*Id.* ¶ 74.)

On or about September 15, 2005, the Attorney General's office announced an indictment against Plaintiffs Gilman and McNenney and others (the "Indictment").  The Indictment charged Gilman and McNenney with thirty-seven counts relating to their employment with Marsh: one count of Scheme to Defraud in the First Degree under N.Y. Penal Law § 190.65(1)(b); one count of Restraint of Trade & Competition under N.Y. Gen. Bus. Law §§ 340 & 341; four counts of Grand Larceny in the First Degree under N.Y. Penal Law § 155.42; thirty counts of Grand Larceny in the Second Degree under N.Y. Penal Law § 155.40(1); and one count of Grand Larceny in the Third Degree under N.Y. Penal Law § 155.35.

Thirteen counts of Grand Larceny against Gilman and McNenney were dismissed prior to trial.  A trial on the remaining counts lasted from April 2007 to February 2008, resulting in conviction of Gilman and McNenney on one count of Restraint of Trade & Competition and acquittal on all other charges.

### D.      Gilman and McNenney Convictions Vacated

Gilman and McNenney applied to the trial court to vacate the judgments of conviction against them pursuant to New York's C.P.L. § 440.10.  Their application alleged that the prosecution had failed to disclose various materials to the accused, undermining the legitimacy of the verdict against Gilman and McNenney.

The trial court granted the application, concluding that "[w]hile each item of [undisclosed] evidence taken individually may present a reasonable possibility that the verdict would have been different, taken as a whole, the evidence raises a not only a possibility, but a probability that its disclosure would have produced a different result."  *People v. Gilman*, 2010

7

WL 3036983, at *19, 28 Misc. 3d 1217(A), 2010 N.Y. Slip Op. 51379(U) (N.Y. Sup. Ct. 2010). Specifically, the trial court stated that, "[o]bjectively viewed, the verdict here rested firmly upon the testimony of [James] Spiegel [of both AIG and Zurich Insurance], [Karen Radke] Jacobson [of AIG], [Jean-Baptist] Tateossian [of AIG], [Regina] Hatton [of Marsh], [John] Mohs [of AIG] and [Todd] Murphy [of Marsh], and yet each one of them, after testifying with very favorable cooperation agreements, has, at times before, during or shortly after the trial, given sworn testimony discrediting, even contradicting, their trial testimony." *Id.* at *20. Further, the court determined that certain documents turned over to the Attorney General by Liberty International Insurance Company but not disclosed to the accused "would have been invaluable to the defense effort to challenge the circumstantial inference of a horizontal agreement and to question [others'] testimony to the contrary." *Id.* Taken together, these and other failures by the prosecution "undermine[d] the Court's confidence in the verdict." *Id.*

On January 13, 2011, the Attorney General's office, by that time headed by Attorney General Eric Schneiderman, declined to continue the prosecution of Gilman and McNenney.

### E.    Marsh Benefit Plans

The SAC alleges that, during Marsh's employment of Gilman and McNenney, "Marsh engaged in a practice of providing their employees with a severance payment if Marsh terminated their employment." (SAC ¶ 81.) Marsh's severance plan was "an 'employee benefit plan' within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3) . . . ." (*Id.* ¶ 14.) Though Plaintiffs were eligible for severance pay under this plan, they received none. Marsh also did not notify Gilman and McNenney that they were entitled to severance pay or that it was being denied to them. The SAC alleges that, "[u]pon information and belief, other employees terminated by

Marsh as a result of [the above-described] investigations received severance payments . . . ."  (*Id.* ¶ 87.)

Gilman and McNenney also participated in Marsh's stock award plan ("SAP").  (SAC, Ex. A, beginning at 41 of 71, 2000 Employee Incentive and Stock Award Plan ("SAP").)  Each Plaintiff received restricted shares of Stock Bonus Units under the SAP during his employment with Marsh.[4]  Each Plaintiff had also received stock options under the SAP, some of which vested before Plaintiffs' terminations and some of which had not yet vested.  After their terminations, "Marsh deemed the unvested stock options forfeited and caused the vested stock options to become unexercisable."  (SAC ¶ 94.)  Plaintiffs allege that, under the terms of the SAP (which are attached to the SAC as Exhibits A and B), their Stock Bonus Units should have vested upon their terminations since they were terminated without cause and their stock options should have been allowed to vest and remain exercisable.

## II.     Standard for Motions to Dismiss

On a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts the complaint's factual allegations as true and draws inferences only in the plaintiff's favor.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  On such a motion, the Court is limited to reviewing the complaint, any documents attached to the complaint or incorporated into it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the Court may take judicial notice.  *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.

