UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM W. GILMAN and EDWARD J. MCNENNEY, JR. <br><br> Plaintiffs <br><br> -against- <br><br> MARSH & MCLENNAN COMPANIES, INC., MARSH INC., MARSH USA INC., MARSH, GLOBAL BROKING INC., and MICHAEL CHERKASKY, <br><br> Defendants. | Case No. 10 Civ. 8158 (JPO) <br> (ECF Case) <br><br><br> **ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Blaine H. Bortnick
Jeffrey L. Liddle
James W. Halter
LIDDLE & ROBINSON, L.L.P.
800 Third Avenue
New York, New York 10022
(212) 687-8500
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

    I.      The Parties ................................................................................................ 2

    II.     The NYAG Investigation And Marsh Complaint................................... 3

    III.    Marsh Suspends Gilman And McNenney Less Than One
           Week After The NYAG Filed The Marsh Complaint ............................ 4

    IV.    Marsh Agrees To Cooperate With The NYAG's Plan To
           Prosecute Individuals In Order To Avoid Criminal Liability................. 4

    V.     Marsh Decides to Terminate Gilman and McNenney ............................ 6

    VI.    Marsh Attempts To Force Gilman And McNenney to
           Cooperate In Their Own Impending Criminal Prosecution.................... 8

    VII.   Marsh Denies Gilman's Efforts To Retire............................................ 10

    VIII.  Gilman And McNenney Are Entitled to Severance And
           Deferred Compensation Because Marsh Terminated Them
           Without Cause ....................................................................................... 10

    IX.    The New York Supreme Court Dismisses The NYAG's
           Criminal Charges Against Gilman and McNenney .............................. 12

ARGUMENT..................................................................................................................... 13

    I.      In October and Early November 2004, Marsh Had No
           Policy Stating That Employees Who Refused To Be
           Interviewed Would Be Automatically Terminated For
           Cause.................................................................................................... 14

    II.     Marsh Could Not Reasonably Expect Gilman and
           McNenney To Participate In Interviews Regarding Their
           Own Impending Prosecutions............................................................... 17

    III.    Marsh Had Already Decided To Terminate Gilman and
           McNenney Before Either Refused To Submit To Interviews ............... 19

IV.   <u>Gilman and McNenney Are Entitled To Severance And Deferred Compensation Because They Were Terminated Without Cause</u> ......................................................................................21

    A.   <u>Gilman and McNenney Are Entitled To Severance</u> ...................................21

    B.   <u>Gilman and McNenney Are Entitled To the Equity And Stock Options That They Earned As Employees of Marsh</u> ................................................................................21

<u>CONCLUSION</u>...........................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................................12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................13

*Dilek v. Watson Enterprises, Inc.*, 885 F. Supp. 2d 632 (S.D.N.Y. 2012) ....................13

*Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588 (2d Cir. 1993)................20

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007) .............................13

*Norman v. Southern Guaranty Ins. Co.*, 191 F. Supp. 2d 1321 (M.D. Ala. 2002).........15

*People v. Rosario*, 9 N.Y.2d 286 (1961) .......................................................................12

*Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628 (S.D.N.Y. 1999) ...........................13

*Scott v. Harris*, 550 U.S. 372 (2007) ...........................................................................13

*Setevage v. Dep't of Homeland Sec.*, 539 Fed. App'x. 11 (2d Cir. 2013) .......................3

*United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *supplemented by* 495 F. Supp. 2d 390 (S.D.N.Y. 2007) ........................................................................18

*Weber v. FujiFilm Medical Sys. U.S.A., Inc.*, 933 F. Supp. 2d 285 (D. Conn. 2013) ...................16

## Statutes

502(a)(1)(B) of ERISA ...................................................................................................1

Fed. R. Civ. P. 56(c) ....................................................................................................13

## PRELIMINARY STATEMENT

Gilman and McNenney are entitled to summary judgment in this case because there is no genuine issue of material fact as to the issue of whether Marsh terminated Plaintiffs for cause—Marsh did not.

Marsh alleges that it terminated Gilman and McNenney for "cause" pursuant to a "policy" that employees who failed to cooperate with its internal investigation were automatically terminated. This proffered reason is false for at least four reasons: (1) because this "policy" did not exist at the time that Marsh decided to terminate Plaintiffs' employment; (2) because this "policy" did not exist at the time that Gilman and McNenney declined to participate in interviews conducted as part of this investigation; (3) because Marsh could not reasonably expect Gilman and McNenney to participate in these interviews based on their impending criminal prosecution and Marsh's public statements about them (and Marsh had already waived its attorney-client and work-product privileges turning over all of its internal investigation documents to the prosecutors); and (4) because Marsh had already decided to terminate Gilman and McNenney before either refused to cooperate.

The Court should find that Marsh breached its own Stock Plans[1] by deeming the stock options and equity that Gilman and McNenney earned during their employment as forfeited. The Court should also conclude that Marsh violated Section 502(a)(1)(B) of ERISA because it failed to pay Gilman and McNenney severance pursuant to its own Severance Plan.[2]

---

[1] "Stock Plans" refers to the Marsh & McLennan Companies, Inc. 2000 Employee Incentive and Stock Award Plan (Halter Decl. Ex. 2) and the several Terms and Conditions applicable to grants at issue here (*see, e.g.,* Halter Decl. Ex. 3). There are Terms and Conditions for each grant at issue and the various Terms and Conditions have differences which may be relevant to the calculation of damages in this case. That discussion, however, is not relevant to the issues presented in this motion and will be addressed at trial with respect to damages.

