UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                                                         :

WILLIAM W. GILMAN and EDWARD J.      :
McNENNEY, JR.,
                                           Plaintiffs,    :         10-CV-8158 (JPO)

                          -v-                      :         <u>OPINION AND ORDER</u>

MARSH & MCLENNAN COMPANIES, INC., *et*:
*al.*,
                                          Defendants. :
-------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiffs William W. Gilman and Edward J. McNenney, Jr., bring this action against their former employers, Defendants Marsh & McLennan Companies, Inc., several of Marsh's subsidiaries (collectively "Marsh"), and Michael Cherkasky, Marsh's former CEO.  Plaintiffs claim that Marsh and Cherkasky wrongfully withheld severance pay and stock in violation of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and in breach of their stock contracts with Marsh.[1]  Plaintiffs and Defendants now move for summary judgment and Defendants move to strike an affidavit from Samantha Mohs, a Marsh employee.  For the reasons that follow, Defendants' motion for summary judgment is granted, Plaintiffs' motion for summary judgment is denied, and Defendants' motion to strike is denied.

**I.**        **Background**

      Gilman and McNenney worked at Marsh, a global insurance broker, for 28 and 14 years, respectively.  Both worked in the excess casualty insurance division and were regularly

---

[1] This Court has previously dismissed Plaintiffs' other claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 34.)  *See Gilman v. Marsh & McLennan Companies, Inc.*, 868 F. Supp. 2d 118, 122 (S.D.N.Y. 2012).

promoted throughout their careers. By the time they were terminated, in 2004, they were managing directors.

In early 2004, the New York Attorney General ("NYAG") began to investigate Marsh's contingent commission practices on the suspicion that they violated antitrust laws, securities laws, and other New York business regulations. Marsh began a simultaneous internal investigation. Gilman and McNenney cooperated fully in this internal investigation by speaking to Marsh's attorneys. The NYAG ultimately filed a civil complaint against Marsh. The complaint was eventually dismissed.[2]

Shortly after the filing of the complaint, during the week of October 18, 2004, Marsh suspended Gilman and McNenney, with pay. Around the same time, Marsh forced its CEO, Jeffrey Greenberg, to resign and replaced him with Cherkasky, a close personal friend of then-NYAG Eliot Spitzer. According to Gilman and McNenney, Marsh replaced Greenberg with Cherkasky as part of a deal with Spitzer to avoid criminal prosecution of the corporation. After taking office, Cherkasky met with Spitzer and agreed to waive Marsh's attorney-client privilege in exchange for avoiding criminal prosecution of the company. As part of this deal, Marsh turned over handwritten notes and typed summaries of Gilman and McNenney's meetings with Marsh's attorneys.

---

[2] Gilman and McNenney, citing Marsh's papers in support of its motion to dismiss, contend that Marsh conceded that the complaint was dismissed because "no wrongdoing occurred." (Dkt. No. 98, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ["Plaintiffs' Opposition"], at 4 (citing Dkt. No. 27, Defendants' Memorandum of Law in Support of Motion to Dismiss, at 26 ["Defendants' Memorandum"]).) Gilman and McNenney have taken this quotation out of context. Marsh wrote, in full: "Marsh had every incentive to defend its employees and seek to establish that no wrongdoing occurred." (Dkt. No. 27, at 26.) This sentence cannot plausibly be read as a concession that no wrongdoing, in fact, occurred.

On October 25, 2004, the NYAG published a press release announcing its agreement with Marsh. It stated that "the goals that would have been advanced by a criminal prosecution of the corporation . . . will be better accomplished by criminal prosecution of individuals." (Dkt. No. 93, Declaration of James Halter, Exhibit 14, at 235–38 ["Halter Declaration"].) According to Gilman and McNenney, Cherkasky knew that they would be prosecuted. In fact, the NYAG civil complaint named Gilman as a wrongdoer and mentioned McNenney as being involved.

In connection with the ongoing investigations, Marsh requested that Gilman and McNenney submit to interviews. McNenney contends that Marsh requested that he interview with the NYAG. Marsh contends that it requested that he interview with its attorneys. The parties agree that Marsh requested that Gilman interview only with Marsh's attorneys. After consulting with their personal attorneys, both Gilman and McNenney declined to be interviewed. Marsh fired McNenney on October 28, 2004. On November 1, 2004, Gilman attempted to retire by faxing paperwork to Marsh. Marsh refused his retirement and, instead, fired him for cause on November 2. Marsh said that the reason it fired Gilman and McNenney was because they refused to interview with its attorneys. Gilman and McNenney contend that they were scapegoats fired to appease the NYAG. In any event, Marsh denied them severance pay, stock options, and the stock bonus units and deferred stock units[3] they had already accrued.