---

[4] The term "Stock Bonus Unit" is used in the SAC and in the documents attached to the SAC, and Stock Bonus Units are described therein as rights that, once vested, entitle their holder to shares of MMC stock.  (Terms and Conditions for March 1, 2004 Award of Stock Bonus Units to U.S. Grant Recipients, Dkt. No. 23, Ex. A, at 37 of 71.)  However, the term "Stock Bonus Unit" is not expressly defined in the SAC or attached documents.

2007).  A complaint will be dismissed if it fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Federal Rule of Civil Procedure 8 requires a plaintiff's complaint to make "a short and plain statement of the claim showing that the pleader is entitled to relief."  F. R. Civ. P. 8(a)(2).  To survive a motion to dismiss, a complaint brought under Rule 8 must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted).  To comport with this plausibility standard, a complaint must support its claims with factual allegations sufficient "'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Twombly*, 550 U.S. at 555).   "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S.Ct. at 1949.

## III.    Discussion

This discussion addresses each of the Plaintiffs' claims in turn.

### A.      Malicious Prosecution

"Because 'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs . . . .'"  *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)).  Under New York law, "[t]o establish a cause of action for malicious prosecution, a plaintiff must show the elements of [1] commencement or continuation of a judicial proceeding, [2] malice, [3] want of probable cause, and [4] the successful termination of the precedent action in the plaintiff's favor."  *Delince v.*

10

*City of New York*, No. 10 Civ. 4323 (PKC), 2011 WL 666347, at *5 (S.D.N.Y. Feb. 7, 2011)

(quoting *G&T Terminal Packaging Co. v. Western Growers Ass'n*, 56 A.D.3d 266, 267 (1st

Dep't 2008)).  The parties' briefs focus on the first and third of these elements.  Because

Plaintiffs fail to sufficiently allege that Defendants commenced or continued the judicial

proceedings against Plaintiffs, the malicious prosecution claim here must be dismissed.

### 1. Commencement or Continuation of a Judicial Proceeding

New York law imposes a presumption that a prosecutor exercises his own independent

judgment in deciding to prosecute a criminal defendant.  *See Takacs v. City of New York*, 2011

U.S. Dist. LEXIS 7055, at *12 (S.D.N.Y. Jan. 24, 2011) (A "showing of misconduct is required

to overcome the presumption . . . that the prosecutor exercised independent judgment in deciding

whether to initiate the criminal proceeding." (citing *Ricciuti v. New York City Transit Auth.*, 124

F.3d 123, 130 (2d Cir. 1996))).  In light of this presumption,

> "[g]enerally, a civilian defendant who merely furnishes information to law
> enforcement authorities who are then free to exercise their own independent
> judgment as to whether an arrest will be made and criminal charges filed will not
> be held liable for malicious prosecution. . . .   The defendant must have
> affirmatively induced the officer to act, such as taking an active part in the arrest
> and procuring it to be made or showing active, officious and undue zeal, to the
> point where the officer is not acting of his own volition."

*Delince*, 2011 WL 666347, at *5 (S.D.N.Y. Feb. 7, 2011) (quoting *Lupski v. County of Nassau*,

32 A.D.3d 997, 998 (2d Dep't 2006)); *see also Alcantara v. City of New York*, 646 F. Supp. 2d

449, 458-59 (S.D.N.Y. 2009) ("Even if the defendants could be considered to have forwarded

information to prosecutors, or to have participated in the arrest of the plaintiff, they would not be

subject to a malicious prosecution action 'in the absence of evidence that [they] misled or

pressured the official who could be expected to exercise independent judgment." (quoting

*Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir.1999)).)

However, "a person who does not file a complaint may be found to have initiated a proceeding for malicious prosecution purposes where that person induces or persuades a prosecutor to act. . . .  [T]his usually arises in situations where the person has induced prosecution by providing false information to the authorities, knowingly withholding highly material information, or convincing a person to file a complaint who would not otherwise have done so." *Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*, No. 99 Civ. 4677 (RJH), 2004 WL 2290499, at *5 n.8 (S.D.N.Y. Oct. 8, 2004) (citation omitted).

Here, Plaintiffs allege that Defendants "encouraged," "convinced" and "colluded with" the Attorney General by "offer[ing] up Messrs. Gilman and McNenney as targets for criminal prosecution."  (SAC ¶¶ 32, 38-42, 104.)  These conclusory allegations are not sufficient to state a claim for relief under the plausibility standard set forth in *Twombly* and *Iqbal*.