[2] "Severance Plan" refers to the Marsh USA Inc. Severance Pay Plan, amended and restated as of October 1, 2003 and the Marsh Ins. Fall 2004 Restructuring Severance Pay Plan—the severance plans in effect when Marsh terminated Plaintiffs' employment. (Halter Decl. Exs. 4 and 5).

While the precise damage resulting from Marsh's breaches of contract and violations of ERISA will need to be determined at trial, the admissible evidence shows that Gilman and McNenney are entitled to judgment as a matter of law on the issue of whether or not Marsh terminated Plaintiffs for cause. Whether Marsh terminated Gilman and McNenney for cause is the sole issue in this case with respect to liability, and is ripe for determination as a summary matter.

## STATEMENT OF FACTS

### I.    The Parties

Plaintiff William W. Gilman worked for Marsh from 1976 until Marsh terminated his employment on November 2, 2004.  (Dkt. No. 38, Defs' Answer at ¶¶ 14 and 15).  Plaintiff Edward J. McNenney, Jr., joined Marsh in 1990 and worked at the company until he was also terminated on October 28, 2004.  (Dkt. No. 38, Defs' Answer at ¶¶ 6, 25 and 54, Halter Decl.[3] Ex. 19).  Marsh promoted both Gilman and McNenney numerous times throughout their employment with the company.   (Dkt. No. 38, Defs' Answer at ¶ 27).  Both Gilman and McNenney worked as Managing Directors in Marsh's Excess Casualty insurance division. (Cherkasky Dep. 78-80, Dkt. No. 38, Defs' Answer at ¶ 26).

Defendant Marsh is an insurance broker that employed more than 50,000 people at the time. (Dkt. No. 38, Defs' Answer at ¶ 20, Cherkasky Dep. 75-76).

### II.    The NYAG Investigation And Marsh Complaint

The New York Attorney General ("NYAG") opened an investigation into Marsh's contingent commission practices in early 2004.  (Burkhardt Dep. 39).  Marsh interviewed Gilman as part of this investigation on May 4-5, 2004, and again on September 14, 2004. (Halter

---

[3] "Halter Decl." refers to the Declaration of James W. Halter submitted in support of Plaintiffs' Motion for Partial Summary Judgment.

Decl. Exs. 6 and 8, Burkhardt Dep. at 42, 51, 58).  Marsh admits that Gilman fully cooperated in those interviews.  (Burkhardt Dep. at 51, Halter Decl. Exs. 6 and 8).

Marsh also interviewed McNenney as part of the NYAG's investigation on June 24, 2004.  (Halter Decl. Ex. 7).  Like Gilman, McNenney fully cooperated with these initial interviews.  (Burkhardt Dep. 41; Halter Decl. Ex. 7).  Indeed, McNenney was not even represented by counsel for his interview.  (McNenney Dep. 11-14; Halter Decl. Ex. 7).

The NYAG filed a civil complaint against Marsh & McLennan Companies, Inc., and Marsh, Inc., in connection with the use of contingent commissions on October 14, 2004 (the "Marsh Complaint").  (Halter Decl. Ex. 10).  This complaint asserted causes of action against Marsh for allegedly engaging in fraudulent business practices, antitrust violations, securities fraud, unjust enrichment, and common law fraud.  (Halter Decl. Ex. 10 at 28-30).  Ultimately, the Marsh Complaint was without merit because—as Marsh concedes—"no wrongdoing occurred." (Dkt. #27 at 26[4]).

### III.   Marsh Suspends Gilman And McNenney Less Than One Week After The NYAG Filed The Marsh Complaint

Marsh suspended Gilman and McNenney during the week of October 18, 2004, days after the NYAG filed its civil complaint against Marsh on October 14, 2004. (Burkhardt Dep. 201-203).  No one at Marsh informed Gilman of this action.  (Gilman Dep. 78-80; Burkhardt Dep. 190-191).  He learned of his suspension from the Wall Street Journal.  (Gilman Dep. 79; Halter Decl. Ex. 12).  Neither Marsh, Gilman, nor McNenney had committed any wrongdoing to justify the investigation, complaint, or suspension.  (Dkt. #27 at 26).

Marsh also suspended Gilman's daughter, Samantha Mohs, even though she had no involvement with Marsh's contingent commission practices.  (Samantha Mohs Aff. ¶ 4).

---

[4] "[A]ssertions of fact [in memoranda of law] constitute judicial admissions to which" the party making the assertions are bound. *Setevage v. Dep't of Homeland Sec.*, 539 Fed. App'x. 11, 13 (2d Cir. 2013).

In November or December 2004, Marsh requested that Samantha Mohs submit to an interview with the NYAG.  (Samantha Mohs Aff. ¶ 5).  Ms. Mohs refused to do so.  (Samantha Mohs Aff. ¶ 5).

Marsh did not terminate Samantha Mohs at that time.  (Samantha Mohs Aff. ¶ 5).  Instead, in May 2005, Marsh terminated Ms. Mohs's employment and deemed the termination part of a reduction-in-force. (Samantha Mohs Aff. ¶ 6).  Marsh, however, paid Ms. Mohs severance, even though it refused to do so for McNenney or her father after they refused requests to be interviewed as part of the NYAG's investigation of Marsh.  (Samantha Mohs Aff. ¶ 7).