Shortly after being fired, Gilman and McNenney were criminally indicted in New York Supreme Court. They went to trial on fraud, securities fraud, and antitrust charges. Justice James Yates tried the case without a jury and acquitted Gilman and McNenney of all charges except one. That conviction, however, was vacated after subsequent events revealed that the NYAG had violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Justice Yates

---

[3] McNenney does not claim that he was entitled to Deferred Stock Units.

concluded that had the prosecution disclosed the evidence in its possession, there was "not only a possibility, but a probability that its disclosure would have produced a different result." (Halter Declaration, Exhibit 21, at *19.)

## II. Discussion

Both parties move for summary judgment. Marsh moves for summary judgment on all issues in the case; and Gilman and McNenney move for summary judgment on the issue of whether Marsh terminated them for cause. Marsh has moved to strike Mohs's affidavit. Because the Court concludes that the affidavit does not affect the result, Marsh's motion to strike is denied as moot.

### A. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The initial burden of a movant on summary judgment is to provide evidence on each element of her claim or defense illustrating her entitlement to relief. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant meets this initial burden of production, the non-moving party must then identify specific facts demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(f). The court views all evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in its favor." *Anderson*, 447 U.S. at 250–51. A motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)

(citation omitted).  But the non-moving party cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587).

Because both parties have moved for summary judgment, the Court will take the facts in the light most favorable to Gilman and McNenney while evaluating Marsh's motion and then take the facts in the light most favorable to Marsh while evaluating Gilman and McNenney's motion.  If a genuine dispute of material fact exists as to any issue, summary judgment will be denied on that issue; if a genuine dispute of material fact does not exist as to any issue, summary judgment will be granted in favor of the party that prevails as a matter of law.

  B.  **Severance Pay**

The Marsh Severance Pay Plan (the "Severance Plan") is an ERISA-governed severance plan sponsored by Marsh USA Inc., one of Marsh's subsidiaries.  Marsh concedes that the plan is governed by ERISA and Gilman and McNenney concede that it complies with ERISA as written.  Gilman and McNenney claim only that they are owed money under the Severance Plan and move under ERISA § 502(a)(1)(B) "to recover benefits due to [them] under the terms of [their] plan . . . ."  29 U.S.C. § 1132(a)(1)(B).

A claim under ERISA § 502(a)(1)(B) is, in essence, a contract claim.  *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 142 (2d Cir. 1998), *abrogated on other grounds in Coan v. Kaufman*, 457 F.3d 250, 253 (2d Cir. 2006).  To prevail on a § 502(a)(1)(B) claim, Gilman and McNenney must show that they were eligible for benefits under the terms of the Severance Plan.  The Plan provides for payments upon termination of employment in certain circumstances only.  First, it restricts eligibility to employees who separate from Marsh under the following conditions:

>(i) the Company has determined, in its sole discretion, that the employee lacks the job skills required for the job even though the employee is diligently attempting to perform the essential functions of the job but is unable to do so through no fault of his/her own, or the employee has been separated from the Company through no fault of the employee as a result of a restructuring or downsizing program, closing of a facility, reorganization, or because the employee's position has been eliminated;
>
>(ii) the employee remains in his/her position in good standing, in the sole discretion of the Company, until the last day of employment with the Company as designated by the Company . . .; *and*
>
>(iii) the employee reconciles his/her expense account, returns any financial advances and company property, and repays any personal loans . . . .

(Dkt. No. 35, Declaration of Jonathan D. Polkes, Exhibit AAA, at 2 (emphasis added) [hereinafter "Polkes Declaration"].) Second, the Plan excludes individuals—as relevant here—who are fired "for cause" and goes on to non-exhaustively define "cause." (*Id.*)

The parties vigorously dispute whether Marsh fired Gilman and McNenney "for cause" or fired them merely to appease the NYAG. But even if Marsh did fire Gilman and McNenney solely for the purpose of appeasing the NYAG, Gilman and McNenney would not be entitled to severance pay under the Severance Plan. This is because they do not meet the requirements of subsection (i) above: they were not terminated as part of a downsizing, restructuring, or the closing of a facility; they were not determined to lack the skills to do their jobs; and their positions were not eliminated. Therefore, they are not entitled to severance pay.