Indeed, the facts of *Twombly* are instructive here.  The *Twombly* plaintiffs alleged an anticompetitive "agreement" among telecommunications companies.  *Twombly*, 550 U.S. 544. Because Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "only restraints [of trade] effected by a contract, combination, or conspiracy," *id.* at 553 (citation omitted), the Supreme Court recognized that alleging such an agreement was necessary to state a claim under that section—but the Court held that asserting the existence of such agreement, without more, was not sufficient to survive a motion to dismiss, *id.* at 556-57.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556.  The Court quoted reasoning from the First Circuit in an analogous case: "[t]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a

12

court is not required to accept such terms as a sufficient basis for a complaint." *Id.* at 557

(quoting *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)).

     Here, the New York malicious prosecution standard faced by Plaintiffs is higher than the

Sherman Act standard faced by the plaintiffs in *Twombly*.  Under New York law, Plaintiffs must

allege more than agreement: they must allege that Defendants "affirmatively induced the

[Attorney General] to act . . . to the point where the [Attorney General was] not acting of his own

volition." *Delince*, 2011 WL 666347, at \*5 (citation and internal quotation marks omitted).

Making such a claim factually plausible requires more than assertions that Defendants were in

communication with the Attorney General's office and reached a resolution of their disputes with

that office prior to Plaintiffs' prosecution.  Even asserting that Defendants knew of Plaintiffs'

innocence is insufficient without a plausible allegation that the Defendants "induced" the

Attorney General to act. *Tommy Hilfiger*, 2004 WL 2290499, at \*5 n.8.  The insufficiency of

Plaintiffs' assertions is especially clear where Plaintiffs' prosecution was also preceded by

evidence gathered in the Attorney General's investigation of AIG, including sworn testimony of

an AIG employee implicating Plaintiffs in the alleged anticompetitive scheme.

     Ultimately, Plaintiffs allege nothing (beyond their conclusory assertions of collusion) to

suggest that the prosecution was driven by Defendants rather than by the Attorney General acting

on his own initiative (or, for that matter, by witnesses like those from AIG).  Because Plaintiffs

do not plausibly allege that Defendants commenced or continued the judicial proceeding against

Plaintiffs, the SAC's malicious prosecution claim must be dismissed. *See Delince*, 2011 WL

666347, at \*5 (On a motion to dismiss a New York malicious prosecution claim, "the bare

allegation that [one person] acted in concert with [another] is a legal conclusion that does not

satisfy *Iqbal* or *Twombly*.")

2.       **Lack of Probable Cause**

To maintain a claim for malicious prosecution, Plaintiffs must also allege that the prosecution against them occurred in the absence of probable cause.  *See id.*  "For purposes of the tort of malicious prosecution," probable cause is "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of or whether a discreet and prudent person would be led to the belief that a crime had been committed by the person charged."  *Silver v. Kuehbeck*, No. 05 Civ. 35 (RPP), 2005 U.S. Dist. LEXIS 26956, at *55 (S.D.N.Y. Nov. 7, 2005) (internal quotation marks and citations omitted). "The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the [civil] defendant at that time."  *Id.*

"Statements of codefendants or accomplices are sufficient to establish probable cause." *People v. Jackson*, 65 A.D.3d 1164, 1165, 885 N.Y.S.2d 213 (2d Dep't 2009) (citation omitted); *see also People v. McCann*, 85 N.Y.2d 951, 953, 626 N.Y.S.2d 1006 (1995) (accomplice statement sufficient to establish probable cause for search warrant); *Fudge v. Town of Shandaken Police*, No. 09 Civ. 0300, 2010 WL 3258385, at *7 (N.D.N.Y. Aug. 16, 2010) (holding that "[u]ncorroborated testimony from an accomplice is sufficient to support the standard of proof needed for probable cause," and stating that a "co-accomplice may be particularly reliable because of [his or her] unique position to possess knowledge of information connected with the crime.").

The plea allocution of Karen Radke stating that she was involved in the alleged fraudulent scheme with Plaintiffs appears to establish probable cause for Plaintiffs' prosecution. That Radke later gave contradictory testimony is immaterial; the question is whether, at the start

of Gilman and McNenney's prosecution, the Attorney General's office knew that Radke had falsely implicated them.  *See Silver*, 2005 U.S. Dist. LEXIS 26956, at *55.  Plaintiffs do not allege that the Attorney General's office knew Radke's testimony to be false when the office initiated criminal proceedings against Gilman and McNenney.