## IV.    Marsh Agrees To Cooperate With The NYAG's Plan To Prosecute Individuals In Order To Avoid Criminal Liability

Less than eleven (11) days after the NYAG's Office filed the Marsh complaint, Marsh forced its then-Chief Executive Officer, Jeffrey Greenberg ("Greenberg"), to resign as part of an agreement with Eliot Spitzer.  (Cherkasky Dep. 70-72).  It replaced Greenberg with Michael Cherkasky ("Cherkasky").  (Cherkasky Dep. 16-20, 70-72).  Until that point, Cherkasky had been an officer of Marsh's subsidiaries.  (Cherkasky Dep. 16-20).

Cherkasky is a friend of former New York Attorney General Eliot Spitzer ("Spitzer").  (Cherkasky Dep. 10-11, 25).  Spitzer and Cherkasky became friends when both worked at the New York County District Attorney's Office in the early 1990s and they socialized outside of their professional careers up to and including the present.  (Cherkasky Dep. 10-13, 25).  At the time that Marsh appointed Cherkasky as CEO, Cherkasky and Spitzer had known each other for more than 15 years.  (Cherkasky Dep. 10-11).

Cherkasky met with Spitzer regarding the Marsh Complaint on October 25, 2004.  (Cherkasky Dep. 65-68).  Spitzer and Cherkasky agreed that the NYAG's Office would not prosecute Marsh criminally.  (Cherkasky Dep. 67).  In return, Marsh pledged complete

cooperation with the NYAG's investigation, and agreed to waive the attorney-client and work-product privilege with respect to all aspects of Marsh's internal investigation. (Cherkasky Dep. 65-70). Marsh never informed either Gilman or McNenney of this secret deal. (Cherkasky Dep. 85-88; Winters Dep. 63-64). And Marsh admits that it turned over to the NYAG both the attorney handwritten notes and typed summaries of its interviews of both Gilman and McNenney. (Winters Dep. 17-23; 43-46).

Michael Cherkasky's deposition testimony shows that Marsh fully understood that the NYAG intended to criminally prosecute individuals. (Cherkasky Dep. 67-69). His deposition testimony also clearly states that Marsh understood that Gilman and McNenney would be among the individuals prosecuted "for sure." (Cherkasky Dep. 68:23-69:3).

The NYAG released a press release the same day that Cherkasky and Spitzer met reflecting the agreement between the two of them. That press release stated:

> The actions announced today by the Board of Directors of Marsh & McLennan Companies permits Marsh and [the NYAG's] office to move forward toward a civil resolution of our lawsuit.
>
> ***We are persuaded that the goals that would have been advanced by a criminal prosecution of the corporation – punishment, restitution, general deterrence, and industry reform – will be better accomplished by criminal prosecution of individuals. . . .***
>
> Realizing these goals, while also allowing Marsh & McLennan to retain a viable role in the marketplace, makes corporate criminal prosecution unnecessary.

(Halter Decl. Ex. 14 (emphasis added); McNenney Dep. 235-238).

Notably absent from this press release was any mention that Marsh agreed to waive its attorney-client and work-product privileges concerning its internal investigation. In other words, there was no communication that information obtained by Marsh through its interviews of

Gilman and McNenney would amount to a back-door waiver of their constitutional protections against self-incrimination.

Plaintiffs' concerns of a back-door waiver of their constitutional protections were not trivial. Indeed, the NYAG Complaint filed against Marsh specifically identified Gilman as a wrongdoer and referenced McNenney among the exhibits to the complaint as well. (Halter Decl. Ex. 10 at ¶ 50). It was also reported in the press that Marsh considered Gilman and "Gilman's group" to be criminals. (Halter Decl. Ex. 15 at 2). And, as stated above, Marsh believed that both plaintiffs would be criminally prosecuted—which they were. (Cherkasky Dep. 68-69).[5]

## V.   Marsh Decides to Terminate Gilman and McNenney

Marsh decided to terminate Gilman and McNenney on or around October 25, 2004. As noted above, Cherkasky gave an interview to Bloomberg on October 26, 2004, one day after becoming CEO. (Halter Decl. Ex. 15 at 1). In this interview, Cherkasky stated that, "bid-rigging appears to have been confined to William Gilman, a managing director at Marsh Global Broking . . . and Gilman's group. Gilman and three of his subordinates are among five employees who have been suspended." (Halter Decl. Ex. 15 at 2). Cherkasky specifically identified Gilman, and referenced McNenney, to the press as having engaged in criminal conduct before the completion of any investigation or before the NYAG's office filed any charges against them.

Cherkasky, in his deposition ten years later, claimed that he was misquoted because he was unaware of how extensive bid-rigging was at the time. (Cherkasky Dep. 75-78). In his deposition, Cherkasky acknowledged that, at that time, he believed that almost all of Marsh's 50,000 employees were honest and had not committed any criminal conduct, and that he "certainly talked about Excess Casualty" during his daily individual meetings with the press.

---

[5] Gilman and McNenney were initially convicted, but their convictions were ultimately vacated by the trial judge and all charges were dismissed, as discussed below.