Nonetheless, Gilman and McNenney claim that they are owed benefits for a few reasons. First, they obliquely claim that they can prevail merely "by establishing that they were not terminated for cause." (Plaintiffs' Opposition, at 18.) Second, they contend that they are entitled to benefits because, at the time they were fired, Marsh was undergoing a restructuring under which they could—and likely would—have been terminated with severance pay. Finally, they contend that they are entitled to benefits because the Severance Plan's administrator did not

5

make a contemporaneous judgment that they did not qualify for benefits.  Gilman and McNenney's first argument fails to address the plain language of the Severance Plan.  Under the Plan, they cannot prevail merely by showing that they were not terminated for cause.  Gilman and McNenney's second argument cannot succeed because, even if it were true that they likely would have been terminated through a restructuring, that fact does not render Gilman and McNenney eligible for severance pay under the plan because they were not in fact terminated as part of a restructuring.  Finally, their third argument fails because the only reason the plan administrator did not provide them with a written explanation for denying their claim is that they did not make a claim.  *See Madera v. Marsh USA, Inc.*, 426 F.3d 56, 62 (1st Cir. 2005) ("Since he never made a claim, there was nothing for Marsh to deny in writing . . . .").[4]  Marsh's motion for summary judgment on Gilman's and McNenney's claim for severance benefits is granted.

   C.   Stock

Gilman and McNenney received three types of incentive-based stock compensation from Marsh throughout their careers: stock options, stock bonus units, and deferred stock units.  These stock grants are governed by Delaware common law pursuant to a choice-of-law clause in the relevant contracts.[5]  To prove a breach of contract claim in Delaware, a plaintiff must show "the

---

[4] Gilman and McNenney contend that Marsh should not be allowed to rely on depositions created for this litigation in order to ascertain the plan administrator's reasons for denying the claim.  Even if it were true that this is a less-than-ideal way to ascertain the administrator's reasons, Marsh can hardly be blamed for it.  Because Gilman and McNenney never filed a claim, the administrator never had the opportunity to issue her reasons.

[5] Marsh, in its Rule 56.1 statement of facts, contends that the stock contracts are governed by Delaware law.  (Dkt. No. 90, ¶ 148.)  Gilman and McNenney admit that this is correct.  (Dkt. No. 90, Plaintiffs' Rule 56.1 Counter Statement ¶ 148.)  Marsh repeats this claim in its Memorandum of Law in Support of Summary Judgment.  (Defendants' Memorandum, at 21 n.12.)  And yet, elsewhere in the same Memorandum, Marsh argues that Gilman's and McNenney's claims should be dismissed because *New York* law does not recognize a separate claim for breach of the implied covenant of good faith and fair dealing.  (*Id.* at 25.)  Gilman and McNenney also cite New York law when discussing their good faith and fair dealing claim.  (Plaintiffs'

existence of the contract, whether express or implied; . . . the breach of an obligation imposed by that contract; and . . . resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Marsh contends that Gilman and McNenney forfeited all three classes of stock grants when they were fired for cause and, therefore, that it did not breach the contract.[6] Gilman and McNenney contend that they were not fired for cause and that Marsh therefore breached the contract when it caused them to forfeit their equity.

Each stock contract is governed by different terms. The stock option grants provide that the stock options are forfeited if the employee is terminated for *any* reason other than death, disability, or certain classes of retirement. (*See* Polkes Declaration, Exhibits LLL-WWW.) But the stock bonus unit and deferred stock unit grants allow employees to keep their equity if they are fired "without cause." (*Id.*, Exhibits SSS-TTT, XXX.) Each of these grants will be addressed separately.

As a preliminary matter, Marsh contends that the Court should review Marsh's decision not to honor Gilman's and McNenney's equity under a "deferential" standard of review. In support of that contention, Marsh cites *W.R. Berkley Corp. v. Hall*, No. CIV.A. 03C-12-146WCC, 2005 WL 406348, at *3 (Del. Super. Feb. 16, 2005). In that case, the stock option

---

Memorandum in Opposition, at 25-6.) Despite these citations, the parties now agree that Delaware law governs these claims. (Dkt. No. 118, Plaintiffs' Supplemental Letter Brief, at 1.)