Plaintiffs' failure to adequately allege a lack of probable cause is an independently sufficient reason that the SAC's malicious prosecution claim must be dismissed.[5]  Accordingly, that claim is hereby dismissed.

### B.    Abuse of Process

As discussed in one authoritative treatise:

> The tort of abuse of process requires that a defendant seek to obtain some collateral advantage over a plaintiff or corresponding detriment to a plaintiff that is outside the legitimate end of process. . . .  The act must constitute a perversion of the process so as to deprive the process of its proper function and permit its use for a purpose not sanctioned by law. . . .  A fairly common illustration of abuse of process occurs where a judgment creditor obtains a writ of execution against his or her judgment debtor but directs the levy thereof on the property of a third person.

86 N.Y. Jur. 2d Process and Papers § 159.

To state a claim for abuse of process under New York law, a plaintiff must allege that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of process."  *Savino*, 331 F.3d at 70

---

[5] Plaintiffs' task is made more difficult because a grand jury indictment creates a presumption of probable cause "founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly." *Colon v. City of New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (1983); *see also Cabble v. City of New York*, 2009 WL 890098, at *3 (S.D.N.Y. Mar. 30, 2009) ("[O]n the face of the complaint, Plaintiff has in effect pled, by virtue of his acknowledgment of the grand jury indictment, that there was probable cause for the prosecution.").  This presumption "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon*, 60 N.Y.2d at 83).  Because Plaintiffs' malicious prosecution claim must be dismissed for other reasons, the Court need not assess Plaintiffs' arguments that the presumption of regularity in the grand jury is overcome here because the grand jury proceedings were infected with the same flaws and failures that required the trial court to vacate the criminal judgment against Plaintiffs.

(quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).  Plaintiffs' abuse-of-process claim fails

because (1) Defendants' alleged wrongdoing did not occur *after* process was issued; (2)

Defendants' alleged continuing collateral objectives show no *employment* of process after

process was issued; and (3) the alleged wrongdoing is not pleaded with facial plausibility.

### 1.    Tortious Conduct *After* Process Is Issued

The traditional rule in New York has been that "the pursuit of a collateral objective must

occur *after* the process is issued; the mere act of issuing process does not give rise to a claim."

*Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) (citation omitted) (emphasis

in original).  However, in *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 583 N.E.2d 939 (1991),

the New York Court of Appeals contemplated whether this timing requirement is truly

dispositive of an abuse-of-process claim.  In *dicta*, the court stated,

> We have noted several times that "[t]he gist of the action for abuse of process lies
> in the improper use of process after it is issued" *(Dean v Kochendorfer,* 237 NY
> 384, 390; *see, Curiano v Suozzi,* 63 NY2d 113, 117; *Hauser v Bartow,* 273 NY
> 370, 373).  It is not clear, however, whether this language should be viewed as a
> strict and limiting definition of the tort or whether it is merely illustrative.
>     In none of the cases from this Court cited by the Appellate Division or by
> defendants was an otherwise viable abuse of process claim defeated simply
> because no improper conduct occurred after issuance of the process.  Thus,
> nothing in this Court's holdings would seem to preclude an abuse of process
> claim based on the issuance of the process itself.  We leave the question open for
> the present, however, because we conclude that this issue was not properly before
> the Appellate Division . . . .

*Id.* at 530.

At least one opinion has held that, "[i]n light of the Court of Appeals' observation in

*Parkin*, proof of a defendant's actions after process has been issued is not required for an abuse

of process claim."  *Giannattasio v. Artuz*, No. 97 Civ. 7606 (RPP) (KNF), 2000 WL 335242

(S.D.N.Y. Mar. 30, 2000).  However, the Second Circuit has, after *Parkin*, maintained that "[t]he

gist of abuse of process is the improper use of process after it is regularly issued."  *Cook v.*

*Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).[6]  As Judge Richard Sullivan has held, this "Court is

bound by the law of the Circuit . . . .  Accordingly, the *dicta* quoted by Plaintiffs from *Parkin*

does not alter the established law governing malicious abuse of process claims."  *Richardson v.*

*New York City Health & Hospitals Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096 (S.D.N.Y.

Mar. 25, 2009).

> Plaintiffs here allege that

> Defendants colluded with and convinced the New York Attorney General to
> prosecute Messrs. Gilman and McNenney for improper motives and without any
> good faith basis.  Among other reasons, Defendants improperly sought to avoid
> criminal prosecution themselves and to create public scapegoats for the New York
> Attorney General's allegations against Marsh.