(Cherkasky Dep. 62-65, 75-80). Cherkasky also admitted that the majority of people who had been identified as engaging in criminal conduct were in the Excess Casualty Department, that Gilman was one of such people, and that he could have used the phrase 'Gilman's Group' when talking to the press. (Cherkasky Dep. 78-80).

Cherkasky's later statements to the NYAG confirm that Marsh had decided to terminate Gilman and McNenney on or around October 25, 2014. (Cherkasky Dep. 75-80, 96). On November 5, 2004, the New York Times published an article reporting that Spitzer's spokesman said that Cherkasky "told the attorney general that they were planning to dismiss some employees as a part of their efforts to correct abuses outlined in Spitzer's lawsuit against Marsh." (Halter Decl. Ex. 18 at 1). In his deposition, Cherkasky only claimed that the quote was inaccurate to the extent that he recalled telling the NYAG that Marsh **had** dismissed employees to correct putative abuses, not that they were **going** to do so. (Cherkasky Dep. 73-74). Marsh had terminated McNenney eight days prior and had terminated Gilman three days prior to the article.

Critically, Cherkasky's statement makes it clear that Plaintiffs' dismissals were not pursuant to its alleged "policy" but rather to correct putative abuses. Marsh's statements to the press reveal that it decided to terminate Gilman and McNenney because it believed that they would be subject to prosecution by the NYAG's office, even though later evidence revealed that neither had engaged in any wrongdoing whatsoever.

### VI.   Marsh Attempts To Force Gilman And McNenney to Cooperate In Their Own Impending Criminal Prosecution

Marsh requested that McNenney submit to an interview by the New York Attorney General on October 19, 2004, one day after suspending McNenney and five days after the

NYAG's office filed the Marsh Complaint. (Devereaux Dep. 12-14[6], Winters Dep. 71-72, 84-85 (Defendants instructed the Davis Polk witness not to answer questions regarding the NYAG's request to interview McNenney based on privilege)). Marsh had already interviewed McNenney in June 2004, and McNenney fully complied with this interview process. (Halter Decl. Ex. 7).

In connection with this interview, McNenney's counsel, Scott Devereaux, requested that Marsh provide him with the documents pertinent to the allegations against McNenney in order to better advise McNenney of his situation. (Devereaux Dep. 14-15). Marsh refused to provide all but a few of the requested documents. (Deveraux Dep. 14-16).

Marsh also requested that Gilman submit to an interview on October 20, 2004, one day after Marsh placed him on suspension (although Marsh did not inform Gilman of his suspension until after it was published in the Wall Street Journal). (Halter Decl. Exs. 12 and 13). Marsh had already interviewed Gilman in May and September 2004 in connection with its internal investigation. (Halter Decl. Exs. 6 and 8). Gilman returned early from a previously-scheduled vacation in order to address Marsh's internal investigation. (Gilman Dep. 35-38).

Marsh internally described its request to Gilman as "the chance to interview him one more time in light of the allegations in the indictment," referring to the Marsh Complaint. (Halter Decl. Ex. 11). Marsh's "one more time" comment is significant because it indicates that Marsh knew that it intended to terminate Gilman, and only delayed in doing so in order to attempt to force him to submit to an interview.

Because of the October 25, 2004 agreement between Spitzer and Cherkasky, Marsh would have immediately conveyed anything that Gilman and McNenney revealed in these interviews to the NYAG's Office. (Cherkasky Dep. 69-70; Goodhart Dep. 26-27, 61; Winters

---

[6]   Marsh required that McNenney submit to the interview by the NYAG without his own counsel present. (Devereaux Dep. 20-21). Marsh, however, disputes that fact (Winters Dep. 79-80) so Plaintiffs do not rely on that fact in the present motion.

Dep. 17-23).   Although Marsh kept its agreement to waive attorney-client and attorney-work-product privilege secret from its employees, the NYAG's Office stated its intention to criminally prosecute individuals in its October 25, 2004 press release (Halter Decl. Ex. 14).   In addition, the Assistant Attorney General individually identified Gilman and McNenney—and no one else— during two guilty plea allocutions on October 13, 2004.   (Halter Decl. Ex 9 at 6:9 and 6:23). Finally, Cherkasky falsely named Gilman and McNenney to the press as the individuals responsible for illegal bid-rigging.   (Halter Decl. Ex. 15).

As such, Gilman and McNenney reasonably declined Marsh's request to submit to interviews.   McNenney declined to be interviewed on October 27, 2004, and Gilman declined to be interviewed on November 1, 2004.   (Devereaux Dep. 38-39, 47-49; Gilman Dep. 101-102, 154-155; Bucknam 69-70).

Marsh terminated McNenney on October 28, 2004, and Gilman on November 2, 2004, immediately after both Plaintiffs' refused Marsh's unreasonable requests to interview. (Cherkasky Dep. 93-96; Gilman Dep. 146-148; Halter Decl. Ex. 17).   To the extent that Marsh argues that Gilman and McNenney were terminated pursuant to a "policy," Marsh candidly admits that any "policy" was constrained by reasonableness.   (Burkhardt Dep. 214; Bucknam Dep. 284).