[6] Marsh also argues that Gilman and McNenney cannot show damages—a requirement of a breach of contract claim—because their options were out of the money on the date of the alleged breach. An option is out of the money when the price at which the option holder can purchase the stock (the strike price) is higher than the market value of that stock. But the value of an out-of-the-money option is not zero merely because it is out of the money. Many methods exist for valuing out-of-the-money options. Nonetheless, Marsh cites *Hermanowski v. Acton Corp.*, 729 F.2d 921, 922 (2d Cir. 1984), for the proposition that damages are always measured by subtracting the strike price from the stock price at the time of the breach—a measure that would result in zero damages in this case. But in *Hermanowski*, the date of the breach was also the date on which the plaintiff tried to exercise his options. Marsh's argument is meritless.

contract "expressly limited the scope of inquiry into the [Stock Option] Committee's determinations . . . ." In fact, all of the cases on which *Berkley*—and therefore Marsh—rely, employ a deferential standard of review only if the governing contract requires one. *Id.* (citing *Maher v. N.E.C.A. - Local Union No. 313 I.B.E.W. Pension Trust Fund*, No. CIV.A. 5026 (1976), 1978 WL 4954, at *2 (Del. Ch. May 30, 1978) (unpublished) ("such *grants* of discretionary authority" are enforceable) (emphasis added); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984) ("*if* one party is given discretion") (emphasis added); *McIntyre v. Philadelphia Suburban Corp.*, 90 F. Supp. 2d 596, 597 (E.D. Pa. 2000) (giving deference where the stock contract provided that "the Committee shall be authorized to interpret the plan"); *Weir v. Anaconda Co.*, 773 F.2d 1073, 1076 (10th Cir. 1985) ("of which the Committee shall be the sole judge").) To the extent Marsh is arguing that, as a general matter, Delaware law requires courts to give deference to companies' decisions not to make payments under binding contracts, Marsh's argument is without merit. Nonetheless, the contracts provide that "[a]ll decisions of the Committee upon any questions arising under the Plan or under these terms and conditions shall be conclusive and binding." (*E.g.*, Halter Declaration, Exhibit 3, at 4.) Therefore, if the decision to deny Gilman and McNenney equity qualifies as a "decision[] of the Committee," this Court should review it for an abuse of discretion only.

      Gilman and McNenney contend that there was no "decision[]" within the meaning of the contract because the "Committee" is defined by the contract to "mean[] the Compensation Committee of the Board, or such other Board committee as may be designated by the Board to administer the Plan. The Committee shall consist solely of two or more directors of the Company." (*Id.*, Ex. 2 at MMC0000170.) The decision not to give Gilman and McNenney equity under the contracts was concededly not made by any directors of Marsh. Marsh, despite being given the opportunity specifically to brief and argue this issue, does not offer any reason

8

why this decision should be considered a "decision[] of the committee." (*Id.*, Ex. 3, at 4.) Therefore, this Court will review Gilman's and McNenney's claims under the stock plans without deference.

1.  **Options**

Under the stock option grant contract, "[a]ll option shares will cease to be exercisable on the date of termination due to termination for *any other reason* than specified above, except to the extent that the Committee may determine otherwise." (*Id.*, Exhibit LLL, at 5 (emphasis added).)  The reasons "specified above" include death, retirement, early retirement, and permanent disability.  McNenney does not contend that he died, retired, or became disabled.  Instead, he contends that Marsh violated the implied covenant of good faith and fair dealing.  Gilman contends both that Marsh violated the implied covenant of good faith and fair dealing and that he retired.  The Court addresses Gilman's contention first; McNenney's argument is addressed below.

The first question is whether a reasonable jury could conclude that Marsh breached its contractual obligations to Gilman when it refused to accept his retirement and, instead, purported to fire him for cause.  Gilman argues that his retirement became effective the moment he sent the fax to Marsh declaring that he was retiring.[7]  He sent that fax on November 1, 2014.  Marsh fired

---

[7] Marsh contends that Gilman cannot make this argument because it conflicts with his argument that he was terminated without cause.  If he retired, Marsh notes, Gilman would not be entitled to severance pay.  Gilman responds that it is permissible for him to argue in the alternative here. Marsh contends that he must pick a theory of his case for purposes of summary judgment. Marsh's argument is unavailing because, although a party may no longer maintain "inconsistent factual positions" at summary judgment, that is not what Gilman is doing here. *Palandjian v. Pahlavi*, 614 F. Supp. 1569, 1579 (D. Mass. 1985).  Gilman is consistent on his version of the facts; he instead argues that either of two permissible legal conclusions may flow from those facts.