(SAC ¶ 109.)  Marsh reached its Settlement Agreement with the Attorney General on January 30,

2005.  (*Id.* ¶ 65.)  But Plaintiffs were not indicted until on or about September 15, 2005.  (*Id.* ¶

72.)  Because these assertions do not allege that Defendants improperly employed process after

Plaintiffs' Indictment in September 2005, the SAC's abuse-of-process claim must be dismissed.

### 2.      Continuing Collateral Objectives

Plaintiffs argue that, even if an abuse-of-process claim must allege abuse that follows

process, their claim nevertheless survives because they have alleged "continuing collateral

objectives and . . . continuing collateral use of Plaintiffs' indictment (and prosecution) *after*

Plaintiffs' indictment of September 15, 2005."  (Pl.'s Br. at 29.)

Plaintiffs cite *Lopez* to support their argument that a continuing collateral objective can

give rise to an abuse-of-process claim.  After stating the rule that abuse must follow process to

give rise to an abuse-of-process claim, the *Lopez* court, in a footnote, seeks to explain that

> *Cook* is not to the contrary. In *Cook*, defendants allegedly arranged a fraudulent
> arraignment of plaintiff and thereafter let him languish in jail to exact retribution.

---

[6] Though the *Cook* court was discussing a federal claim of malicious abuse of process under 42 U.S.C. § 1983, the
court did so by reference to New York state law.  *Cook*, 41 F.3d at 80.

> The plaintiff in *Cook* thus was subjected to abuse of process after it was issued by remaining in jail to satisfy the retributive intent of plaintiffs. The Court held that this was actionable abuse of process.

*Lopez*, 901 F. Supp. at 691 n.6.

This Court does not read *Cook* or *Lopez* to recognize a cause of action where only a defendant's improper motive lasts beyond the issuance of process.  Rather, as stated in *Cook*, "[t]he gist of abuse of process is the improper *use* of process after it is regularly issued."  *Cook*, 41 F.3d at 80 (emphasis added).  The issue before the *Cook* court was not whether the facts there satisfied the elements of an abuse-of-process claim but, rather, whether the district court had been correct in denying summary judgment to police officers who invoked qualified immunity.  Thus, the facts presented in *Cook* do not undermine the validity of the Second Circuit's recognition that abuse must follow process for an abuse-of-process claim to lie.

> In particular, Plaintiffs argue that
>
> Defendants' post-indictment collateral objectives included: (i) making a show of complying with Marsh's January 5, 2005 civil Settlement Agreement with the [Attorney General], which required Marsh to fully cooperate with the [Attorney General's] investigation and actions against Marsh's current and former employees; (ii) continuing to distance Marsh from wrongdoing by falsely blaming a few purported "bad apples"; and (iii) illegitimately achieving Defendants' publicly announced objective of obtaining the "opportunity to regain [Marsh's clients'] trust."

(Pl.'s Br. at 30 (citations omitted).)

These points allege that Defendants continued benefiting from what Plaintiffs claim to be Defendants' wrongdoing.  But none of these allegations, and no others in the SAC, allege that Defendants "*employ[ed]*" or "*use[d]*" process against Plaintiffs in any legal sense after their indictment.  *Cf. Richardson*, 2009 WL 804096, at *17 ("This evidence does not establish that any Defendant sought to improperly *use* the legal process *after* the summonses were issued." (first emphasis added)).  Defendants' alleged wrongdoing occurred before Plaintiffs' indictment,

18

and "the mere act of issuing process does not give rise to a claim." *Lopez*, 901 F. Supp. at 691

(citation omitted).  That Defendants allegedly continued to benefit from their alleged pre-process

wrongdoing does not give rise to an abuse-of-process claim.

### 3.    Plausibility

Finally, even if a claim for abuse of process may be stated where abuse precedes process,

Plaintiffs' abuse-of-process claim rests on allegations that Defendants "encouraged,"

"convinced," and "colluded with" the Attorney General by "offer[ing] up Messrs. Gilman and

McNenney as targets for criminal prosecution."  (SAC ¶¶ 32, 38-42, 104.)  This speculation

about what Defendants communicated to the Attorney General behind closed doors is

insufficient to state a plausible claim for abuse of process just as it was insufficient to state a

plausible claim for malicious prosecution.  Though, on this claim, Plaintiffs need not allege that

Defendants drove the Attorney General to act, they must allege some conduct by Defendants

based on more than speculation that Defendants *must* have spoken ill of Plaintiffs to the Attorney

General.  Thus, Plaintiffs' abuse-of-process claim fails to satisfy the plausibility standard for

pleading established in *Twombly* and *Iqbal*.