## VII.   **Marsh Denies Gilman's Efforts To Retire**

Gilman attempted to retire from Marsh before he declined Marsh's request for an interview.   In the fall of 2004, Gilman was 61 years old and had been with the company for 28 years.   (Gilman Dep. 131-132, 145).   Gilman was eligible to retire under Marsh's retirement plans.   (Halter Decl. Ex. 1 at G-5, Burkhardt Dep. 228-231).   As such, Gilman completed the

necessary paperwork to retire and faxed that paperwork to Marsh on November 1, 2004. (Halter Decl. Ex. 16; Burkhardt Dep. 221-223).

Marsh refused Gilman's efforts to retire and terminated his employment on November 2, 2004. (Burkhardt Dep. 222-226; Cherkasky Dep. 96). Marsh did not base its reasoning for denying Gilman's attempt to retire upon the Marsh retirement plan. (Cherkasky Dep. 93-95, Halter Decl. Ex. 1). Rather, Marsh refused to allow Gilman to retire because he declined its unreasonable request that he submit to an interview. (Cherkasky Dep. 93-95, 98-99). The retirement plan, however, contains no such requirement. (Halter Decl. Ex. 1).

## VIII.   Gilman And McNenney Are Entitled to Severance And Deferred Compensation Because Marsh Terminated Them Without Cause

Marsh decided to terminate Gilman and McNenney before either refused to submit to Marsh's unreasonable interview request. As such, Marsh did not terminate Plaintiffs for cause because its proffered reason is a pretext designed to justify its earlier decision to fire Gilman and McNenney.

As salaried employees terminated without cause, Gilman and McNenney were entitled to severance from Marsh under Marsh's Severance Plan. (Halter Decl. Exs. 4 and 5). Marsh did not pay Plaintiffs such severance. (Burkhardt Dep. 128). Marsh did not even inform Gilman and McNenney that they were otherwise entitled to severance, or that Marsh had denied them this benefit. (Gilman Dep. 175-177; McNenney Dep. 172-173). Marsh concedes that any attempts that Gilman and McNenney might have made to get severance would have been futile. (Burkhardt Dep. 248-249, 258-259).

Gilman and McNenney were also entitled to deferred compensation in the form of stock options and stock bonus units. Marsh awarded Gilman and McNenney stock bonus units and stock options as part of their compensation over the course of their employment. (Burkhardt

Dep. 119-121; 124-128; Halter Decl. Exs. 22 and 23).   These bonus units vested when Marsh terminated Gilman and McNenney without cause (or, alternatively, when Gilman retired). (Halter Decl. Exs. 2 and 3 at 2).

Instead, Marsh improperly deemed Gilman and McNenney's stock bonus units and stock options forfeited.   (Burkhardt Dep. 118-122, 142-145).   In so doing, Marsh's actions violated the parties' express 2000 Employee Incentive and Stock Award Plan (Halter Decl. Ex. 3, Section IV.E, *Termination of Employment By the Company without Cause*).   Marsh therefore owes Gilman and McNenney severance and deferred compensation in an amount to be determined at trial.

### IX.   The New York Supreme Court Dismisses The NYAG's Criminal Charges Against Gilman and McNenney

The NYAG's Office announced an indictment against Gilman, McNenney, and others (the "Indictment") on or around September 15, 2005.   This Indictment charged Gilman and McNenney with 37 criminal counts related to their employment with Marsh.   (Halter Decl. Ex. 21 at *1).

This Indictment was baseless.   Gilman and McNenney suffered through more than five years of litigation in order to prevail.   The court dismissed thirteen counts of the Indictment prior to trial.   (Halter Decl. Ex. 21 at *2).   Following a lengthy bench trial over the eleven months between April 2007 and February 2008, New York Supreme Court Justice Yates acquitted Gilman and McNenney of 20 criminal counts and dismissed 3 more. (Halter Decl. Ex. 21 at *2). At the end of this trial, Gilman and McNenney were acquitted of all but one of the counts in the Indictment—and that conviction was later vacated.   (Halter Decl. Ex. 21 at *2, *20).

Justice Yates initially convicted Gilman and McNenney of a sole count of Restraint of Trade and Competition.   (Halter Decl. Ex. 21 at *2). At a subsequent trial by the NYAG of other

individuals, however, Gilman, McNenney, and Justice Yates discovered that the NYAG possessed approximately 700,000 pages of undisclosed documents. (Halter Decl. Ex. 21 at *2). Additionally, the NYAG possessed undisclosed deposition transcripts that discredited and contradicted the testimony of six key witnesses called against Gilman and McNenney. (Halter Decl. Ex. 21 at *2, *6-*11). Justice Yates concluded that the NYAG had committed prosecutorial misconduct and *Brady*[7] and *Rosario*[8] violations by failing to turn over the documents. (Halter Decl. Ex. 21 at *18-*20).

Since Gilman and McNenney's sole conviction had rested upon the testimony of these discredited witnesses, Justice Yates vacated his own conviction of Gilman and McNenney on July 2, 2010. (Halter Decl. Ex. 21 at *20). In his opinion, Justice Yates found that "newly discovered contradictory evidence, undermines the Court's confidence in the verdict," (Halter Decl. Ex. 21 at *20) and that "taken as a whole, the evidence raises not only a possibility, but a ***probability*** that its disclosure would have produced a different result." (Halter Decl. Ex. 21 at *19 (emphasis added).

Following this, the current New York Attorney General, Eric Schneiderman, moved to have the Indictment dismissed on January 13, 2011, and the court granted that request. (Dkt. No. 38, Defs' Answer at ¶ 80). In the end, Marsh improperly terminated Gilman and McNenney over baseless claims.