9

him on November 2, 2014.  Therefore, if the fax was sufficient to render his retirement effective, Gilman was entitled to his stock options and Marsh breached the contract.

Marsh first argues that Gilman has failed to offer any evidence that his retirement was effective.  It argues that Gilman "does not even attempt to establish that his retirement was effective" and contends that "Gilman must present admissible evidence establishing that he effectively retired."  (Dkt. No. 116, Defendants' Reply Memorandum of Law in Support of its Motion for Summary Judgment, at 9 (internal quotation marks omitted) ["Defendants' Reply"].)  But the undisputed evidence shows that Gilman sent Marsh a fax saying that he was retiring.  The issue is not whether there is *evidence* that Gilman retired; the issue is whether, as a matter of law, Gilman's fax constituted an effective retirement within the meaning of the stock plans.  On this score, Marsh contends that Gilman's retirement cannot be effective because at the time he sent the fax he was already in breach of his fiduciary obligations to Marsh and was eligible to be fired for cause.  (Dkt. No. 112, Marsh's Supplemental Brief, at 11.)

The parties have been unable to identify a document that defines when a purported retirement at Marsh is effective.  Marsh has introduced its employee manual, which describes the procedures for retirement.  (*See* Polkes Declaration, Exhibit EEE, at iii.)  Gilman and McNenney have introduced a copy of the Marsh Employee Benefits Handbook, which has a page on "How to File for Retirement Benefits."  (*See* Halter Declaration, Exhibit 1, at G-13.)  This page reads: "About four months before [an employee] wants to retire, [he] should write to [his] Personnel Representative" and include in the letter his desired retirement date and some personal identifying information.  (*Id.*)  Gilman did not write to his personnel representative four months before his desired retirement date.  But that does not appear to be a requirement for effective retirement.  Indeed, it would be quite odd if an employee forfeited a career's worth of accrued equity merely because he failed to write to his personnel representative "[a]bout four months"

10

before retiring.  (*Id.*)  The handbook says only that he "should" do that, not that he must.  (*Id.*)  None of the available sources—the stock contracts, the handbook, or the benefits handbook—comprehensively defines "retirement."  Therefore, the Court, in interpreting the stock contracts, must give that term its ordinary meaning under Delaware law.

Delaware law does not appear to offer a definition of "retirement" that would cover this case.  In *Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 473 (8th Cir. 2012), for example, the Eighth Circuit, interpreting Delaware law, concluded that the term "retirement" was ambiguous and, therefore, resolved a dispute as to the meaning of that term against the drafter of the relevant contract.  "Retirement," the court noted, "can mean either ceasing all work or simply 'withdrawing permanently from one's usual sphere of activity.'"  *Id.* (quoting OXFORD ENGLISH DICTIONARY ONLINE (December 2011), http://oed.com/view/Entry/164330 (January 27, 2012); BLACK'S LAW DICTIONARY 1342 (9th ed. 2009) (defining "retirement" as "[v]oluntary termination of one's own employment or career, esp. upon reaching a certain age.")).  Under this definition, Gilman's retirement would be effective.

But this Court is charged with predicting what the Delaware Supreme Court would do if faced with this precise question.  *E.g.*, *MindGames, Inc. v. Western Pub. Co.*, 218 F.3d 652, 655–56 (7th Cir. 2000) (Posner, J.) ("The rule is that in a case in federal court in which state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case, and decide it the same way.").  And it is hard to imagine that Delaware would interpret this contract such that Gilman could preempt being fired for cause—assuming, as will be discussed below, that there was cause to fire him—merely by sending a fax before he received his notice of termination.  Such an interpretation would render the "cause" provision of the contract nugatory—as long as the employee knows in advance that he is about to be fired, he can retire and keep his benefits.  Parties may agree that, regardless of the circumstances, an employee

11

will keep his equity once he reaches a certain age if he chooses to retire. But where that is the case, one would not expect them to include a provision divesting the employee of benefits when he is fired "for cause." That the contract at issue in this case denies Gilman equity if he is fired for cause strongly suggests that "retire" does not encompass merely saying "I retire" in the face of a for-cause firing. Similarly, it is extremely unlikely that the parties intended to create a regime under which the dispositive fact is *when* an employee sent a fax. Gilman's retirement, therefore, was effective if and only if Marsh did not have "cause" to fire him under the contract.