### C.    Misconduct by an Attorney

Section 487 of the New York Judiciary Law provides that

> [a]n attorney or counselor who:
>     (1) [i]s guilty of any deceit or collusion, or consents to any deceit or
> collusion, with intent to deceive the court or any party . . .
>      [i]s guilty of a misdemeanor, and in addition to the punishment prescribed
> therefor by the penal law, he forfeits to the party injured treble damages, to be
> recovered in a civil action.

N.Y. Judiciary Law § 487.

However, "Section 487 is aimed at actions by an attorney in his or her role *as an*

*attorney*. The mere fact that a wrongdoer is an attorney is insufficient to impose liability for

treble damages under section 487." *Northern Trust Bank of Florida/Sarasota v. Coleman*, 632 F.

Supp. 648, 650 (S.D.N.Y. 1986) (emphasis in original); *see also Barrows v. Alexander*, 78

A.D.3d 1693, 1693, 912 N.Y.S.2d 831 (4th Dep't 2010) ("Section 487 applies only to an

attorney acting in his or her capacity as an attorney, not to a party who is represented by counsel

and who, incidentally, is an attorney.") (internal quotation marks omitted).

Here, Plaintiffs have alleged that Defendant Cherkasky is an attorney.  (SAC ¶ 11.)  They

allege further that Cherkasky, knowing "that the charges against Messrs. Gilman and McNenney

lacked merit or recklessly disregard[ing] the truth," "colluded with the New York Attorney

General and convinced him to prosecute Messrs. Gilman and McNenney and deceived the Court

and the public regarding the criminality of their actions."  (SAC ¶¶ 114-15.)

However, Plaintiffs do not allege that Cherkasky committed wrongs *in his role as an

attorney*.  The SAC discusses Cherkasky's actions when he "was transitioning from CEO of

Kroll, Inc. to Marsh, Inc., both subsidiaries of [MMC]" and when he served as CEO of MMC.

(SAC ¶¶ 11, 46, 48.)  Plaintiffs argue that their § 487 claim survives "because Cherkasky was

engaged in the classic functions of an attorney" in that he negotiated with the Attorney General's

office.  (Pl.'s Br., Dkt. No. 31, at 30-31.)  But Cherkasky's alleged actions are those of a

corporate CEO.  That Cherkasky's leadership of Marsh involved him in the legal affairs of

Marsh does not make Cherkasky liable under § 487.  *Cf. Coleman*, 632 F. Supp. at 650

(dismissing a § 487 claim against an attorney who drafted a will because the alleged wrongdoing

concerned defendant's role as executor of the will).  Plaintiff's § 487 claim must be dismissed

due to the SAC's failure to allege that Cherkasky served as counsel to Marsh and that he

committed wrongdoing in his role as an attorney.

20

**D.     ERISA Violations Relating to the Marsh Severance Plan**

In the Second Circuit, a plaintiff may not file suit seeking benefits under ERISA §

502(a)(1)(B) without first exhausting his administrative remedies.  *See Burke v. Kodak Ret.*

*Income Plan*, 336 F.3d 103, 107 (2d Cir. 2003).  "Where a plan participant or beneficiary has not

exhausted her administrative remedies, a plan defendant is entitled to dismissal . . . ."  *Morillo v.*

*1199 SEIU Benefit and Pension Funds*, 783 F. Supp. 2d 487, 493 (S.D.N.Y. 2011).  "[F]ederal

courts regularly dismiss claims for judicial determination of benefits under an ERISA-regulated

plan where the plaintiff has failed to plead and prove exhaustion of the plan's administrative

remedies.  Only where the plaintiff can make a clear and positive showing that pursuing

available administrative remedies would be futile will a court release the plaintiff from the

exhaustion requirement."  *Kirkendall v. Halliburton, Inc.*, No. 07 Civ. 289 (JTC), 2011 WL

2360058, at *5 (W.D.N.Y. June 9, 2011) (internal quotation marks and citation omitted).  On a

motion to dismiss, drawing all reasonable inferences in favor of the plaintiff and assuming the

truth of the complaint's allegations, the Court asks whether the  "internal remedies indeed may

have proven futile."  *De Pace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 560

(E.D.N.Y. 2003).

Here, Plaintiffs claim that Marsh unlawfully failed to pay them severance pay owed to

them under Marsh's severance plan.  Plaintiffs do not allege that they exhausted their

administrative remedies for seeking severance pay.  Instead, they allege that

> [a]ny administrative procedure provided for by the Severance Plan would have
> been futile given Marsh's malicious prosecution of Messrs. Gilman and
> McNenney, the public statements against Messrs. Gilman and McNenney by
> Marsh, and the fact that prosecution of Messrs. Gilman and McNenney did not
> terminate in their favor until January 13, 2011.