## ARGUMENT

A court must grant summary judgment when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring prosecutors to disclose potential exculpatory evidence to criminal defendants).
[8] *People v. Rosario*, 9 N.Y.2d 286 (1961) (requiring prosecutors to turn over all prior statements of witnesses to criminal defendants).

fact, and that the moving party is entitled to summary judgment as a matter of law.  "Partial summary judgment may be granted on the issue of liability alone if there exists a genuine issue as to the amount of damages."  *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (citing Fed. R. Civ. P. 56(c)).  As the proponents of summary judgment, Plaintiffs bear "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation omitted).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation and citation omitted) (emphasis removed).  "A fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation and citation omitted).

Here, even viewing the facts in the light most favorable to Marsh, no genuine dispute of material fact exists regarding Marsh's liability for breach of contract and ERISA violations.  *See Dilek v. Watson Enterprises, Inc.*, 885 F. Supp. 2d 632, 641 (S.D.N.Y. 2012).  Plaintiffs are therefore entitled to summary judgment.

I.   **In October and Early November 2004, Marsh Had No Policy Stating That Employees Who Refused To Be Interviewed Would Be Automatically Terminated For Cause**

Marsh alleges that it had an internal policy that any employee who did not cooperate with an interview request—whether conducted by Marsh, its counsel, or the NYAG—would be terminated for cause. (Burkhardt Dep. 59-62; Cherkasky Dep. 85-88, 98-99). Marsh argues that it terminated Gilman and McNenney because of this policy. (Burkhardt Dep. 59-62, 133-138). This reason is false because Marsh had no such policy at the time that it terminated Plaintiffs' employment.

In her Rule 30(b)(6) deposition representing Marsh, Susan Burkhardt ("Burkhardt") stated that "[t]here was no reason to have a policy around something that hadn't happened." (Burkhardt Dep. 52). Burkhardt's deposition testimony referred to the time frame of May 2004 and, later, September 2004, but this remains equally true in late October 2004. Quite simply, Marsh admits that it had no such policy requiring that employees who refused to submit to interviews would be automatically terminated.

Cherkasky alleges that he both created and enacted the policy when he became Chief Executive Officer on October 25, 2004. (Burkhardt Dep. 59-60; Cherkasky Dep. 85-88). Neither he nor Marsh ever committed the alleged policy to writing. (Cherkasky Dep. 85-86). Marsh also did not inform Gilman and McNenney that this policy existed. (Burkhardt Dep. 190-191, Gilman Dep. 105, McNenney Dep. 60).

Although Gilman and McNenney were aware that refusing to agree to the interviews could result in their termination (assuming, of course, that no decision had been made by that time to terminate them), they did not know that they would be automatically terminated *for cause* as a result of this refusal pursuant to a company policy. (Winters Dep. 62-63, Gilman Dep. 105, McNenney Dep. 59-60). Moreover, while there are documents dated *after* Plaintiffs' termination that Marsh contends embody the policy, none of those documents show that refusal to interview

14

would result in a termination for "cause"—let alone predate Plaintiffs' termination.  (*See, e.g.*, Halter Decl. Ex. 20).

For this reason, McNenney, in connection with his application for unemployment benefits, responded to a questionnaire from the New York State Department of Labor dated November 10, 2004, with the following information: "Did your employer say you were fired for violation of a company rule, regulation or policy?  No." (Halter Decl. Ex. 19 at 3).  McNenney shared these responses—in draft form for accuracy prior to submission—with Barbara Silvan ("Silvan"), the head of Human Resources at Marsh. (Burkhardt Dep. 236-239).  Silvan did not disagree with McNenney's responses and, in fact, confirmed McNenney's responses. (Burkhardt Dep. 236-239; McNenney Dep. 62-69.)  Thus, as of November 10, 2004, McNenney had not violated a company policy.

The questionnaire also contains the following responses: "Did you receive any written or spoken warnings?  No" and "Were you aware of this rule?  No." (Halter Decl. Ex. 19 at 3). Ms. Silvan did not object to these responses because they were accurate. (Burkhardt Dep. 236-239).

Although Marsh may have had such an automatic termination policy later on (*see, e.g., Halter Decl. Ex. 20[9]), it may not attempt to use that policy retroactively to justify terminating Gilman and McNenney.  Indeed, retroactively citing a later-enacted policy is evidence of pretextual intent.  *See, e.g., Norman v. Southern Guaranty Ins. Co.*, 191 F. Supp. 2d 1321, 1334 (M.D. Ala. 2002) ("After her return from her medical leave of absence, this practice was

---

[9]  The purported "automatic" nature of the alleged policy is contradicted by the testimony of James Bucknam who was asked to arrange some of the interviews, including Gilman's (Bucknam Dep. 18-19 (describing that employees were "subject to termination" which implies discretion rather than an automatic termination)) and the Affidavit of Samantha Mohs (Samantha Mohs Aff. ¶¶ 5-6).

retroactively revoked. This change in the rules also points toward a retaliatory intent behind Southern Guaranty's actions against her.").