This interpretation can, of course, raise some difficult factual questions in other circumstances. What about the employee who had been planning to retire anyway but who is eligible to be fired for cause at the moment he sends in the paperwork? In that circumstance, a court would have to resolve the thorny question whether intent controls and how that intent is to be determined. But those questions are not presented here. Here, it is clear that Gilman sent in his retirement paperwork in response to the request that he submit to an interview, and having decided that he would not submit to an interview. If that refusal gave Marsh cause to fire him, then his retirement was not effective.

McNenney is in a different position. He did not retire. Instead, he argues that Marsh fired him without cause and, therefore, he is entitled to his stock options. Under the plain terms of the contract, this argument cannot succeed. (*E.g.*, Polkes Declaration, Exhibit LLL.) Therefore, McNenney can survive summary judgment only if he can show that Marsh breached the implied covenant of good faith and fair dealing. That issue is discussed below.

    **2. Bonus Units and Deferred Units**

Under the contracts governing the grants of Bonus Units and Deferred Units, Gilman and McNenney are entitled to keep their equity if they were terminated "by the company without

12

cause." (Polkes Declaration, Exhibit SSS and TTT, at 2.)[8]  The question, then, is whether a reasonable juror could conclude that they were fired without cause.  Marsh contends that it fired Gilman and McNenny because their "refusal to cooperate in Marsh's investigation constituted 'cause' under multiple prongs of the definition of 'cause' in the plans."  (Defendant's Reply Memorandum of Law, at 8.)  Plaintiffs do not dispute that Marsh asked them to submit to interviews during the investigation and that they refused to do so.  Instead, they argue that (1) Marsh "manufactured" the cause to terminate them; (2) the purported cause was not the real reason for their termination; and (3) it was unreasonable to ask that they submit to interviews and, therefore, they were not fired for "cause" within the meaning of the contracts.

Gilman and McNenney's first argument is unavailing because no reasonable juror could conclude that Marsh did not, in reality, want to interview Gilman and McNenney in connection with the NYAG investigation.  The undisputed evidence shows that Marsh was actively under investigation by the NYAG and that, at the very least, Marsh had an obligation to try to find out what Gilman and McNenney knew about the charged wrongdoing.  Even if the jury were to conclude that Marsh wanted to fire Gilman and McNenney for reasons other than their refusal to submit to interviews, the jury could not reasonably conclude that Marsh did not actually want to interview them.

Gilman and McNenney's second argument is unavailing because, although Marsh's subjective intention when it fired them might be relevant to the reasonableness of Marsh's conduct—discussed below—its subjective intention is not dispositive of the issue of whether Gilman and McNenney could be fired for cause.  Even if the jury were to conclude that Marsh

---

[8] These contracts also allow Gilman to keep his equity if his retirement was effective.  Because Gilman's retirement was not effective if and only if he was fired for cause, the issue of his retirement is resolved by the issue of whether he was fired for cause.

actually wanted to fire Gilman and McNenney in order to appease the NYAG, it would still be required to conclude that Marsh actually wanted to interview them, that Marsh asked them to submit to interviews, and that they refused.  Similarly, the mere fact that other employees who may or may not have been involved in the alleged wrongdoing—namely, Gilman's daughter, Samatha Mohs—were treated differently is insufficient to show that Marsh did not have cause to fire Gilman and McNenney.  The only question, then, is whether Marsh's request that they submit to interviews was reasonable in this context.