(SAC ¶ 119.)  While Plaintiffs' malicious prosecution claim is dismissed by this decision, the SAC does allege that Marsh made public statements against Plaintiffs with the knowledge that Plaintiffs were innocent of the charges against them.  While this alleged bad faith is not directly tied to the Marsh severance plan, it is sufficient to allege that the "internal remedies indeed may have proven futile."  *De Pace*, 257 F. Supp. 2d at 560.  Accordingly, Defendants' motion to dismiss is denied with respect to Plaintiffs' claim that Marsh violated ERISA § 502(a)(1)(B).

### E.      Breach of Contract Relating to the Marsh Severance Plan

Under New York law, a breach-of-contract claim requires "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Feingold v. Chrismas*, 818 F. Supp. 2d 763, 768 (S.D.N.Y. 2011) (quoting *Harris v. Seward Park Hous. Corp.*, 913 N.Y.S. 2d 161, 162, 79 A.D.3d 425 (1st Dep't 2010) (per curiam)).

However, federal law explicitly provides that, except under exceptions not applicable here, ERISA "supersede[s] any and all State laws . . . [that] relate to any employee benefit plan" as defined by ERISA.  29 U.S.C. § 1144(a).  Further, claims for benefits under ERISA plans may be enforced only through ERISA's "comprehensive civil enforcement scheme."  *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 651 (1995).

The SAC alleges that, during Marsh's employment of Gilman and McNenney, "Marsh engaged in a practice of providing their employees with a severance payment if Marsh terminated their employment."  (SAC ¶ 81.)  The SAC also alleges that "[t]he Severance Plan is, and at all times relevant hereto was, an 'employee benefit plan' within the meaning of ERISA § 3(3) . . . ."  (*Id.* ¶ 14.)  The SAC's contract claim for severance pay is brought pursuant to "Marsh's Severance Plan."  (*Id.* ¶ 123.)  Thus, Plaintiffs seek to invoke New York's contract law

in "relat[ion] to an[] employee benefit plan."  29 U.S.C. § 1144(a).  This contract claim for

breach of the Severance Plan is barred because it is preempted by ERISA.  29 U.S.C. § 1144(a).

Plaintiffs' opposition to Defendants' motion to dismiss argues that the contract claim for

severance pay should survive in case such pay is guaranteed by some agreement *other* than an

ERISA plan.  (Pl.'s Br. at 34-35.)  This argument is defeated by the allegations in the SAC.  The

SAC makes plain both that Marsh's severance plan referred to therein is an ERISA plan (SAC ¶

14) and that the contract claim for severance pay is brought pursuant to "Marsh's Severance

Plan" (*id.* ¶ 123).  If there is some other, non-ERISA agreement for severance pay, the SAC does

not allege its existence, and Plaintiffs have therefore failed to satisfy the first element of stating a

contract claim: alleging "the existence of a contract."  *Feingold*, 818 F. Supp. 2d at 768 (citation

omitted).  Accordingly, Plaintiffs' contract claim for severance pay must be dismissed.

## F.    NYLL Violations Relating to the Marsh Stock Award Plan

New York law provides that, except in circumstances not relevant here, "[n]o employer

shall make any deduction from the wages of an employee."  N.Y. Lab. Law § 193(1).  Plaintiffs

allege that they "earned wages that Marsh chose to defer by paying Messrs. Gilman and

McNenney in the form of Stock Bonus Units and Stock Options."  (SAC ¶ 131.)

Equity-based awards to incentivize employees to remain with an employer do not

constitute "wages" under the NYLL.  *See Guiry v. Goldman Sachs & Co.*, 31 A.D.3d 70, 71, 73,

814 N.Y.S.2d 617 (1st Dep't 2006) (holding that "restricted shares of [an] employer's stock, and

options to purchase such stock" are "deferred equity-based compensation" that is "as a matter of

law, 'incentive compensation . . . not included in the definition of "wages" under Labor Law §

190 (1).'"); *Econn v. Barclay's Bank PLC*, No. 07 Civ. 2440 (BSJ), 2010 U.S. Dist. LEXIS

143063, at *14-15 (S.D.N.Y. May 10, 2010).  Further, such awards are not wages where "the

ultimate value of [an] equity-based compensation would depend on [an employer's] stock price after the rights vested" and thus "on [the employer's] 'overall financial success,' not simply on the employee's personal productivity." *Guiry*, 31 A.D.3d at 73 (citation omitted).