Marsh's treatment of Gilman's daughter, Samantha Mohs, provides further evidence that no such policy existed (and, to the extent any policy later existed, it was inconsistently applied). In approximately November or December 2004, Samantha Mohs ("Mohs") refused Marsh's request that she submit to an interview by the NYAG. (Samantha Mohs Aff ¶ 5). Marsh did not respond by terminating her employment for cause. (Samantha Mohs Aff. ¶ 5). Marsh allowed Mohs to continue her employment for five months before terminating her in what Marsh termed a reduction-in-force. (Samantha Mohs Aff. ¶ 6). Marsh paid Ms. Mohs the severance that it denied to Gilman and McNenney, even though each of the three ostensibly violated the same policy. (Samantha Mohs Aff. ¶ 7).

In sum, Marsh did not have a policy requiring that all employees who failed to submit to an interview would be automatically terminated at the time that it terminated Gilman and McNenney's employment. As such, Marsh cannot justify terminating Gilman and McNenney pursuant to a policy that did not yet exist.

## II.   Marsh Could Not Reasonably Expect Gilman and McNenney To Participate In Interviews Regarding Their Own Impending Prosecutions

As Marsh acknowledges, an employee's requested participation in an internal investigation must be reasonable. (Bucknam Dep. 284, Burkhardt Dep. 214). By making an unreasonable request, Marsh was manufacturing "cause" to terminate Gilman and McNenney. *See, e.g.*, *Weber v. FujiFilm Medical Sys. U.S.A., Inc.*, 933 F. Supp. 2d 285, 292-93 (D. Conn. 2013). Any termination resulting from manufactured cause is unreasonable. *Id.*

Marsh manufactured "cause" against Gilman and McNenney because Marsh knew that it could not reasonably expect Plaintiffs to comply with its interview requests in October 2004.

Gilman and McNenney were aware that they could be the subjects of a criminal prosecution at least as of October 13, 2004. (Halter Decl. Ex 9 at 6:9 and 6:23).

Here, the NYAG intended to prosecute Gilman and McNenney criminally and Marsh knew this. (Cherkasky Dep. 68-69). On October 13, 2004, the Assistant Attorney General conducting plea allocutions of two individuals identified Gilman and McNenney by name as individuals purportedly engaged in bid rigging. (Halter Decl. Ex 9 at 6:9 and 6:23).

On October 14, 2004, Gilman was specifically identified in the Marsh Complaint as someone engaged in criminal conduct and McNenney was referenced among the exhibits to the complaint. (Halter Decl. Ex. 10 at ¶ 50).

On October 25, 2004, to avoid criminal prosecution of Marsh, Cherkasky and Spitzer agreed that Marsh would waive all attorney-client and work-product privileges and would produce all information revealed during its internal investigation to the NYAG. (Cherkasky Dep. 29-35). That same day, the NYAG issued a press release that confirmed their intention to prosecute individuals: "We are persuaded that the goals that would have been advanced by a criminal prosecution of the corporation – punishment, restitution, general deterrence, and industry reform – will be better accomplished by criminal prosecution of individuals. . . ." (Halter Decl. Ex. 14).

On October 26, 2004, Cherkasky identified Gilman and "Gilman's group," which would include McNenney, as criminals in an interview with the press. (Halter Decl. Ex. 15 at 2). Regardless of the fact that Cherkasky now claims he was misquoted by Bloomberg (Cherkasky Dep. 75-80), the fact of the press article played a role in the decision-making process of Gilman and McNenney in deciding whether to submit to Marsh's request (Cleary Dep. 99, McNenney Dep. 220-221).

Prior to these events in October 2004, both Gilman and McNenney fully cooperated with Marsh's internal investigation.   Gilman voluntarily submitted to two interviews by Marsh. (Halter Decl. Exs. 6 and 8).  McNenney also agreed to submit to an interview to assist in Marsh's investigation.  (Halter Decl. Ex. 7).

By October 2014, Marsh knew that it was unreasonable to ask Gilman and McNenney to participate in interviews that would lead to their criminal prosecution, even though Marsh admits that any valid policy had to be reasonable.   (Devereaux Dep. 16-17, Bucknam Dep. 284, Burkhardt Dep. 214).   Obviously, Gilman and McNenney have constitutional rights not to provide testimony that can be used against them, U.S. CONST. amend. V, and Marsh's attempts to assist the NYAG in a back-door waiver of their constitutional rights was not only unreasonable, but also a legal violation.  *See, e.g.*, *United States v. Stein*, 435 F. Supp. 2d 330, 382 (S.D.N.Y. 2006), *supplemented by* 495 F. Supp. 2d 390, 404 (S.D.N.Y. 2007) (J. Kaplan) (finding KPMG's cooperation with the government by not advancing attorneys' fees to its employees facing criminal charges, at the urging of the government, violated the Fifth and Sixth Amendments of the Constitution and dismissing the indictments against the affected defendants as a result).  By insisting that Gilman and McNenney participate in these interviews—knowing that they would likely refuse—Marsh manufactured the "cause" it now cites as its justification for terminating their employment.

Since Marsh did not terminate Plaintiffs' employment for "cause," it owes Gilman and McNenney severance and deferred compensation in an amount to be determined at trial.

**III.    Marsh Had Already Decided To Terminate Gilman and McNenney Before
         Either Refused To Submit To Interviews**

Even if Marsh had a reasonable policy, and even if Plaintiffs violated a reasonably policy, Marsh decided to terminate Gilman and McNenney before either refused to cooperate with

Marsh's internal investigation in late October and early November of 2004.   Marsh's manufactured "cause" for firing Gilman and McNenney is therefore a pretext used to justify its earlier decision to terminate Plaintiffs' employment.