Marsh contends that Gilman and McNenney were eligible to be terminated for cause under several prongs of the definition of "cause" in the contracts.  Marsh argues that they were eligible to be terminated because their failure to interview constituted (1) "willful misconduct in the performance of [their] duties"; (2) "refusal to perform the[ir] duties"; (3) "violation of an important policy of the Company"; and (4) activity that would bring substantial discredit to the company.  (*Id.*)  Marsh concedes that each of these theories requires that Marsh's request that Gilman and McNenney submit to interviews was reasonable.  (*E.g.*, Defendants' Memorandum, at 17 n.10 (citing *Reilly v. Polychrome Corp.*, 872 F. Supp. 1265, 1268 (S.D.N.Y. 1995) ("[A]n employee's refusal to obey 'strikes at the very heart of the contractual relationship existing between an employee and his employer' . . . . The obligation to obey all reasonable instructions of the employer is a 'fundamental duty' of the employee[.]") (citations omitted)).)  Indeed, Delaware law interprets the phrase "cause" to hold that an employee's "expected standard of conduct require[s] that [he] obey a direct, unequivocal, *reasonable* order of the employer." *Unemployment Ins. Appeal Bd. v. Martin*, 431 A.2d 1265, 1268 (Del. 1981) (emphasis added).  Marsh argues that, as a general matter, an employee has a duty to divulge information to his employer even where that information may be incriminating.  (*See* Dkt. No. 101, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, at 21.)  This is

14

certainly true.  But there must be a limit to this principle.  An employer cannot ask an employee to do something unreasonable and then fire the employee *for cause* when she fails to do it.

But in this context it is clear that, even taking the facts in the light most favorable to Gilman and McNenney, Marsh's request was reasonable.  The jury could permissibly conclude that Marsh's cooperation with the NYAG gave Marsh a motive to blame Gilman and McNenney for the alleged wrongdoing and to fire them as a result.  But it could not conclude that the request to interview them was unreasonable.  When a corporation is under investigation, it is standard operating procedure for the corporation at least to *ask* that its employees who might have information about the wrongdoing submit to interviews with company lawyers.  Indeed, even if Marsh asked McNenney to submit to interviews with the NYAG's office—a fact that the parties dispute—that request was reasonable as a matter of law.  To assure that the corporation cooperated, Marsh needed to assure that its employees cooperated as well.  *See, e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1076–77 (Del. Ch. 2004) (Strine, V.C.).  There is, indeed, a limit to what corporations can ask employees to do in the context of government investigations.  But this case is far from that limit.

### 3. Good Faith and Fair Dealing

Gilman and McNenney argue that Marsh breached the implied covenant of good faith and fair dealing because their failure to interview was not Marsh's real reason for firing them.  Instead, Gilman and McNenney contend, Marsh fired them to appease the NYAG.

In Delaware, whose law governs the stock contracts, every contract is subject to the implied covenant of good faith and fair dealing.  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).  Despite its ancient provenance, the term "good faith" does not have a precise meaning under Delaware law.  *Id.*  Instead, "[t]he covenant is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments

15

or to fill gaps in the contract's provisions." *Id.* (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996); citing *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. 1994).) Nonetheless, the covenant ought not to free parties from the terms of contracts to which they have agreed. "[I]mplied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document." *Id.* (internal citations, quotations, and alterations omitted). Basically, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain. *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985), *superseded by statute on other grounds as recognized in DiSabatino v. Salicete*, 695 A.2d 1118 (Del. 1997).

A reasonable jury could not conclude that Marsh engaged in unreasonable conduct that had the effect of preventing Gilman and McNenney from receiving the fruits of the stock option agreement. *See id.* The parties, when they signed the stock agreement, did not agree that the fruits of the agreement would include Gilman and McNenney's keeping their equity when they were fired for any reason other than the reasons stated in the contract. And a reasonable jury could not conclude that Marsh unreasonably prevented Gilman and McNenney from realizing the benefits of the stock bonus unit and deferred stock unit contracts for the same reason that it could not conclude that Marsh unreasonably requested that they submit to interviews. The two inquiries, in this context, are more or less identical.

### 4. Quasi Contract

Finally, Gilman and McNenney argue that they are entitled to equity under a quasi-contract theory. Their argument is premised on the possibility that the Court would hold the stock contracts invalid or unenforceable. (Plaintiffs' Memorandum, at 27-8.) The stock

contracts are valid and enforceable. Therefore, Marsh's motion for summary judgment on Gilman and McNenney's quasi contract claim is granted.

### III. Conclusion

For the foregoing reasons, Marsh's motion for summary judgment is GRANTED and Gilman and McNenney's motion for summary judgment is DENIED. Marsh's motion to strike the affidavit of Samatha Mohs is DENIED.

The Clerk of the Court is directed to close the motions at docket numbers 84, 88, and 104, and to close the case.

SO ORDERED.

Dated: January 26, 2015
       New York, New York

_____
J. PAUL OETKEN
United States District Judge