Here, the SAP states that its purposes are "to advance the interests of Marsh & McLennan Companies, Inc. and its stockholders by providing a means to attract, retain, and motivate employees of the Company and its Subsidiaries and Affiliates, and to strengthen the mutuality of interest between such employees and the Company's stockholders." (SAP at 44 of 71, § 1.) Equity awards under the SAP do not vest when announced (SAC, Ex. A at 37 of 71, § II; Ex. B at 60 of 71, § I), so the ultimate value of an SAP award depends on Marsh's overall financial success, not on the personal productivity of the recipient employee. Accordingly, Plaintiffs' awards under the SAP do not constitute wages under the NYLL, and their claim for violations of the NYLL must be dismissed.

### G.    Breach of Contract Relating to the Marsh Stock Award Plan

Defendants argue that Plaintiffs' contract claim for breach of the SAP is barred by the statute of limitations provided in Delaware law, the law selected by the terms of the SAP to govern the SAP. *See* 10 Del. C. § 8106 (imposing a three-year statute of limitations for breach-of-contract claims); (*see also* SAP at 58 of 71, § 10(j)). However, "[u]nder New York law, a choice of law clause is construed as choosing only the applicable substantive law," and statutes of limitations "are regarded as part of the forum's procedure." *Ins. Co. of N. Am. v. ABB Power Generation, Inc.*, 925 F. Supp. 1053, 1059 (S.D.N.Y. 1996) (citation omitted). Parties to a contract may elect to limit claims by a period shorter than that provided in statute, but "the intention to establish a shorter period must be clearly set forth in the contract." *Hurlbut v. Christiano*, 63 A.D.2d 1116, 1117, 405 N.Y.S.2d 871 (1978).

24

The SAP provides merely that "[t]he validity, construction, and effect of the Plan, any rules and regulations relating to the Plan, and any Award Agreement shall be determined in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law, and applicable federal law."  (SAP at 58 of 71, § 10(j).)  This language does not clearly select a limitations period other than the applicable New York statute of limitations.  Thus, New York's six-year statute of limitations applies.  *See* N.Y. C.P.L.R. § 213(2).  Since Plaintiffs' terminations occurred on or about October 28, 2004 and November 2, 2004, their initial October 27, 2010 complaint came within the six-year statute of limitations.  Defendants' motion to dismiss is therefore denied as to Plaintiffs' contract claim for breach of the SAP.

### H.      Quasi-Contract Claims Relating to the Marsh Stock Award Plan

Defendants argue that Plaintiffs' claims for unjust enrichment and *quantum meruit* relating to the SAP should be dismissed because "the existence of a valid and enforceable written contract governing a particular subject matter generally precludes recovery on a theory of *quantum meruit* or unjust enrichment for events arising out of the same subject matter." *Alter v. Bogoricin*, 1997 WL 691332, at *10 (S.D.N.Y. Nov. 6, 1997) (citation omitted).  Defendants are correct with regard to *recovery*, but Plaintiffs plead their quasi-contract claims as alternatives to their contract claim under the SAP.  (SAC ¶¶ 143, 148.)  "It is black letter law that a complaint *may* plead in the alternative." *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003) (citing Fed. R. Civ. P. 8(e)(2)) (emphasis in original).  Accordingly, Defendants' motion to dismiss is denied as to Plaintiffs' quasi-contract claims.

## IV.      Conclusion

For the reasons discussed above, Defendants' motion to dismiss the complaint is GRANTED as to Plaintiffs' claims of malicious prosecution, abuse of process, misconduct by an

attorney, breach of contract relating to the Marsh Severance Plan, and NYLL violations relating

to the Marsh Stock Award Plan.  The claims dismissed by this decision are dismissed with

prejudice because further amendment would be futile.  *See Van Buskirk v. New York Times Co.*,

325 F.3d 87, 92 (2d Cir. 2003).  Plaintiffs already have amended their Complaint two times, once

after Defendants had filed a motion to dismiss the first amended complaint.  Defendants' Motion

is DENIED as to Plaintiffs' claims of ERISA violations relating to the Marsh severance plan,

breach of contract relating to the Marsh Stock Award Plan, and quasi-contractual liability

relating to the Marsh Stock Award Plan.

      The Clerk of Court is directed to close the motion at docket entry number 26.


      SO ORDERED.

Dated:  New York, New York
       June 15, 2012

                                J. PAUL OETKEN
                        United States District Judge