The chronology of the NYAG investigation, complaint, and Marsh's communications to the press reveals that Marsh's purported "cause" for firing Gilman and McNenney was pretextual. McNenney refused to submit to an interview on October 27, 2004. (Devereaux Dep. 38.) He was fired the next day. Gilman refused to submit to an interview on November 1, 2004, after he submitted the paperwork to retire, and was terminated November 2, 2004. (Cherkasky Dep. 93-96; Gilman Dep. 146-147; Halter Decl. Ex. 17). These were the "one more time" interviews that Marsh wanted before officially terminating their employment. (Halter Decl. Ex. 11).

Cherkasky had decided to terminate Gilman and McNenney at least as of October 26, 2004, the day that he told a Bloomberg reporter that Gilman and his group—which would include McNenney—were criminals. (Halter Decl. Ex. 15 at 2).   Marsh could no longer employ Gilman and McNenney after it publicly stated that they had engaged in criminal conduct. Cherkasky was solely responsible for the decision to terminate Gilman and McNenney. (Cherkasky Dep. 96).   His statements to the press on October 26, 2004 indicate that he had already decided to terminate Plaintiffs' employment.

Marsh confirmed that it terminated Gilman and McNenney for reasons other than their refusal to submit to unreasonable interviews in its later statements to the press and to the Attorney General.   On or around November 5, 2004, Cherkasky told Attorney General Spitzer

that Marsh had dismissed employees as part of its efforts to correct the abuses outlined in the Marsh Complaint. (Halter Decl. Ex. 18 at 1; Cherkasky Dep. 73-74[10]).

Marsh cannot use events that had not happened yet to justify its decision to terminate Gilman and McNenney's employment. The Court should find that Marsh terminated Gilman and McNenney without cause and, as such, they are entitled to the appropriate treatment under the Marsh's deferred compensation and severance plans.

## IV.   Gilman and McNenney Are Entitled To Severance And Deferred Compensation Because They Were Terminated Without Cause

### A.   Gilman and McNenney Are Entitled To Severance

Gilman and McNenney are entitled to Severance under Marsh's ERISA-regulated Severance Plan. Marsh admits that the Severance Plan is an ERISA-regulated plan and that Gilman and McNenney were participants in the plan. (Dkt. No. 38, Defs' Answer at ¶¶ 14 and 88). Marsh also concedes that any administrative attempts by Gilman or McNenney to receive severance would have been futile at the time. (Burkhardt Dep. 248-249, 258-259). *See, e.g., Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993) (exhausting administrative remedies is not required where "pursuing available administrative remedies would be futile").

Marsh further concedes that the reason Gilman and McNenney were denied severance is that they were terminated for cause. (Burkhardt Dep. 247-249 and 258-259). In fact, employees terminated in November 2004 were deemed part of a reduction in force and received an enhanced severance. (Halter Decl. Ex. 5). Indeed, Gilman's own daughter engaged in identical

---

[10] There were no "abuses" to correct. (Dkt. #27 at 26 ("no wrongdoing occurred")). Regardless of the other reasons articulated by Cherkasky, evidence that the reasons defendants proffer in this litigation are false constitutes evidence of pretext and is sufficient evidence to find that the reason asserted by plaintiff is correct. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000); *Cabrera v. Jakabovitz*, 24 F.3d 372, 382 (2d Cir. 1994) ("the jury is entitled to infer, but need not infer, that [plaintiff's] burden has been met if they find that the [*prima facie* case] ha[s] been establihsed and they disbelieve the defendant's explanation.").

conduct as Plaintiffs when she refused to interview with the NYAG but Marsh paid her severance when she was terminated.  (Samantha Mohs Aff. ¶ 7).

Since Marsh cannot justify the terminations as for "cause" for the several independent reasons discussed above, this Court should conclude that both Plaintiffs are entitled to severance payments in an amount to be determined at trial.

### B.   Gilman and McNenney Are Entitled To the Equity And Stock Options That They Earned As Employees of Marsh

Marsh should pay Gilman and McNenney the equity and stock options that they earned as part of their compensation while employed at Marsh.  It is undisputed that the Stock Plans are contracts between Gilman and McNenney and Marsh.  (Dkt. No. 38, Defs' Answer at ¶ 138). According to the Stock Plans, when an employee is terminated by Marsh without cause or retires, all of their options and earned equity vest immediately.  (*See, e.g.*, Halter Decl. Ex. 3 at 2).  Here, Marsh forfeited all of Gilman and McNenney's options and equity instead of allowing them to vest.  (Burkhardt Dep. 118-122 and 142-149).

As discussed above, Gilman and McNenney were terminated without cause.  As such, Marsh's decision to deem the options and equity forfeited was a breach of contract.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court order partial summary judgment in favor of Plaintiffs with respect to Marsh's liability for breach of the Severance Plans and the Stock Plans and that the parties proceed to trial on the issue of damages resulting from Marsh's liability.

Dated: June 2, 2014
      New York, New York

                         LIDDLE & ROBINSON, L.L.P.

By: _____
                    Blaine H. Bortnick
                    Jeffrey L. Liddle
                    James W. Halter
              800 Third Avenue
              New York, New York 10022
              (212) 687-8500
              *Attorneys for Plaintiffs*